IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE DUFRESNE SPENCER GROUP, LLC, et al., ) Volume III
)
Plaintiffs, ) C.A. No. 21-1875-JLH
)
v. )
)
HAN NARA ENTERPRISES, et al., )
)
Defendants. )

Wednesday, June 12, 2024
8:30 a.m.
Courtroom 6D

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE JENNIFER L. HALL
United States District Court Judge

APPEARANCES:

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
BY: SAMANTHA WILSON, ESQ.
BY: COLIN KEITH, ESQ.

-and-

MUNSCH, HARDT, KOPF & HARR, P.C.
BY: HUMA ALI, ESQ.
BY: GREG C. NOSCHESE, ESQ.

Counsel for the Plaintiff

APPEARANCES CONTINUED:

FISH & RICHARDSON, P.C.
BY: JEREMY D. ANDERSON, ESQ.
BY: RYAN McKAY, ESQ.
BY: BRET WINTERLE, ESQ.
BY: SARIKA PATEL, ESQ.

Counsel for the Defendant

----------------------------

08:36:08 COURT CLERK: All rise.

08:36:14 THE COURT: Please be seated. Good morning, everyone. All right.

08:36:20 Are we ready to proceed?

08:36:21 MS. ALI: Oh, we have an issue that we want to address, Your Honor.

08:36:24 THE COURT: Okay. Sure.

08:36:25 MS. ALI: So last night, we received a PowerPoint for Michael Martinez, it appears to be an expert -- some type of expert demonstrative, and, Your Honor, on December 22nd, 2023, Mr. Martinez was disclosed as an expert. He had an 11-page disclosure. I have it right here. What's in his PowerPoint is not in here.

08:36:50 We asked opposing counsel as soon as they designated him as an expert if we could take his deposition because he had been previously deposed as a fact witness. I

took his deposition, you're saying he's an expert, he talked to your experts. I need to talk to him so I can be prepared to try my case.

They said no, they said we're going to withdraw his designation. I was like I still need it because he talked to your experts, they formed opinions based on his representations; I need to talk to him. The parties were before the Court and Your Honor said we could take his deposition.

At that time, you limited the conversations that Mr. Martinez had with the experts because we didn't know what his status was. During the deposition, it became clear that he was going to be an expert, so I -- and before his deposition, to prepare, I said, will you give me the notes that he used in his -- the notes referenced in his disclosure. They said, No, what's your basis? I asked for those notes on February 12th, I asked for them again on February 27th. They didn't provide it. In my letter brief, I had a footnote about it.

During his deposition, I said, Mr. Martinez, you said you did a thousand dollar- -- I mean, you reviewed these -- you reviewed Exhibit C, which was our former analysis for a hundred hours. What did you do, where are your documents? He told me he highlighted a spreadsheet. I said, Would you provide that to me. Counsel objected. He

said he can't answer that question.

Counsel objected to every question I asked, unless it specifically was, Did you talk to your expert about this?

And now we see this expert PowerPoint slide? It's unfairly prejudicial. I've asked numerous times for it. We have complied with the Court's rules. We have complied with our obligations of disclosures. We ask that none of this come in, because I've asked, it hasn't been provided. I don't know what this is. And to the extent they're trying to say this is Exhibit C, he didn't provide that either, and this is not Exhibit C. This is something more. It's way past the disclosure schedule.

THE COURT: Okay. All right. Let me hear from Mr. Winterle. Are you going to try to introduce these demonstratives into evidence?

MR. WINTERLE: No, we're not, Your Honor. These are just illustrative things to help the examination during court today.

THE COURT: Okay.

MR. WINTERLE: Most of the material in there is evidence that has already been admitted by the plaintiffs in this case. So unless -- I mean, I'm happy to refute many of the things that were said, but it's not necessary and I'm happy to move on.

THE COURT: Well, I'm interested about time. Here's how I think we should proceed and then I'll hear from both sides. How I think we should proceed is that the demonstratives are not going to be introduced into evidence. So if defendants want to use a demonstrative with their expert, that's fine.

To the extent there's an additional objection or to the extent that plaintiffs' objection has to do with the content of Mr. Martinez's testimony, which I think it does, and I'm seeing Counsel nodding that it does, I guess here's the way that I'm seeing this. Plaintiff hired a forensic accountant to testify to try to recreate what the data was in the system, because plaintiffs' didn't have a witness with personal knowledge that could tell us about the data in the system, and they wanted an expert to take an unbiased look at it.

The data was introduced by plaintiffs' as a business record, and now, to the extent we're going to have the actual accountant that has personal knowledge of what some of these entries are, or at least how the data was kept, I'm okay hearing about that.

If it crosses into the line of expert testimony, we'll hear a contemporaneous objection from plaintiffs' and then we'll deal with it, or we won't, but that is how I think we should proceed.

Does anybody have any questions about that?

MR. WINTERLE: I do. Just one procedural question, I guess, from our side. Mr. Anderson will be presenting Mr. Martinez. If we do have an objection like that, just like an exception to the "one riot, one ranger" rule, I can handle the decision.

THE COURT: That's fine.

Go ahead.

MS. ALI: Your Honor, may we recall Mr. Fahlman, if necessary?

THE COURT: I'm not going to rule that out, but I'm not going to rule on that now because I don't really know what's about to happen. So let's see how it plays out.

MS. ALI: Thank you.

THE COURT: I'm not going to say you can't, but I'm not going to say you can at this point either. Okay?

All right. Let's proceed.

MR. ANDERSON: Thank you, Your Honor. Good morning. We call Michael Martinez to the stand.

COURT CLERK: Please remain standing, and raise your hand. Please state and spell your name for the record.

THE WITNESS: Michael Martinez, M-I-C-H-A-E-L, M-A-R-T-I-N-E-Z.

MICHAEL MARTINEZ, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ANDERSON:
Q. Good morning, Mr. Martinez.
A. Good morning.
Q. Could you please introduce yourself to the Court?
A. I'm Michael Martinez.
Q. Let's talk about your educational background. Did you go to college?
A. Yes, sir.
Q. Where did you go?
A. Texas Tech University.
Q. Did you receive a degree from Texas Tech University?
A. I did.
Q. What did you get your degree in?
A. Business, in a bachelor's in administration and accounting.
Q. Did you go to any more college after receiving that business degree?
A. I did not.
Q. So you don't have a postgraduate degree?
A. I do not.
Q. What was your first job out of college?
A. I worked for a local communications company called Stenocall as their controller.
Q. What were your responsibilities as a controller at

Stenocall?
A. It was their financials, with their income statement, their balance sheet, their payroll and payables.
Q. How long were you there?
A. I was there for about a year.
Q. What was your next job after Stenocall?
A. I went to work for Han Nara Enterprise and I was their controller CFO for 13 years.
Q. Do you recall exactly when you started with Han Nara?
A. It was April of 2008.
Q. So you started in April of 2008 as the controller?
A. Yes.
Q. Did your responsibilities change at any point?
A. They did when I became CFO.
Q. Do you recall when you became CFO?
A. I believe it was sometime around 2018.
Q. And from becoming the CFO after being a controller, how did your responsibilities change?
A. It was more involved with the operations side, the front-end sales, marketing, advertising, the back-end logistics, and just not preliminarily focusing on financials.
Q. Were you the head of the Accounting Department at Han Nara as a CFO?
A. I was.

Q. Did you supervise anybody?
A. I did.
Q. How many people did you supervise?
A. It varied from about 3 to 4 individuals.
Q. And what were their titles, the people that were under you?
A. We had a junior accountant, an accounts payable, a payroll HR clerk and an accounts receivable.
Q. Did your role change after DSG acquired Han Nara?
A. It did.
Q. Did you become a DSG employee?
A. I did.
Q. Did you start reporting to people at DSG?
A. I did.
Q. Do you recall who you reported to?
A. Yes, there was Mike Linton, Dawn, Justine and Fedeliz.
Q. Who is Mike Linton?
A. I believe he is the CFO of DSG.
Q. Are you employed today?
A. I'm self-employed.
Q. What do you do?
A. I'm a Realtor.
Q. Let's switch gears now and talk about Profits. What is Profits?

08:45:24 A. It is a business management software.
08:45:29 Q. And what are some of the capabilities and functionalities of Profits?
08:45:34 A. It is an integrated system that has your point of sale, your accounting and logistics, inventory.
08:45:47 Q. Can you tell the Court, describe to the Court what are some of the accounting functions in Profits, what does it do?
08:45:53 A. Yeah, so it included compiling of the financials. So they would have your general ledger, your subledgers, your income statements, your balance sheets.
08:46:07 Q. AR subledger?
08:46:09 A. Yeah, AR subledgers included in the subledgers.
08:46:13 Q. What does the AR subledger do? How does that connect with the general ledger?
08:46:20 A. That's the detail to the general ledger.
08:46:23 Q. What is your experience with Profits?
08:46:26 A. I worked in Profits for 13 years on a daily basis.
08:46:32 Q. Did you receive any formal training on Profits?
08:46:35 A. I did.
08:46:36 Q. Can you explain to the Court what kind of training you received?
08:46:40 A. The prior controller trained me. I contacted the software design -- or creator, the software creator directly, got training, and then we also had a manual that

was provided.
Q. So anything else as far as formal training?
A. Those were -- just those three.
Q. Did anybody at Han Nara know Profits better than you?
A. No.
Q. Looking around the courtroom today, does anybody here in the courtroom know Profits better than you?
A. No.

MR. ANDERSON: Your Honor, we moved, back in December, as was discussed, we designated Mr. Martinez as an expert in Profits under Rule 26(a)(2)(c) and we move now to qualify him as an expert in Profits.

THE COURT: Okay. Counsel?

MS. ALI: Objection.

THE COURT: Okay. Did I hear opposing counsel say that you had withdrawn your designation of Mr. Martinez as an expert?

MR. ANDERSON: So, Your Honor, if I may?

THE COURT: Yes.

MR. ANDERSON: We did not withdraw him. So we offered to withdraw him when they moved to depose him the second time. So as you recall --

THE COURT: Here's what I will say: I don't recall anything. Just so everybody knows, it is very helpful when you let me know how I ruled before, because

this is one of 400 cases that I have.

MR. ANDERSON: Sure.

THE COURT: So a lot of water has passed under the bridge since that time.

MR. ANDERSON: Let me walk you through sort of what happened. So back in December when we were submitting expert reports, we asked for a little bit of extra time. You granted us a little bit of extra time to submit our expert reports. And during that time, we submitted -- that was in December -- an expert disclosure for Mr. Martinez under Rule 26(a)(2)(c).

In January, the plaintiffs' came to us and said, "Since you've disclosed him as an expert, we'd like to depose him again."

And we talked with Mr. Martinez and we thought to ourselves after doing a little bit of strategy, we'd rather not have him deposed again so we'll withdraw that.

They went forward anyway, they brought a motion. We said, "We'll withdraw him as an expert as long as you don't depose him again."

THE COURT: Do you have that document or is that oral conversations?

MR. ANDERSON: This is all on the Court record.

MS. ALI: Your Honor, there's letter briefs to the Court. I believe my letter was 154, docket 154, so it

should be around there. They withdrew it when they drafted their letter brief, but -- I think it's around February 27th, my letter was on February 24th.

THE COURT: Okay. So I'm going to look at those letters and there's going to be a discussion about Mr. Martinez getting withdrawn or an offer to the extent he won't be deposed or something like that.

MR. ANDERSON: There was a suggestion that we would withdraw that if they chose not to depose him.

They said, "No, we did letter briefing."

Your Honor said, "You get to depose him again."

But before that, we said, "If you take this to the Court, we're withdrawing that offer."

THE COURT: Okay. Do you have that in an e-mail?

MR. ANDERSON: I'm sure we do.

THE COURT: Okay.

MR. ANDERSON: Yes, February 27th, 2024 at 4:41 p.m., we sent them an e-mail stating this very thing.

THE COURT: Okay. All right. Why don't you forward that right now to the Court's civil e-mail address.

All right. Keep going.

MR. ANDERSON: So we -- they said, "We're going forward with the deposition." We said fine, "Then we're withdrawing our offer to -- we're still going to go forward

with our designations as a 26(a)(2)(c) witness."

THE COURT: Okay. Mr. Winterle, make sure you CC opposing counsel and I need that e-mail for the Court as well.

MR. WINTERLE: Yes.

MR. ANDERSON: So then I would have proceeded. If they took his deposition, we would have said, "Fine, we're keeping our designation."

THE COURT: All right. Let me hear from Ms. Ali.

MS. ALI: Sure.

Your Honor, this is a letter dated February 26th, 2024 --

(Reporter interruption.)

MS. ALI: Let me start over.

So on February 26th, 2024, defendants sent a letter to the Court and in their letter, they say, "Defendants withdrew Martinez's designation under Rule 26(a)(2)(c) and represented to plaintiffs and defendants -- to plaintiffs that defendants' will not present opinions from Martinez at trial; and three, experts did not rely on Martinez's opinions."

So they sent a letter, the Court granted my deposition request, but it was restricted to asking Mr. Martinez about questions related to his conversations

with defendants' experts, I did not get to ask him about his expert opinions, because of the court's order.

THE COURT: All right. Can you send the deposition transcript to the Court's civil e-mail address and CC opposing counsel.

MS. ALI: Sure. Thank you, Your Honor.

MR. ANDERSON: Your Honor, that is absolutely not correct. They were only allowed to depose him about what was said in the expert disclosure. And so they had the expert disclosure and that's all they were allowed to talk about with him in his second deposition.

THE COURT: So they had in their hands, the expert disclosure at the deposition and were asking Mr. Martinez about it?

MR. ANDERSON: That was the bounds of it.

THE COURT: Is that the case?

MS. ALI: Your Honor, I did get to ask him but it was only -- it was specifically related to his conversations about the disclosure with defendants' experts.

So to the extent, I did -- and he did say, he's like, "Yeah, I may testify at trial."

And I said, "What are you going to testify about?"

Counsel objected.

So then I said, "What did you talk to Dr. Starr

about?"

And then they wouldn't let me proceed.

I go, "Did you tell Dr. Starr you did a hundred hours of work?

So the only topics I got to ask questions about were Martinez's conversations with defendants' experts.

THE COURT: Okay. So what I see is getting set up here, what I think is happening, is Mr. Martinez is going to testify about some evidence that was in his disclosure and then defendants' expert is going to rely on that in his testimony.

So what is unfair about that? What did you want to ask him that you didn't get to ask him?

MS. ALI: Your Honor, I wanted to ask him about his expert opinions, not necessarily what he just told the experts, his expert opinions about Profits and how he formed those bases and what he did.

THE COURT: But you had his disclosure for that.

MS. ALI: Yes, Your Honor.

THE COURT: And you didn't get to ask him for that?

MS. ALI: I didn't get to fully ask him those questions.

THE COURT: All right. Is there any other documents that any of the parties think that I need to sit

here and review up on the bench and make a determination on this or are we ready for me to take this under advisement and we'll sit and work it out?

MR. ANDERSON: I think we're ready to take under advisement. The fact is, we gave this to them in December. They took his deposition in February. The evidence was essentially limited, the very thing we said we're disclosing, which is the 26(a)(2) statement, so that's what they deposed him about.

THE COURT: Okay. Ms. Ali, anything else I need to read?

MS. ALI: I have the e-mails but, Your Honor, if you have the -- I can give you the timeline.

THE COURT: Why don't you send the e-mails and we'll sit down and read them.

Mr. Martinez, you can step down for right now. We'll sit here and get this worked out.

MR. ANDERSON: Your Honor?

THE COURT: Yes.

MR. ANDERSON: Your oral ruling is DI 156.

THE COURT: Thank you.

Ms. Ali, was there any portion of the expert disclosure that you asked about or wanted to ask about that you feel you didn't get to ask about?

MS. ALI: Well, Your Honor, it's more that the

expert disclosure related to Exhibit C, which was our old damage model, we hired experts. His PowerPoint and -- it appears that his expert testimony today is going to be related to what my experts did. My experts didn't have time to review it, they didn't have the time to, you know, include it in any kind of report because he didn't provide that analysis, he was only speaking to Exhibit C in his disclosure.

THE COURT: Okay. So I had originally understood this to be an issue about whether or not we're going to let him be an expert, but now I'm hearing it is an issue that even if he is an expert, he is going to say stuff that isn't in his expert disclosure. Is that what you're saying?

MS. ALI: Yes. I'm sorry if I wasn't clear.

MR. WINTERLE: May I read two paragraphs -- I'll read two paragraphs of that disclosure that the defendants' made into the record.

Paragraph 11: "Because plaintiffs have almost no experience with Profit, no employees who, quote, 'really understood it' and no measurable expertise to speak of, plaintiffs and their proffered experts, generation, preparation, reliance upon and analysis of reports" --

(Reporter clarification.)

MR. WINTERLE: -- "experts, generation,

preparation, reliance upon and analysis of reports, spreadsheets and, quote, 'underlying sales and receivables data,' end quote, allegedly, quote, 'obtained from,' quote, 'Profit' --

(Reporter clarification.)

MR. WINTERLE: "Allegedly," and then I have "obtained from," end quotes, "Profits."

"In addition to the faulty data contained in the reports and spreadsheets themselves, is unreliable." That was paragraph 11.

And then paragraph 23 of his disclosure says: "However, the underlying data that Mr. Fahlman relied upon -- relied on in his report fares no better than the information they discarded within Exhibit C.

The data tables, DSG 520733 and DSG 520734, relied upon by plaintiffs' proffered experts, which plaintiffs claim were, quote, 'obtained from,' end quote, Profit, contains corrupted and unreliable data within Profit, which neither DSG, Mr. Fahlman had the expertise to fully interpret, analyze and understand."

THE COURT: Okay. Can you hand the disclosure up to me if you have a clean copy?

MR. WINTERLE: Sure. May I approach?

THE COURT: Yes.

MS. ALI: Your Honor, may I respond?

THE COURT: Yes. Why don't you let me read it first, and then we'll give you a chance.

(Pause in proceedings.)

THE COURT: All right. Go ahead, Counsel.

MS. ALI: Sure.

Your Honor, so, again, his disclosure has to do with Exhibit C, which was our former damage analysis. My expert looked at this, they saw there was no specific references to any -- any -- I mean, they have a general allegation that the data tables are corrupt. They've been saying that from the beginning. We needed specifics.

So if Mr. Martinez is going to get up there and talk about specific entries in the data tables that are allegedly incorrect, especially related to Mr. Fahlman's analysis, we should have known about that. We didn't know about it. We thought he was talking about Exhibit C.

Here, in paragraph 19, he says, "From August through September 2023, Mr. Martinez spent approximately 100 hours reviewing 6,000 entries on Exhibit C3." The whole disclosure has to do with Exhibit C3, which is irrelevant. My experts looked at it, it's not relevant. And then now, they're all of a sudden talking about the data tables and Mr. Fahlman's analysis, which they didn't provide us any -- you know, they didn't let us know any of the actual entries that they were going to discuss. This is all Exhibit C.

09:12:10 THE COURT: Okay. Sit down. Give me a minute.

09:17:45 Okay. All right. So I don't know how this is

09:17:48 coming up at trial the morning of his testimony.

09:17:50 I can say this: The record is certainly muddy,

09:17:54 we've looked at it. We looked at the letters to the Court

09:18:00 that the parties provided months ago, we looked at the

09:18:02 e-mails you provided us to each other. We looked at the

09:18:06 deposition testimony and the objections. And what I can

09:18:08 certainly say is that the expert -- or that the record is

09:18:13 muddy.

09:18:14 It's clear to me from reading the transcript of

09:18:18 the deposition proceedings that both sides knew that

09:18:22 Mr. Martinez was going to be testifying as an expert and

09:18:26 that defendants were proffering him under Rule 26(a)(2)(C),

09:18:31 which does not require a full written report.

09:18:34 We looked at the objection at the deposition and

09:18:38 I'm not persuaded that plaintiff was denied the opportunity

09:18:43 to examine Mr. Martinez on the opinions expressed in his

09:18:47 disclosure.

09:18:49 That said, Ms. Ali has made the point that

09:18:55 plaintiff didn't know what particular entries Mr. Martinez

09:18:57 was going to discuss at trial.

09:19:02 It's unclear to me that that would have violated

09:19:07 Rule 26(a)(2)(C) to the extent that such testimony is expert

09:19:10 testimony. On the other hand, to the extent that

Mr. Martinez is and was going to discuss particular entries, it's not really clear to me that he needed to be an expert witness to -- to do that for the reasons I stated at the outset, which is that these entries were introduced as business records by plaintiff and Mr. Martinez worked at the business as the person in charge of this database. And so if he's going to talk about them, that's okay.

So after assessing all of this, the Court's ruling is that we're going to allow Mr. Martinez to go forward and testify. I'm not ruling out that plaintiff may want to recall its expert and we'll hear what proffered testimony that is. But let's see how it goes.

Let's resume.

MS. ALI: Thank you, Your Honor.

MR. ANDERSON: Thank you.

Call Mr. Martinez back to the stand.

BY MR. ANDERSON:

Q. So, Mr. Martinez, we were just talking about Profits.

A. Yes.

Q. Did Han Nara use any other software programs?

A. We did.

Q. What did Han Nara use?

A. We had a third-party delivery tracking system called DispatchTrack and we had an electronic filing system called DocuWare.

Q. Thank you.

Let's now turn to the ransomware attack. Can you explain to the Court what the effect of the ransomware attack was on the data in Profits system?

A. It wiped out the whole system completely.

Q. So when you say wiped out, does that mean completely gone? Erased?

A. It was as if we were a brand new company and we had to start over and enter our company name.

Q. Did Han Nara ever get that data back?

A. We reached out to Ashley IT because we thought they had a backup and it took them a couple of weeks to get us an outdated file.

Q. When you say that you thought they had a backup, what do you mean by that?

A. It was our understanding that they had a current backup as of this time -- this point in time, but that was not the case.

Q. So you're saying you thought they had a real time backup?

A. Correct.

Q. They didn't have a real time backup?

A. They did not.

Q. How outdated was the backup?

A. I don't recall.

Q. When Ashley IT restored the data from the backup server, did that fix the problem?
A. It did not.
Q. Can you explain why it didn't fix the problem?
A. We started to notice that there were certain issues with the subledger -- the subledger, the general ledger. The AR module as a whole was not communicating and it was creating some errors. We think there was a bug on the back end. I'm not an IT expert, but I worked in it on a daily basis and we saw that the database itself was corrupt.
Q. So you think the ransomware attack may have placed some kind of bug or virus into the system and then once -- once the data was imported from Ashley IT, that bug affected the data somehow?
A. I do.
Q. As a result of that corruption, how reliable was the data in Profits?
A. There were some portions that were reliable, but it was disclosed to DSG from the very beginning that AR was never reliable.
Q. Let's talk about the portions that were still reliable. What -- what was reliable?
A. We were able to get inventory back on track, payables, payroll, expenses.
Q. Anything else that you recall?

A. Not that I recall.
Q. So let's talk about the part of the system that was corrupt or inaccurate.
What was -- what was wrong with that part of the system?
A. The AR module, which we believe had the bug.
Q. As a result of that AR module being corrupted and providing inaccurate information, what kind of -- how did that affect your reporting out of AR?
A. Nothing was lining up as it should. No subledger ever agreed with a general ledger. You had to look into accounts individually to get an accurate count.
Q. Was the AR aging reports, was that -- was that inaccurate?
A. They were.
Q. And you talked about the AR subledger, that was wrong?
A. Correct.
Q. So you talked about doing something manually to kind of give yourself, give Han Nara more accurate information.
Explain to the Court what exactly you had to do as part of that manual process?
A. I took a written sales report and -- for a time period, and then I would pull deliveries for the same time period. I would eliminate anything that had been delivered,

that would just leave us the outstanding customers that needed to be delivered. And then I would manually go back to check third-party sources on if there was any payments towards the customers awaiting to be delivered.

Q. Let's talk about time frame.

So was the information in Profits accurate at any point in time or can you delineate when it was accurate and when it wasn't accurate?

A. Prior to ransomware --

Q. So --

A. -- it was accurate.

Q. And then ransomware happened. And what did it do to the data prior to April 2019?

A. Well, the whole database when we brought it back, it had a bug.

Q. Right. So going forward -- so say for example, ransomware happened in April 2019 and the next month, after it got restored, say May or June, when you put a new sales order -- new customer information into the system, new post-ransomware, could you still rely on that data that was input post-ransomware?

A. We could input the data correctly. But, again, there was a back end bug that our IT could not figure out nor Ashley IT could figure out that was corrupting the data.

Q. So you're saying that once the data was input -- you

09:26:19 could input it correctly, but even though it was input
09:26:23 correctly, something was happening in the system on the back
09:26:25 end to corrupt all the data?
09:26:26 A. Correct.
09:26:29 Q. And that corruption, did it cause certain things that
09:26:34 were input to come out of the system incorrectly?
09:26:37 Like for example, the deliveries, could you
09:26:40 always rely on the deliveries?
09:26:41 A. We could not. I mean, there were several issues that
09:26:45 it caused. Like the delivery date issue, the delivery
09:26:48 amount issue, an invoice amount issue, and an invoice date
09:26:53 issue.
09:26:53 Q. So even though it was input correctly in the system,
09:26:58 couldn't rely on it because something was happening on the
09:27:01 back end to affect the delivery date or the accounts
09:27:08 receivable date -- amount or customer deposit amount, that
kind of thing?
A. Correct.
Q. All right. Let's take a look at a couple of
examples.
09:27:10 MR. ANDERSON: Your Honor, this is our
09:27:12 demonstrative. And this demonstrative comes straight from
09:27:16 the data tables that we've seen in the case. The data
09:27:20 tables that they --
09:27:21 THE COURT: Why don't you ask the witness that.

MR. ANDERSON: Because we have the back end.

THE COURT: Understood.

BY MR. ANDERSON:

Q. Okay. Michael, if I ask you about this FOGACAR, what does that mean if you pull it up in Profits?

A. FOGACAR is a unique -- a unique customer ID, typically a combination of the first and last name of the customer.

Q. So it could be something like Caroline Fogarty, or something like that, that would be that customer name?

A. Correct.

Q. Okay. Just making it up.

So let's look at some examples of how the information, if input correctly, would still come out wrong on the back end.

So, first of all, let me do this. These data tables that we're pulling, have you ever -- had you ever seen them before prior to this litigation?

A. I have not.

Q. Did you see these two data tables, this big 733, AR data table, and 734, sale table, did you see that for the first time when I gave it to you?

A. I did.

Q. Do you know who pulled these data tables out of Profits?

09:28:39 A. I do not.
09:28:39 Q. Do you know the method by which they did that?
09:28:42 A. I do not.
09:28:44 Q. Do you know when the data tables were pulled?
09:28:52 A. I do not.
09:28:53 Q. Do you know if any information in the data tables was changed after it came out of Profits?
09:28:59 A. I do not.
09:29:03 Q. Do you know if any corrections were made in the system that can be shown in these data tables?
09:29:11 A. I do not.
09:29:12 Q. So these are just data tables, right?
09:29:15 A. Correct.
09:29:15 Q. They've been represented by plaintiffs' that they come out of Profits?
09:29:19 A. That's my understanding.
09:29:21 Q. But other than that representation, we have no way of verifying that; is that correct?
09:29:25 A. Correct.
09:29:26 Q. All right. So let's look at the AR data table that the plaintiffs provided. This is the JTX-101. And they also provided a sales table, which is JTX-102.
09:29:39 If you look at this -- these entries on these data tables, what is being reflected here on these data tables with respect to the payment date?

A. So that very top row that's highlighted there in yellow shows FOGACAR was -- had a purchase or a payment of $48.70 on September 8th of 2020.
Q. Okay. So there's a payment of $48.70 made on September 8th, 2020; is that right?
A. Correct.
Q. And what is the delivery date showing?
A. So that's going to be in that second table there at the bottom, highlighted in green. It shows it was delivered as of October the 1st of 2020.
Q. Now, if we go to the underlying source data, pull up the invoice, what can you see on this invoice as far as what the sales date was?
A. The sales data agrees. It says it's 9/8 of 2020.
Q. So in the system, it's showing the sales date of 9/8. On the DocuWare invoice it's showing 9/8, but what is it showing in the database as far as the delivery date goes?
A. The delivery was a customer take-with. That means they took that item with them the day that they were in store, so that delivery date would have been 9/8 of '20, disagreeing with what the second table says.
Q. So the information in Profits is incorrect with respect to the delivery date, isn't it?
A. Correct.
Q. Let's take another example. Again, what is that

CABPATT1?
A. A CABPATT1 is a unique customer ID.
Q. Name of a customer?
A. Yes, sir.
Q. Okay. So here we looked at this order in both of the tables that were provided, the AR data table and that sales table. And one of them has no entry, do you know why that --
A. I'm not sure.
Q. So we have no idea, but one of the tables, there's just nothing. So if we go look at the underlying source data -- first of all, what does the data show as far as delivery goes?
A. That second table shows there was a delivery date of October the 7th of 2020.
Q. And if you look at the underlying invoice?
A. It shows that the customer took that item with on June 26th of 2020, disagreeing with the second table.
Q. So the information is not correct?
A. Correct.
Q. All right. Let's take a look at an example where the delivery amount is incorrect. And by the way, these examples are all taken from Mr. Fahlman's expert report, right?
Do you see that under there? That's Fahlman

Report Number 59?
A. I do.
Q. So here we're looking at the AR table. For this entry, what is it showing as the delivery date?
A. It shows this particular customer was delivered October the 12th of 2020 in the amount of $4,085.99.
Q. So that's a delivery date of October 12th, $4,085.99. Let's take a look at the DispatchTrack record.
What does this show?
A. That's a delivery receipt, and it shows the customer was delivered on October the 12th of 2020 in the amount of $3,696, disagreeing with the table.
Q. So that amount doesn't agree with what's showing in Profits. Is that what we're seeing?
A. Correct.
Q. And I'm going to back this up and say this is actually JTX-124, which was produced in the case.
Let's take a look at another example. MELERUT. What is that?
A. That's the unique customer ID, customer name.
Q. This is the Fahlman Report Number 61. Take a look here. What do we see on the data table?
A. That table shows that this particular customer was delivered October the 1st in the amount of $5,402.97.
Q. Okay. Let's take a look at the underlying data.

09:34:50 What is this showing?
09:34:51 A. It shows that this customer was delivered on October
09:34:54 the 1st, 2020 in the amount of 4,473.
09:34:59 Q. So these amounts aren't correct?
09:35:01 A. Correct.
09:35:01 Q. The actual invoice is not matching up with what's in
09:35:07 Profits; is that right?
09:35:08 A. Correct.
09:35:09 Q. So this is an example of why you couldn't rely on
09:35:12 Profits for correct information?
09:35:13 A. It absolutely is.
09:35:17 Q. Let's take a look at another example where the
09:35:21 payment amount and date are incorrect.
09:35:27 Looking at JTX-101, this is the AR data table
09:35:31 that plaintiffs' provided, what is this showing?
09:35:38 A. This shows that there is a payment in the amount of
09:35:42 $3,138.44 for this particular customer.
09:35:47 Q. On June 27th, 2020?
09:35:50 A. On June 27th of 2020.
09:35:53 Q. Take a look at the underlying invoice.
09:35:56 What do we see as far as the payment amount
09:35:59 goes?
09:35:59 A. The total payment is $11,838.44.
09:36:04 Q. So, again, the actuality, what's happening in the
09:36:10 stores isn't matching up with what's going on in the

accounting system; is that right?
A. Correct.
MR. ANDERSON: And this is -- for the record this is DDX-002.16.
Oh, sorry. This is the sales order actually. For the record, it's DSG721567.
MS. ALI: Your Honor, objection, this is not an exhibit.
MR. ANDERSON: I'm just reading into the record so we can tell what's going on. Okay.
BY MR. ANDERSON:
Q. So for the Court, this is some of what you're seeing on a daily basis when you're looking at the information in Profits; is that correct?
A. That's correct.
Q. And seeing all this, you know for a fact that all that data in there is not correct, right?
MS. ALI: Objection, leading. He's been leading him.
THE COURT: Why don't you rephrase the question.
BY MR. ANDERSON:
Q. What is your understanding about the reliability of the data?
A. It was unreliable.
Q. There's been mention in this case something called a

ghost account. Can you explain for the Court what a ghost account is?
A. Yeah. So you would have to look at each account individually to find what a ghost account is because these lines would either just magically appear after ransomware on any account, on any customer as a payment or as a delivery, and they weren't factual.
Q. So a ghost account is an example where perhaps a payment was made, a delivery was made, but then your system is showing up as a delivery was never made?
A. That could be possibly a case, yes.
Q. Any other examples?
A. The delivery amount, delivery date, the invoice amount, invoice date, all those were affected by a ghost account.
Q. So that's what we're talking about in ghost accounts is all of that was possibly incorrect?
A. Correct.
Q. So those aren't necessarily real liabilities?
A. Correct.
Q. Did you ever get in there and try to manually clean up the AR subledger?
A. We did.
Q. Talk about what you tried to do.
A. We extracted the written sales for a certain time

period. I believe it was from November through February. And then I pulled deliveries for that same time period, eliminating anyone who had been delivered, only leaving those customers who had pending deliveries. And then I would go to a third-party source to check if they made any payments towards those particular invoices.

Q. So is it fair to say that you were doing some kind of triangulation of multiple data sources to try to get reliable information?

A. Correct.

Q. Let's talk a little bit more about that, your manual research in this triangulation, what you'd have to do. What were you looking at? Were you looking at written sales?

A. Yeah. We looked at written sales, delivered sales, and then you would go to wherever the payment was sourced, whether it was cash, checks, credit cards, third-party financing.

Q. And once you did all that, did you have better visibility as to the reliability of the data?

A. In that particular point in time, yes, and only on those accounts that I looked at.

Q. So if you did some kind of, like, manual calculation for a certain period of time, that information would be accurate, sort of a snapshot. Is that what you're saying?

A. Yes, it would only be accurate for that point in time

because two minutes later, that data is outdated.
Q. So essentially all you could do is take a really quick snapshot to look at the data and after that, not reliable anymore?
A. Correct.
Q. How long did it take you to do that manual calculation and all these different reporting systems that you're looking at, looking at very different databases outside of the system? How long did that take?
A. Several hours. I mean, several days.
Q. So it wasn't something that was easy to do?
A. No, it was not.
Q. Did you review the expert report of DSG's expert, Mr. Fahlman?
A. I did.
Q. Did he rely on the data tables we just looked at in his expert analysis?
A. I believe so.
Q. Do those data tables contain inaccurate information?
A. They did.
Q. He talked about in his expert report, talked about the underlying and raw data. Is that underlying and raw data coming directly out of the data tables?
A. It's coming out of the corrupt data tables.
Q. And those data tables are corrupt and inaccurate and

unreliable?
A. Correct.
Q. Mr. Fahlman said in his expert report that Han Nara had internal controls that made the data in the data tables reliable; is that true?
A. That's his statement.
Q. What's your position?
A. Because we had internal controls, we could input the data correctly, but because of the virus, it does not mean the output is correct.
Q. So your internal controls centered on getting correct data inputted into the system?
A. Correct.
Q. After the data was input correctly, you had no ability to verify that whatever the system was doing, that the data would stay that way, right?
A. Correct.
MS. ALI: Objection, leading. He keeps leading this witness.
THE COURT: That objection's sustained. Why don't you rephrase the question.
BY MR. ANDERSON:
Q. Talk to me what was happening after you input it initially to what was happening on the back end.
A. What we noticed is we could input the information

correctly. There was still a bug from ransomware that was corrupting the database on the back end.

Q. So with that back-end bug, how reliable was the data?

A. It's not reliable.

Q. Did your manual research ever make the data in the system reliable?

A. No, because that was an outside Excel spreadsheet.

Q. What do you mean by that?

A. My research was done manually outside of the system.

Q. So you do a bunch of research, create an Excel spreadsheet outside the system, and you were able to get that data that you created outside the system to people that wanted it; is that right?

A. Yes, we gave that -- I gave my work and my findings to KPMG.

Q. Okay. We're going to talk about that in just a minute. But as far as the overall reliability, if you do a manual calculation, you're looking at things, and you create your own Excel spreadsheet using data from the system to create an Excel spreadsheet that gave you information; is that right?

A. I would pull written sales from the system. That would be the starting point, yes. I had to go to third-party sources to figure out the other data that I needed to complete the research.

Q. What you were doing, though -- that didn't make the data back in the system -- that didn't make it all good.
A. The data in the system was corrupt. No. The data was never corrected or good.
Q. When did you first hear about DSG?
A. I believe it was late or fourth quarter of 2019.
Q. In what context?
A. Mrs. Choi had let me know that she was looking to sell the company.
Q. Did Aggie want you to be involved in those discussions?
A. I was the only individual on Han Nara's side to know that she was selling the company.
Q. Did DSG introduce you to KPMG?
A. They did.
Q. And who was KPMG?
A. KPMG, from my understanding, was out of -- it's an accounting firm out of Canada.
Q. When did you first meet KPMG?
A. I believe that was the first quarter of 2020.
Q. How many interactions did you have with KPMG?
A. Several, for a few months, via in-person, on the phone and over the e-mail.
Q. What kinds of things was KPMG asking you?
A. They had a checklist of items that I had to upload to

a virtual room.
Q. So they were asking for information about the company and you were providing it?
A. Yeah, so they asked anything from contracts to leases, to finance providers, to our operations, how those finance providers worked. Any of our financial information, tax information.
Q. Do you recall meeting with KPMG in Lubbock?
A. I do.
Q. Do you remember about when that was?
A. That was the first quarter of 2020.
Q. February of 2020?
A. Sounds correct.
Q. To be exactly specific, it was February 10th and 11th in Lubbock. Does that refresh your recollection?
A. It's probably right.
Q. Who was at the meeting?
A. So there was three representatives from KPMG, Matt, Hayley, Tyler; and two from DSG, Derek and Evan.
Q. Okay. Let's just --
A. And myself, James, and Mrs. Choi.
Q. Okay. As far as the KPMG people go, let's put last names on these folks. So is it Matt Younger?
A. Matt Younger.
Q. Was it Hayley Johnston?

A. Hayley Johnston.
Q. And Tyler Bell?
A. Tyler Bell.
Q. And at DSG, it was Evan Vermette?
A. Evan Vermette.
Q. And Derek East?
A. Derek East.
Q. And that in-person meeting, what was discussed?
A. The general operation of the business, how we ran things.
Q. Were Han Nara's sales discussed?
A. They were.
Q. Were Han Nara's financials discussed?
A. They were.
Q. Was prefunding discussed at the meeting?
A. It was.
Q. In what context?
A. They asked us who our finance party providers were and how each -- each one of those providers operated.
Q. At that meeting, did you tell DSG that Han Nara prefunds with Comenity Bank?
A. We did.
Q. Did you tell Evan Vermette that Han Nara prefunds with Comenity Bank?
A. Evan was told several times, in person, on the phone

09:47:50 and -- yeah.
09:47:52 Q. Did you tell KPMG at that meeting that Han Nara prefunds with Comenity Bank?
09:47:57 A. We did.
09:48:01 Q. Was a gentleman named Matt Duncan from KPMG, was he present at the meeting?
09:48:08 A. He was not.
09:48:10 Q. All right.
09:48:11 MR. ANDERSON: I'd like to introduce JTX-022, and if we could --
THE COURT: Yes.
BY MR. ANDERSON:
09:48:35 Q. Have a look at this e-mail, Mr. Martinez, and I'd like to direct your attention to the top of the -- the first e-mail on this page.
09:48:50 Is this an e-mail from you to Hayley Johnston and James Francis on Monday, March 2nd, 2020?
09:48:59 A. It is a reply, yes.
09:49:02 Q. What is your understanding of this e-mail?
09:49:04 A. So after our initial meeting, KPMG had several questions on anything they would -- our documentation they would ask from us. And they asked -- they wanted some detailed information on the accounts receivable.
09:49:22 Q. You talked earlier about pulling some information manually. Is this what you're referring to?

A. This is exactly what I'm referring to.
Q. Explain to the Court what KPMG is asking you to do. What you were doing?
A. We were unable to pull accurate information straight out of Profit and HOMES, so again, I had to do a self-assessment of the accounts receivable. I had pulled out the deliveries for -- it looks like November the 1st, 2019 through February 26th of 2020. And I pulled written for that time period, deliveries as well.

If whatever -- what had been delivered was taken off the list, only those pending deliveries remained on my Excel spreadsheet, and then I went in to check any payments that were made towards these outstanding deliveries.

And what we found was there was 3.6 million dollars in pending deliveries and that we had already collected or prefunded 2.6 million dollars in payments and had a million dollars still to collect.
Q. Okay. So I want to ask you a couple of questions about that. So this is your manual calculation for a certain point in time from November 1st, 2019 through February 26, 2020; is that right?
A. Correct.
Q. So this is a snapshot that existed as of March 2nd, 2020?
A. At that time, yes.

Q. Okay. So if the next day, March 3rd, 2020, could you rely on the manual calculation that you had just done the day before?
A. You could not.
Q. Is that because of the bug in the corruption?
A. It's because we are a moving business. And so there was deliveries being made and there was payments being made. So this data would have changed.
Q. So you couldn't even rely on that more than one day?
A. Correct.
Q. How long did it take you to do this calculation?
A. Several days, maybe weeks.
Q. And you just mentioned, Mr. Martinez, about this 2.6 million dollar payment being prefunded. How do you know -- how does that reflect that that's prefunding?
A. So any payment collected prior to a delivery being made would be a customer deposit or what is being referred to as prefunding.
Q. So there's 3.6 million dollars in pending deliveries. Is that what you're saying?
A. Correct.
Q. And you've collected 2.6 million dollars in payments?
A. Correct.
Q. So you've collected those 2.6 million dollars up front?

A. We did.
Q. At the point of sale?
A. Correct.
Q. And then you had outstanding deliveries still to be made?
A. A million dollars of -- or a million dollars that still needs to be collected.
Q. Okay. Let's take a look at JTX-24. This is the end of March of 2020. Do you recognize this e-mail?
A. I do.
Q. I'd like to direct your attention to the e-mail, the bottom e-mail on this page. This is from Matt Younger to you. Who is Matt Younger?
A. He's a representative from KPMG.
Q. What is your understanding of this e-mail?
A. He was -- he had three follow-up questions on some data that I had given them -- or have -- excuse me, I had uploaded into the virtual room.
Q. Let's look at .3. What is Mr. Younger asking you with respect to .3?
A. So this is a follow-up question. And so he is confirming what he heard or understands, and there it says that the accounts receivables, the AR comprises of receivables from finance providers and credit cards, and both are funded within 72 hours.

Q. So Matt Younger from KPMG is asking you to confirm this statement; is that right?
A. Correct.
MS. ALI: Objection, leading. He keeps leading the witness.
THE COURT: That's sustained.
Why don't you rephrase.
BY MR. ANDERSON:
Q. Mr. Martinez, what is Mr. Younger asking?
A. So Matt Younger is asking me to confirm his statements that he made in the e-mail.
Q. Is he asking you to confirm the statements because that's what you told him?
MS. ALI: Objection, leading.
THE COURT: Overruled.
You can answer.
THE WITNESS: Sorry. As I said, this is a follow-up e-mail. So these are questions that he just confirmed the information that he's already heard.
BY MR. ANDERSON:
Q. Did he already hear from you that Han Nara is prefunding?
A. Correct.
Q. That's what he's asking here in this Section A?
A. He is asking, yes.

09:54:58 MS. ALI: Objection, hearsay.

09:55:00 THE COURT: Overruled.

09:55:02 BY MR. ANDERSON:

09:55:02 Q. Okay. Let's look at the top line of the e-mail and
09:55:07 look at your response to him.

09:55:10 MR. ANDERSON: Can we go up?

BY MR. ANDERSON:

09:55:13 Q. Okay. Mr. Martinez, is this your response?

09:55:15 A. Correct. In 3A, I confirmed to Matt Younger, his
09:55:19 understanding is correct.

09:55:20 Q. So 3A corresponds as a yes to the question.

09:55:24 If we could just scroll back down to the
09:55:27 question below.

09:55:32 It's a yes to his question on 3A; is that
09:55:35 correct?

09:55:35 A. That's correct.

09:55:37 MR. ANDERSON: Your Honor, I'd like to move into
09:55:40 evidence JTX-22 and JTX-24.

09:55:44 MS. ALI: No objection.

09:55:45 THE COURT: They're admitted.

09:55:46 (JTX Exhibit Nos. 22 and 24 were admitted into
09:55:47 evidence.)

09:55:47 BY MR. ANDERSON:

09:55:48 Q. Do you have any other -- in addition to this period
09:55:54 of time when you're talking with KPMG and DSG in the

diligence portion of the case or the transaction, did you disclose to DSG -- other than that, did you disclose to DSG Han Nara's practice of prefunding with Comenity Bank?
A. We did.
Q. When?
A. Several times. As early -- very early in the due diligence period, through the end of the due diligence period.
Q. Was that you doing that?
A. I did, personally, yes.
Q. How many conversations?
A. Several.
Q. Did it -- let's talk now about the closing period and the period of time right after the closing in September and October of 2024(sic).
What was your role when the transaction picked up again?
A. Again, I was the only person that knew. Just prior to -- are you asking about the period prior to closing?
Q. Yes?
A. I was the only person that knew that Han Nara was selling and so I was uploading all of the documents into a virtual room that DSG had created.
Q. I'd like to look at JTX-427. This is a closing checklist for the deal. Do you recognize this?

A. I do.

MR. ANDERSON: Matt, if you could scroll through a little bit. Keep going.

BY MR. ANDERSON:

Q. All right. This closing checklist, is this the information that you were providing to DSG?

A. It was.

Q. This is several pages long; is that right?

A. Yes, it is. It's several rows.

Q. And it says here, "Status: Settled or complete." Does that mean that DSG has received the information from you that they wanted?

A. Yes, we would not move forward with anything unless they were satisfied with what they received.

MR. ANDERSON: Your Honor, I'd like to move JTX-24 into evidence.

MS. ALI: No objection.

THE COURT: It's admitted.

(JTX Exhibit No. 24 was admitted into evidence.)

BY MR. ANDERSON:

Q. Prior to close, did anybody from DSG get access to Profits?

A. They did.

Q. Do you recall who?

A. They had a couple of employees and the one in

particular that I remember is Fedeliz.

MR. ANDERSON: Your Honor, I'd like to move JTX-427 into the record.

MR. WINTERLE: D.

MR. ANDERSON: Sorry. DTX-427.

MS. ALI: No objection.

THE COURT: It's admitted.

(DTX Exhibit No. 427 was admitted into evidence.)

BY MR. ANDERSON:

Q. After Han Nara was acquired, did you become a DSG employee?

A. I did.

Q. As a DSG employee, who did you report to?

A. I reported to Fedeliz, Justine, Dawn and Mike.

Q. After you became a DSG employee, did they ask you to provide reports?

A. I was in communication with their executives on a daily and weekly basis.

Q. Did you provide them everything that they asked for?

A. I did.

Q. When did you leave DSG?

A. I left DSG March 31st of 2021.

Q. Why did you choose that date?

A. Ms. Choi had let me know she was leaving, and I had

no reason to stay.
Q. So after Ms. Choi told you she was leaving, you decided to go with her?
A. I didn't go with her.
Q. Oh. You decided to leave at the same time?
A. I mean, I had no reason to stay. I did not want to work for DSG.
MR. ANDERSON: Thank you for your testimony. Pass the witness.

CROSS-EXAMINATION

BY MS. ALI:
Q. Good morning, Mr. Martinez. We have met twice now, right?
A. Yes.
Q. All right. You were in charge of Han Nara's accounting department since at least 2008; is that correct?
A. Correct.
Q. And in 2020, you served as Han Nara's CFO, correct?
A. Correct.
Q. And as a CFO, you were responsible for Han Nara's accounting, correct?
A. Correct.
Q. And you prepared Han Nara's financials, correct?
A. I did.
Q. And you had practices in place to make sure the

accounting data in Profit was correct, right?
A. That's not correct.
Q. As the CFO, you were aware that Han Nara employees recorded all payments received from customers via cash, credit card, check and financing in Profits, correct?
A. That's not correct.
Q. All right. Let's take a look at your deposition. Please turn to Page 20, Line 11 through 16.
Oh, sorry, Page 20 --
MS. ALI: Is this Page 20? Does he have his deposition? Do you need your deposition?
MR. ANDERSON: Yes, he needs his deposition.
And I'd like ask for time for him to read the portions that you're about to show him.
MR. NOSCHESE: Your Honor, may I approach the witness?
THE COURT: You may.
MS. ALI: Yes. Sorry, the first deposition.
Let's take a look at your October 3rd, 2023, deposition.
MR. NOSCHESE: Would the Court like a copy, Your Honor?
THE COURT: No, that's okay.
MS. ALI: All right.
MS. WILSON: Excuse me, Your Honor, may I

approach the witness? He has the second deposition, this is the first.

THE COURT: That's fine.

MS. WILSON: Thank you.

MS. ALI: Actually, Page 24.

BY MS. ALI:

Q. Mr. Martinez, you were responsible for checking the employees' work, correct?

A. I reviewed it globally, yes.

Q. And you knew they were recording payment information in Profits, correct?

A. Yes, they recorded payment information into Profit.

Q. And you were reconciling that information, correct?

A. Globally, yes.

Q. All right. And then you were also responsible for reconciling the check payments, correct?

A. Globally, yes.

Q. What does "globally, yes" mean?

A. I did not look into each individual account. I only looked at it as a whole.

Q. You would check the check payments made that would come in daily -- you would check the check payments recorded in Profit daily, correct?

A. I would check it globally.

Q. Again, what does "globally" mean?

A. What I just said.
Q. Can you please tell me again.
A. I wouldn't check it per account. I checked it as a total sum.
Q. All right.
MS. ALI: Let's take a look at your deposition, Page 24, Line 12.
"Question: Okay. So tell me what you would do. So October 1st, there's a bunch of transactions, say there's 20,000 worth of transactions" --
(Reporter clarification.)
MS. ALI: "There's a bunch of transactions, say there is 20,000 worth of transactions, would you and the -- would -- you and the customer service reps are inputting all of this information, what would you do to check this information?
"Answer: So it's called a cash journal that would be created and it would have every transaction for each customer that came in that day, whether it was check, credit card or cash. And for cash, they would have to send me their deposit receipt so it has to match up with the grand total of how much cash they had.
For checks, we had a check scanner that told us a grand total. These two had to be in agreement.
And then for credit card, the credit card

settlement had to be in agreement with the cash journal.
"Question: So you would look at the cash journal?
"Answer: Yes."
BY MS. ALI:
Q. Mr. Martinez, did I read that correctly?
A. Yes, you did.
Q. Did I ask you those questions during your deposition?
A. Yes, you did.
Q. And did you answer those truthfully under oath?
A. They were.
Q. Mr. Martinez, did you check the work recorded in Profit by the employees related to payments for check, credit cards and cash daily?
A. I checked them for credit card, cash and check daily, globally.
Q. You also reconciled the finance payments recorded in Profit, correct?
A. I reconciled the finance, correct.
Q. As the CFO, it was important to you that there was reliable accounting information in Profit, correct?
A. Yes.
Q. As the CFO, you verified Han Nara's employees reconciliations of payments recorded in Profit every business day, correct?

A. Only globally.

MS. ALI: Let's take a look at page 30 of your deposition, Line 19 through 23.

"Question: So every morning -- not every morning -- every business day, you would check the check payments, the cash payments, finance payments and credit card payments from the day before; is that correct?

"Answer: Yes, Monday through Friday business day, yes."

BY MS. ALI:

Q. Mr. Martinez, did I read that correctly?

A. You read it correctly.

Q. Did I ask you those questions in your deposition?

A. You did.

Q. Did you answer truthfully under oath in your deposition?

A. I did.

Q. All right. Let's move on.

You also reconciled the customer deposit liabilities in Profits daily, correct?

A. No.

MS. ALI: Let's take a look at page 35 of your deposition, Line 7 through 11.

"Question: So tell me what you did. What did you do with the customer deposit liabilities in your daily

reconciliation?

"Answer: I made sure, for any payment that we received, it equaled to any outside source that showed those funds that are applying to the system were received."

MR. ANDERSON: Objection.

BY MS. ALI:

Q. Mr. Martinez, did I read that correctly?

MR. ANDERSON: Objection, Your Honor. This is improper impeachment. This isn't lining up to what she's asking him.

MS. ALI: Your Honor --

THE COURT: I understand that. The objection's going to be overruled. You can answer the question.

THE WITNESS: Can you repeat that?

BY MS. ALI:

Q. Sure.

Did I read that correctly?

A. No, what are you reading? I'm sorry.

Q. Sure. We're going to start with Line 7.

"Question: So tell me what you did. What did you do with customer deposit liabilities in your daily reconciliation?

"Answer: I made sure, for any payment that we received, it equaled to any outside source that showed those funds that are applying to the system were received."

10:07:31 A. Correct. For grand total, yes.
10:07:33 Q. And you answered those questions under oath, correct?
10:07:36 A. Yes, I did.
10:07:38 Q. All right. Let's move on.
10:07:39 Now let's talk about the delivery information recorded in Profit. It was Han Nara's practice to record deliveries in Profits the day the furniture was delivered, correct?
10:07:47 A. That was our practice.
10:07:48 Q. All right. And as the CFO, you were aware that Han Nara employees checked the delivery information recorded in Profit, correct?
10:07:55 A. Can you repeat that?
10:07:56 Q. Sure.
10:07:57 As the CFO, you were aware that Han Nara employees checked the delivery information recorded in Profit, correct?
10:08:07 A. I was aware.
10:08:09 Q. All right. And as the CFO, you reconciled the delivery information recorded in Profit with the information in DispatchTrack on a monthly basis, correct?
10:08:19 A. Globally, yes; not customer by customer.
10:08:22 MS. ALI: Let's take a look at your deposition, Page 86, Line 16 through 22.
10:08:29 "Question: So you would run a sales revenue

report monthly and then you would use that with DispatchTrack report to see if the delivery dates were correct?

"Answer: Right. It's the volume and delivery dates, like, totaled up.

"Question: And you did that monthly?

"Answer: Yes.

BY MS. ALI:

Q. Mr. Martinez, did I read that correctly?

A. Yes, you read volume correctly, that's correct.

Q. And did you answer those questions under oath?

A. I did.

Q. All right. Let's move on.

Mr. Martinez, you would generate Han Nara's financials by clicking a button in Profits, correct?

MR. ANDERSON: Objection. "Clicking a button." That makes no sense.

THE COURT: Overruled.

THE WITNESS: There was a drop-down menu that we would go look for financials and click, yes.

BY MS. ALI:

Q. You could generate Han Nara's financials with the click of a button in Profits, correct?

A. Yeah, if you scrolled to the right area. Yes.

Q. All right. Let's talk about financing.

What percentage of Han Nara's financing was with Comenity?
A. If I remember correctly, it was about a third.
Q. All right. How about Synchrony?
A. I don't recall that.
Q. How about Acima?
A. I don't recall.
Q. And you talked this morning about prefunding. So I'm going to talk about prefunding and when I talk about prefunding, it is when Han Nara would request and accept payments from finance vendors before the delivery of furniture to a customer.
Do you follow me?
A. I do.
Q. All right. So Han Nara prefunded with Comenity, correct?
A. We did.
Q. Han Nara prefunded with Synchrony, correct?
A. We did until a time.
Q. And Han Nara prefunded with Acima?
A. No.
Q. And as far as prefunding, did you believe this was a good practice?
A. It was.
Q. Why?

A. It was a normal practice in the furniture industry.

Q. And prefunding with finance providers would create a customer deposit liability, correct?

A. It would create the customer deposit liability.

Q. And if it was Comenity, you wouldn't have an accounts receivable, right, because you prefunded every transaction with Comenity, correct?

A. Well, that's the definition of a customer liability.

Q. Right. But you would not have an accounts receivable from Comenity, correct?

A. It could be possible that we would have an accounts receivable from Comenity.

Q. Right. But majority of the transactions with Comenity would be customer deposit liabilities, correct?

A. If -- if it was run correctly, yes.

Q. Because you prefunded, correct?

A. We prefunded with Comenity.

Q. And prefunding results in customer deposit liabilities, correct?

A. That's correct.

Q. All right. Now, how long did it take on average to deliver furniture before COVID?

A. 14 to 17 days.

Q. All right. And how about after COVID?

A. We didn't track it.

10:11:24 Q. Do you know an average?
10:11:26 A. I do not.
10:11:27 Q. Do you think prefunding was a good practice during COVID when you couldn't track the delivery dates?
10:11:32 A. It was normal practice.
10:11:33 Q. All right. I want to look at the contract between Synchrony and Han Nara. Han Nara had a contract with Synchrony, correct?
10:11:46 A. We did not.
10:11:47 Q. Did you provide DSG a contract between Han Nara and Synchrony?
10:11:52 A. I provided DSG an e-mail with two sentences.
10:11:56 Q. Let's take a look at PTX-215.
10:12:11 All right. Let's take a look at the bottom e-mail. It says can you share -- Hey, Josh -- this is from Fedeliz to Josh Copeland and Michael Martinez on December 30th, 2020.
10:12:27 "Hi, Josh. Can you share to us the finance agreement for Synchrony and Progressive?"
MS. ALI: Let's scroll up.
BY MS. ALI:
10:12:33 Q. Josh Copeland responds, "Fedeliz, I'm not your contact for anything regarding finance. I handle payables, HR, payroll. I believe you will need to get this directly from Michael or our finance manager, Johnny Martinez. I

10:12:49 will CC him on this."
10:12:50 MS. ALI: Scroll up.
BY MS. ALI:
10:12:51 Q. Mr. Martinez, you respond on December 30th, 2020,
10:12:53 with two attachments, Synchrony and Progressive.
10:12:57 MS. ALI: Let's look at the attachments.
BY MS. ALI:
10:13:00 Q. This is an e-mail that says, "Hey, Aggie," and I
10:13:04 won't read the whole thing into the record, and it's from
10:13:08 Cathy Long.
10:13:09 Do you see that?
10:13:10 A. I don't see any address.
10:13:14 Q. Sorry, what did you say?
10:13:16 A. I don't see any e-mail address to who it's from and
10:13:19 to where it is going.
10:13:21 Q. Well, do you see Cathy Long in the signature block?
10:13:24 A. I see her name there, yes.
10:13:26 Q. Mr. Martinez, you provided this to DSG.
10:13:28 Do you want to go back to the cover page?
10:13:30 A. Sure.
10:13:30 MS. ALI: Let's go back.
BY MS. ALI:
10:13:31 Q. All right. That's you providing it to Josh Copeland,
10:13:38 Fedeliz and Johnny. It says, "Synchrony contract,
10:13:42 Progressive contract."

Do you see that?
A. Okay.
Q. Han Nara had a contract with Synchrony, correct?
A. It was a two -- what I provided was two sentences. What I remember providing to DSG and uploading in the virtual room was, like, a two sentence e-mail from Synchrony.
Q. This is what you provided DSG, correct?
A. What I provided and what I remember providing to DSG is a two sentence e-mail into that virtual room.
MS. ALI: Let's take a look at this attachment again.
BY MS. ALI:
Q. This is the attachment that you provided that represented the contract between Han Nara and Synchrony, correct?
A. Yeah. We didn't have a contract, that's what I remember.
Q. All right. Let me read this into the record then.
It says, "Hi, Aggie. What that means is we do not have a signed custom contract with you, just that short term dealer agreement that says you can have your customers apply and transact with Synchrony. In the agreement, it states that upon first transaction, dealer agrees upon the contents of this agreement. You basically are only held to

this agreement for 15 days after the last transaction through Synchrony." And then there's a paragraph.

Do you see that?

A. Yes.

MR. ANDERSON: Your Honor, I'd just like to make a relevance objection here.

THE COURT: All right. That's noted for the record and overruled.

BY MS. ALI:

Q. Did Han Nara have a retailer agreement with Synchrony?

A. From what I remember, it was a two sentence e-mail.

Q. All right. Let's move on.

Okay. So as the CFO, you were aware that Han Nara employees continued to record payment and delivery information in Profit after the ransomware attack, correct?

A. We did.

Q. And as the CFO, you were aware that Han Nara employees continued to reconcile payments and delivery information in Profit after the ransomware attack, correct?

A. Say that again.

Q. Sure.

As the CFO, you were aware that Han Nara employees continued to reconcile payment and delivery information in Profit after the ransomware attack, correct?

10:15:46 A. I don't think they reconciled anything.
10:15:50 Q. And so -- and Han Nara employees entered into -- entered payment information into Profit, correct?
10:15:57 A. Han Nara employees did enter information into Profit.
10:16:00 Q. And after the ransomware attack, did you have them stop reconciling the payment information?
10:16:08 MR. ANDERSON: Objection. Vague and ambiguous.
10:16:11 THE COURT: Overruled.
10:16:12 THE WITNESS: No one reconciled. I don't believe anyone reconciled.
10:16:17 BY MS. ALI:
10:16:17 Q. Han Nara's employees did not reconcile payment information in Profit?
10:16:20 A. Not that I'm aware of.
10:16:22 Q. Did you reconcile payment information in Profit?
10:16:25 A. Globally, yes.
10:16:27 Q. And you continued to reconcile the accounting data in Profit after the ransomware attack, correct?
10:16:36 A. With the -- yeah, the information that we had. Yes.
10:16:39 Q. And as the CFO, you didn't change any of Han Nara's practices after the ransomware attack, correct?
10:16:47 A. We did not change any practice -- well, I can't say any. I'm not going to say any.
10:16:52 Q. And was -- well, what practices did you change? Tell me.

A. I can't recall, but I'm not going to say any.
Q. All right. And was the information in Profit for new sales transactions after April 5th, 2019, reliable?
A. Can you say that again?
Q. Sure.
Was the information in Profit from new sales transactions after April 5th, 2019, reliable?
A. It was not.
Q. And accurate? Was it accurate?
A. No.
MS. ALI: Let's take a look at your deposition, please. Turn to Page 121, Line 3 through 15.
Sorry. 160 -- sorry. 163, Line 9 through 11:
"QUESTION: But everything post-ransomware was accurate and reliable?
"ANSWER: Correct."
BY MS. ALI:
Q. Mr. Martinez, did I ask you those questions in your deposition?
A. The information we input into was correct. But, again, the back end, we had no control of what the virus was doing.
Q. Mr. Martinez, were you asked that question in your deposition?
MR. ANDERSON: Objection. Improper impeachment.

THE COURT: He can answer the question. You can ask him on redirect about this, if you like.

THE WITNESS: Can you repeat your question?

BY MS. ALI:

Q. Sure.

Were you asked that question in your deposition and did you answer that question under oath?

A. What was the question?

Q. "QUESTION: But everything post-ransomware was accurate and reliable?

"ANSWER: Correct."

A. Everything wasn't reliable.

Q. Were you asked that question in your deposition?

A. Sure.

Q. Did you give your answer under oath?

A. I did.

Q. Let's move on.

And you continued to use the accounting data in Profit after the ransomware attack, correct?

A. We did.

Q. And you continued to prepare Han Nara's financials using Profit after the ransomware attack, correct?

A. We did.

Q. And you manually calculated customer deposit liabilities using Profit after the ransomware attack,

correct?
A. That's not correct.
Q. You didn't manually use the information in Profit to calculate the customer deposit liabilities?
A. We used portions --
Q. So you used --
A. -- for Profit.
Q. You used portions of information from Profit to calculate the customer deposit liabilities after the ransomware attack, correct?
A. Correct.
Q. You used portions of Profit to manually calculate the accounts receivable after the ransomware attack, correct?
A. Correct.
Q. So did you manually recreate the accounts receivable subledger?
A. Only for a certain period of time and not in Profit.
Q. Did you manually recreate the balance sheet?
A. We had -- when -- so ransomware wiped out the system as a whole. We had to recreate everything. And so we would have recreated the balance sheet.
Q. So could you not click a button and generate the financials after the ransomware attack?
A. Not with any data, no.
Q. So after the ransomware attack, you manually

10:20:02 recreated the balance sheets for Han Nara?
10:20:04 A. They were in there because it was an outdated file, but it had no data in it.
10:20:10 Q. How were Han Nara's financials prepared after the ransomware attack?
10:20:14 A. Through Profit.
10:20:17 Q. How about the profit and loss statements, was that through Profit as well?
10:20:21 A. Yes.
10:20:22 Q. How about the general ledger, was that through Profit as well?
10:20:27 A. Yes.
10:20:30 MS. ALI: Let's take a look at the AR subledger report. JTX-94.
BY MS. ALI:
10:20:45 Q. We have talked a lot about this AR subledger report. So now I want to talk about it. So this document is 3,600 and -- pages.
10:20:57 MS. ALI: You can scroll down if you like. And actually, Chris, will you go all the way down to the bottom.
BY MS. ALI:
10:21:05 Q. This is a report from Profit, correct?
10:21:07 A. It is.
10:21:08 Q. And this AR subledger report was unreliable after the ransomware attack, correct?

A. That's what DSG was told, yes.
Q. And it's unreliable because it contains historical accounts that come up as undelivered, correct?
A. There was a bug so we didn't know which accounts were correct or incorrect.
Q. So there were some accounts on here that were correct, right?
A. The only way you would know is going through each account individually.
Q. But there were some accounts on here that were correct, right?
A. You would have to go through each account individually to know.
Q. And there were some accounts that were correct?
MR. ANDERSON: Objection. Your Honor, she's been asking this -- like, this is the third time.
THE COURT: Overruled.
THE WITNESS: You would have to go through each account individually.
BY MS. ALI:
Q. All right. So let's take a look at this total. So this total right here, the 3.13 million, that's incorrect, right?
A. I'm not sure.
Q. Well, is this report reliable?

A. Yeah, this is unreliable data.
Q. Right. So is it unreliable because the grand total is incorrect?
A. I don't know what is.
Q. So there's information here that's incorrect, and is it possible the grand total is incorrect?
A. The grand total could be incorrect.
Q. And, Mr. Martinez, this is an evolving ledger, correct?
A. Yes, it is.
Q. Because there's customer deposit liabilities that are being satisfied and they're taken off, correct?
A. Correct.
Q. And there's accounts receivable that are being added on so that would change the balance, correct?
A. Correct.
Q. And this would happen on a daily basis, correct?
A. Yes.
Q. And the reason you couldn't use this report is because there were certain accounts on here that were incorrect, right?
A. The accounts with the bug that you could not identify.
Q. All right. And you can't filter this report to see which ones were transactions dated before April 5th, 2019,

correct?
A. It doesn't matter what the date was.
Q. Right, but if I wanted to filter this report to see transactions before the ransomware attack, could I do that?
A. I don't recall.
Q. So it's a possibility that I could?
A. I said I don't recall.
Q. Do you know?
A. I said I don't recall.
Q. No, I'm asking you as a Profit expert, do you know if I could filter this?
MR. ANDERSON: Objection.
THE WITNESS: It's been four years since I worked in the program, I don't remember.
BY MS. ALI:
Q. You testified this morning that you were a Profit expert. You were talking about some data tables.
I need to know in your expert opinion or in your 13 years of using Profit and doing Han Nara's financials, could I filter this report as of April 5th, 2019, to figure out if certain accounts were historical accounts that should not be on this report.
A. Like I said, I said I don't recall.
Q. But you do have 13 years of experience in Profit?
A. I do.

Q. And you were responsible for Han Nara's financials, correct?
A. I am.
Q. All right. Let's talk about due diligence.
MS. ALI: Oh, Your Honor, we move to admit PTX-94 -- oh, JTX-94.
MR. ANDERSON: No objection.
THE COURT: It's admitted.
(JTX Exhibit No. 94 was admitted into evidence.)
BY MS. ALI:
Q. So we just looked at the AR subledger report. Did you tell KPMG that the AR subledger report was inaccurate as a result of the ransomware attack?
A. We told them it was unreliable after the ransomware attack, yes.
Q. And did you tell DSG that the AR subledger report that we were looking at was inaccurate after the ransomware attack?
A. Yes, several times.
Q. And I heard you this morning say that you told KPMG about prefunding; is that correct?
A. Yes. They acknowledged it in the e-mail, their follow-up e-mail.
Q. And if you told KPMG that Han Nara was prefunding with Comenity, it should be reflected in their report,

10:25:04 correct?

10:25:05 A. I don't know what's in their report.

10:25:07 Q. And if you told KPMG that Han Nara prefunded, then it should be reflected in a calculation that they would provide DSG, correct?

10:25:15 A. I don't know what they calculated for DSG.

10:25:17 Q. And if you told KPMG about prefunding with -- prefunding, you would believe that they would tell DSG, correct?

10:25:27 A. I would believe they should have told DSG.

10:25:31 Q. Because you didn't; is that correct?

10:25:34 A. I'm sorry. You said what?

10:25:36 Q. Did you tell DSG that you prefunded with Comenity?

10:25:40 A. We did.

10:25:46 Q. And are you aware that the KPMG report doesn't reflect prefunding?

10:25:50 A. I don't know what the KPMG report says.

10:25:53 Q. And are you aware that Matt Duncan wasn't aware of prefunding?

10:25:58 A. Matt Duncan was never in a meeting.

10:26:00 Q. Are you aware that the KPMG reports -- the numbers calculated in that report do not reflect prefunding?

10:26:09 A. I don't -- I'm not aware what's in a report.

10:26:12 Q. Did you tell KPMG that Han Nara prefunded every transaction with Comenity?

A. They were aware when I gave them -- we told them the operations of what we did with every finance company and when I gave them the manual calculations in the e-mail. They acknowledged you had $2.6 million worth of customer deposits, which is prefunding.

Q. Did you tell them that you had 3.3 million in prefunded transactions with Comenity alone?

A. I wouldn't know that.

Q. Did you give KPMG a number of the value of the prefunded transactions with Comenity?

A. We gave them my external report that I did, yes. I gave that to KPMG.

Q. And we'll take a look at that. And did that say $2.6 million are from prefunded transactions with Comenity?

A. It was just a general spreadsheet, if I remember correctly, with, like, a customer name, maybe an invoice amount and payment amount.

Q. And in that spreadsheet, did it say "prefunded transaction with Comenity, X dollars"?

A. I did not -- I don't recall breaking out how the payments were made.

Q. And as the CFO, do you think it's important for KPMG to understand how Han Nara ran their business?

A. They asked any question. If they were not satisfied with what they gave them, they would ask follow-up

questions.
Q. And as Han Nara's CFO, was it important for KPMG to understand how much of Han Nara's business was prefunded?
A. Can you repeat that?
Q. Sure. As Han Nara's CFO, did you believe it was important to tell KPMG how much of Han Nara's business was through prefunding with Comenity?
A. Yes.
MS. ALI: All right. Let's take a look at JTX-23.
BY MS. ALI:
Q. All right. Mr. Martinez, I want to direct your attention to the second e-mail from you to Hayley Johnston and James Francis on March 2nd, 2020.
You discussed this with your counsel earlier today, but I will have some questions for you. It says, "We found we have roughly 3.6 million in pending deliveries, have checked 2.6 million in payments and have 1 million still to be collected."
Is this saying there are 2.6 million in customer deposit liabilities?
A. That's what that means. However you want to put it, it's all the same. Payments, prepayment, customer deposit liability, it's all one and the same.
Q. This reflects 2.6 million in customer deposit

liabilities, correct?
A. Correct.
Q. And 1 million in accounts receivable, correct?
A. Correct.
Q. And, Mr. Martinez, you used modules in Profit to manually calculate the customer deposit liability in March of 2020, correct?
A. I used the written sales for Profit.
Q. You used the written sales reports from Profit, correct?
A. Correct.
Q. Did use anything else from Profit?
A. I did not.
Q. You did not use the open receivables module?
A. I could have looked at the open receivables module, but I went back to the original data source where it originally came from.
Q. All right.
MS. ALI: Let's take a look at your deposition, please, Line -- let's go on -- oh, Page 174, Line 24.
"QUESTION: Okay, so to figure out the 2.6 million in customer deposit liabilities that you're providing to" --
I'm going to scroll down.
Chris -- no. I'm going to scroll down.

"-- to KPMG and DSG during the due diligence process, you would run the written sales report from Profit, correct?

"ANSWER: Yes.

"QUESTION: Then you would go to the accounts receivable page in Profit?

"ANSWER: Yes.

"QUESTION: And you would look at the accounts receivable and see the invoice, the white area and that meant that the furniture was delivered and invoice the payment that was received in connection with the delivery, correct?

"ANSWER: Yes. This would show any activity, if any payments were received on the specific invoice. Correct.

"QUESTION: Okay. And then did you look at anything else in Profits?

"ANSWER: No.

"QUESTION: Did you run any other reports?

"ANSWER: No.

"QUESTION: Okay. And then you would manually enter all of that information on your Excel spreadsheet?

"ANSWER: Correct."

BY MS. ALI:

Q. Mr. Martinez, did I ask you those questions in your deposition?
A. You did.
Q. And did you answer those truthfully under oath?
A. Yes. That's what I did and there was outside things that I looked at, yes.
Q. And you used Profits to do your manual calculation of customer deposit liabilities, correct?
A. I pulled some information from Profits.
Q. You used the written sales report from Profit to do your manual calculation, correct?
A. Correct.
Q. And you used the open receivable modules from Profit to do your manual calculation, correct?
A. I could have looked at that, yes.
MS. ALI: Your Honor, we move to admit JTX-23 into evidence.
MR. ANDERSON: I think it's already been admitted.
THE COURT: We will admit it, if it hasn't been already.
(JTX Exhibit No. 23 was admitted into evidence.)
BY MS. ALI:
Q. All right. Now I want to talk about negotiations. You provided documents to DSG during negotiations, correct?

A. I did.
Q. Was it your understanding that Han Nara had to provide complete copies of all contracts to DSG during due diligence?
A. We provided everything that they requested, and if they had any issue with what we provided, they would have follow-up questions.
Q. Did you provide complete copies of the finance contract to DSG?
A. I provided them with what we had and if they weren't satisfied, we would not move forward.
Q. So it's possible that you didn't provide the entire contract to DSG, correct?
A. I provided them with what we had.
Q. And if -- you didn't provide all the documents and you did not provide the complete contract, correct?
A. I provided them with everything we had.
Q. All right. And was it your understanding under the APA that Han Nara was obligated to provide complete contracts?
MR. ANDERSON: Objection, legal conclusion.
THE WITNESS: I don't --
THE COURT: Overruled.
THE WITNESS: I don't remember what was on the APA.

BY MS. ALI:

Q. All right. Let's take a look at the APA, actually. JTX-1, Page 27.

MS. ALI: Can you scroll down, Chris?

MR. ANDERSON: Lay a foundation with this witness. He's not a signatory on this, he wasn't selling a company. I don't even know if he's ever seen it.

THE COURT: Overruled.

You can ask your question.

MS. ALI: Thank you, Your Honor.

BY MS. ALI:

Q. Okay. 3.13(b), "The seller has delivered to the buyer, a correct and complete copy of each written material contract, together with all amendments, exhibits, attachments, waivers, or other changes thereto. Schedule 1.3(b) of the disclosure schedule contains an accurate and complete description of all material terms of all oral material contracts."

Do you see that?

A. I do.

Q. Did Han Nara provide DSG with accurate and complete copies of all finance contracts?

A. We provided them with everything we had.

Q. All right. I want to focus in on the mid-September 2023 time frame. So let's take a look at JTX-146. This is

an e-mail from Mr. Vermette to you and Aggie Choi, copying James Francis, on September 17th, 2020.

And he writes, "When it comes to AR and customer deposits, anything from April 5th, 2019, or earlier, is worth about zero. It is either uncollectible or doesn't really exist. From my perspective, we are trying to get a handle on what receivable and deposits actually are, the majority of which would have arisen from business over the last 120 days or so."

Mr. Martinez, was it your understanding that Mr. Vermette was concerned with accounts predating the April 5th, 2019, ransomware?

A. I don't know what he was concerned with.

Q. Well, did you agree with Mr. Vermette that there was likely an immaterial amount of customer deposit liabilities predating the April 2019 ransomware attack?

A. Did I reply to the e-mail?

Q. As the CFO, did you agree with Mr. Vermette that there was likely an immaterial amount of customer deposit liabilities predating the April 2019 ransomware attack?

A. I don't recall replying to this.

Q. No, I'm asking you today. Do you agree that there's likely an immaterial amount of customer deposit liabilities predating the April 5th, 2019 ransomware attack?

A. There is no way to tell without going through each

account.
Q. And before COVID, Han Nara would deliver furniture within 14 days, correct?
A. 14 to 17 days.
Q. And so is it fair to say that anything pre-2019 was probably delivered?
A. 14 to 17 days, maybe.
Q. So it's likely there's probably no customer deposit liabilities given Han Nara's quick delivery in two weeks of furniture, correct?
A. Repeat that.
Q. Sure. So customer deposit liabilities -- so strike that. Let me restart.
Is it fair to say if Han Nara delivered furniture within 14 days of the purchase -- of the customer purchasing the furniture, then it's likely that there was no real customer deposit liabilities from April 2019?
A. I mean, it's going to vary case by case. I'm not going to make any general statements.
Q. But Han Nara did deliver furniture within 14 days in 2019, correct, on average?
A. On average, we delivered 14 to 17 days.
Q. And a customer deposit liability is satisfied when the furniture is delivered to the customer, correct?
A. That's correct.

Q. All right. Did you provide Mr. Vermette with an estimate of customer deposit liabilities in September 2020?
A. I believe he may have asked for, like, some reporting, AR reporting out of HOMES, and I would have provided it to Evan.
Q. Did you provide him an estimate of the customer deposit liabilities?
A. I would have provided him an AR reporting that would have included liabilities.
Q. Did you do a manual calculation for Mr. Vermette?
A. At that time, I don't think so.
Q. Why not?
A. It wasn't asked.
Q. If he didn't ask, you weren't going to do it?
A. And it took very long. It would have taken many hours and time of which we did not have.
Q. Ms. Choi testified that she wanted a deal that was $17 million. As the CFO of the company, did you do anything to make sure she was getting her $17 million?
A. I did not.
Q. Why not?
A. It's her company, she's selling it.
Q. Did you understand that the Working Capital Target and the actual working capital would impact that purchase price?

A. Right. It's a component.
Q. And as the CFO, who has worked with her for 13 years, did you do anything to give her some assurance about the actual working capital number?
A. I mean, she asked if we could get a number for AR and it was impossible due to this time restraint and the amount of detail that it would take. Evan had volunteers that him and his team would take care of that and that's what we relied on.
Q. You're working with the seller party, Ms. Choi, who you worked with for 13 years. The buyer is separate. Mr. Francis is a certified forensic accountant as well, correct?
A. I'm not sure about that.
Q. All right. Did you and Mr. Francis work together to somehow give Ms. Choi some assurances regarding the working capital adjustment that could potentially happen based on actual working capital?
A. There was no way we could actually calculate accounts receivable.
Q. But you did provide a manual calculation to KPMG in March of 2020, correct?
A. I did.
Q. All right.
A. For a short time period.

10:39:14 Q. And that calculation reflected 2.6 million in customer deposit liabilities, correct?
10:39:19 A. It did.
10:39:20 Q. And that calculation reflected accounts receivable of 1 million, correct?
10:39:25 A. Yes.
10:39:26 Q. And a net AR of 1.6 million, correct?
10:39:28 A. That's what it would net to.
10:39:31 Q. And that calculation was reliable, correct?
10:39:33 A. For that specific time period and those customers.
10:39:36 Q. And you could do a manual calculation for 2020, correct?
10:39:43 A. It was possible, but it took a very long -- or too much time and we wouldn't have met any deadline.
10:39:50 Q. Did you tell Ms. Choi it would take too much time for you to manually calculate the customer deposit liabilities?
10:39:57 A. Yeah, I told her it was pretty much impossible for one man to do.
10:40:02 Q. But you did do a calculation in March?
10:40:05 A. For specific customers in a short period of time.
10:40:08 Q. All right.
10:40:09 MS. ALI: Let's move to admit JTX-146.
10:40:12 MR. ANDERSON: No objection.
10:40:13 THE COURT: It's admitted.
10:40:15 (JTX Exhibit No. 146 was admitted into

evidence.)

BY MS. ALI:

Q. Please turn to JTX-40. I want to focus in on September 4, 2020, at 8:44 a.m.

Mr. Martinez, the $38 million reflected here next to the word "written," what does that mean?

A. Looks like it's written sales.

Q. And the 27 million delivered, is that delivered sales?

A. That's what it looks like, 27 million worth of delivered sales.

Q. And the $10 million difference, is that the difference between the two numbers?

A. That would be the difference between the two numbers.

Q. And then the $7.1 million deposits, is that the customer deposit liabilities?

A. I'm sorry, can you repeat that?

Q. Sure. The 7.1 million deposits, is that the customer deposit liabilities?

A. I don't know. We didn't know what the deposit liabilities were. That's just a calculation.

Q. That's a calculation of the customer -- that is a calculation of the customer deposit liabilities, correct?

A. That's what the corrupt data showed.

Q. But it is a calculation of the customer deposit

liabilities?
A. It's a calculation that's incorrect, yes.
Q. And then Come, what does "Come" mean?
A. Comenity.
Q. And 32 percent?
A. That was a historical percentage of what we typically funded with Comenity.
Q. Did you provide this e-mail to Mr. Vermette?
A. I did not.
Q. Why not?
A. He didn't ask for it.
Q. So if he didn't ask for it, you weren't going to give it to him?
A. It was inaccurate data.
Q. But you did provide him an inaccurate AR subledger report, correct?
A. He requested it.
Q. And did you provide him other financials that were incorrect?
A. He wanted to calculate AR himself, with him and his team, and so we provided him with the information that he requested.
Q. You provided Mr. Vermette with unreliable, inaccurate estimates from Profits, but you did not provide him this unreliable calculation, correct?

A. He did not request it.
Q. And you did not provide it, correct?
A. He did not request it.
Q. If he didn't know about it, how could he request it?
A. You'll have to ask Evan.
Q. And Ms. Choi responds -- let's look up -- Ms. Choi responds with a sad face one minute later.
What was your understanding of the sad face?
A. I don't have an understanding of the sad face.
Q. Why did she respond so quickly?
A. You'll have to ask her.
Q. And at this point in time, Mr. Vermette was going to do the calculation, correct?
A. Yeah, he had mentioned that he was doing the calculation.
Q. Then why were you looking into this?
A. She had asked me, what do -- how can we or is there a way that we know what receivables or what the system shows. That's what the calculation showed.
Q. And when you saw this unreliable $7.1 million customer deposit number, did you say, "Ms. Choi, let me figure out manually what the right number is so you don't have a sad face"?
A. That's impossible.
Q. But you did do a manual calculation for a specific

10:43:38 set of time in March of 2020, correct?
10:43:39 A. It would have taken too long to do that.
10:43:42 Q. And you were -- and Han Nara was filing tax returns with its customer deposit liabilities, correct?
10:43:47 A. We did.
10:43:48 Q. And Han Nara was -- had financials with its customer deposit liabilities, correct?
10:43:53 A. We did.
10:43:53 Q. And Han Nara was providing DSG with financial information during negotiations of an Asset Purchase Agreement, correct?
(Reporter clarification.)
BY MS. ALI:
10:44:05 Q. Financial information, correct?
10:44:05 A. We did.
10:44:06 Q. All right.
10:44:08 MS. ALI: Now, let's turn to JTX-41.
BY MS. ALI:
10:44:16 Q. This is an e-mail from James Francis to you and Ms. Choi on September 4th, 2020 at 10:14.
10:44:26 MS. ALI: Let's take a look at the second line.
BY MS. ALI:
10:44:35 Q. It says: "A cap of plus or minus, about 500 on the 120-day WC true-up may be adequate for buyer and seller concern over amount of AR and customer deposits."

Do you see that?
A. I do.
Q. Mr. Francis proposed a collar around customer deposits and accounts receivable, right?
A. That's what it says.
Q. And he proposed it on September 24th, 2020, at 10:14 a.m., correct?
A. That's the timestamp.
Q. And Mr. Francis did this after the e-mail -- after the e-mail between you and Ms. Choi an hour and a half earlier, correct?
A. Sure.
Q. Did you ask Mr. Francis to negotiate a collar around net AR because you knew Han Nara's deposit liabilities were 7.1 million?
A. No.
MS. ALI: Your Honor, we move to admit JTX-41 into evidence if it's not already there.
MR. ANDERSON: No objection.
THE COURT: It's admitted and it is already there.
MS. ALI: All right. Let's turn to the APA, which is JTX-1, please turn to page 144.
BY MS. ALI:
Q. Schedule 3.7(a) is Han Nara's financial statement.

Mr. Martinez, did you prepare the financial statements attached to the APA?
A. I believe James did.
Q. James Francis did?
A. Yes.
Q. So he didn't do taxes, he did your financials as well?
A. He compiled the financials.
Q. Did you provide him information from Profit to prepare the financials?
A. We provided him with the information.
Q. And was the information from Profit accurate?
A. Everything except AR.
Q. So the accounts receivable amounts reflected in the APA are inaccurate, correct?
A. Say that again.
Q. So the amount of accounts receivable reflected in these balance statements are incorrect, right?
A. No. Anything prior to COVID was accurate -- I mean, not COVID -- ransomware, is accurate. And post-ransomware would have been inaccurate AR.
MS. ALI: All right. Let's take a look at Page 155.
BY MS. ALI:
Q. So this is dated 12/31/2019. This is after the

ransomware attack, correct?
A. It is.
Q. And the accounts receivable here of 2.8 million, that's incorrect, right?
A. Correct.
Q. All right. Let's move on.
MS. ALI: Please go to Page 158.
BY MS. ALI:
Q. These are -- this is Han Nara's balance sheet for 3/31/2020, accounts receivable here is a positive 3.6 million. This amount is incorrect, right?
A. That's what the system showed.
Q. So it's not accurate, correct?
A. Yeah, it's flawed data, yes.
Q. All right.
MS. ALI: Let's go to the second quarter balance sheet, 161, Page 161.
BY MS. ALI:
Q. And this is Han Nara's balance sheet as of June 30th, 2020. Here, it shows accounts receivable is about negative 3.6 million. That number is inaccurate, correct?
A. Yes.
Q. So it is wrong?
A. The AR is incorrect as DSG was aware.
Q. All right. Now, I want to talk about the 120-day

true-up.

So after the acquisition, you joined DSG as an employee, correct?

A. I did. October the 1st, 2020.

Q. And you were still in charge of the accounting of the former Han Nara stores, correct?

A. I reported to Fedeliz and Dawn.

Q. But you were still involved and you were doing Han Nara's accounting -- or DSG accounting for the former Han Nara stores, correct?

A. Yes, I was involved.

Q. And you were a part of DSG's accounting team?

A. I was a part of DSG's accounting team.

Q. And as a member of the team, you provided DSG's accounting team report --

(Reporter clarification.)

MS. ALI: Sorry.

BY MS. ALI:

Q. And as a member of DSG's accounting team, you provided them reports post-closing related to customer deposit liabilities and accounts receivable, correct?

A. Yes, I gave them the reports they requested.

Q. And as a member of the team, you understood that they were relying on you as a member of the team to provide complete and accurate information, correct?

A. Incorrect.
Q. Why?
A. Because they knew that AR was not reliable and Evan and his team were the ones calculating the correct data.
Q. But they were relying on you for reports, correct?
A. They wanted the incorrect -- or the incorrect data from Profit, yes.
Q. And you're a Profit -- you have 13 years of experience in Profit and you provided them the reports that they requested, right?
A. I provided them the reports they requested.
Q. Did they pull the reports or did you pull the reports?
A. They had access to pull the reports.
Q. Did you pull the reports or did they pull the reports?
A. If they requested it from me, I pulled the reports.
Q. And your team knew these reports were being used for the final calculation?
A. I don't know what those reports were used for.
Q. You weren't involved with preparing the true-up calculation?
A. I was not involved.
Q. What did you think they needed the report for?
A. On a monthly basis, they would request different type

of reports.
Q. And what did you believe they needed the reports for?
A. Their financing on their end, like the DSG, whoever I reported to, Fedeliz, Justine and Dawn.
Q. And did you provide them complete reports?
A. They were inaccurate. They were aware.
Q. And you told them every report that you provided was inaccurate?
A. They would ask me: "Why do the subledgers and the GL not agree?"
And I said, "Hey, you need to get with Evan, this is something that you and your team are working through."
Q. And that would be reflected in an e-mail, correct?
A. That is.
Q. And did you provide them delivery reports?
A. Maybe. I don't recall.
Q. And the delivery reports you provided them, they would be accurate, right?
A. If they were from DispatchTrack, yes.
Q. If the delivery reports -- if it was a Profit report related to deliveries, was it accurate?
A. We wouldn't know, because, I mean, of the bug.
Q. So the delivery reports in Profit were unreliable?
A. There's a possibility, yes.

Q. Let's take a look at the reports you provided DSG's accounting team.

MS. ALI: Please turn to PTX-101.

THE COURT: Let's go ahead and take a morning break here. It's 10:51. We'll be back at 11:05.

COURT CLERK: All rise.

(A brief recess was taken.)

COURT CLERK: All rise.

THE COURT: All right. Please be seated. Let's continue.

MS. ALI: Chris, will you please pull up PTX-101. Let's turn to the top of page 2.

BY MS. ALI:

Q. Mr. Martinez, this is an e-mail from Justine Hudson to you dated November 2nd, 2020, and Josh Copeland.

It says: "Hi, Michael" --

MS. ALI: And I want to scroll to Bullet Point 2.

BY MS. ALI:

Q. She's asking for the estimated income contribution, written sales, delivered sales, gross margin, EBT for October.

And you see the comments: "Can you please provide earlier, if possible."

Do you see that?

11:10:43 A. I do.
11:10:43 Q. Was it your understanding that Ms. Hudson wanted the written and delivered sales for October 2020?
11:10:54 A. Deadline: October 2020 --
11:10:58 MS. ALI: Chris, can you zoom out?
11:11:02 THE WITNESS: I'm not sure, I don't see a time period there.
11:11:05 MS. ALI: All right. Let's scroll up. Hold on.
BY MS. ALI:
11:11:08 Q. Bullet Point 2, it says: "EBT for October."
11:11:13 A. Is that a highlighted section somewhere?
11:11:15 Q. Yes. So if you're -- you're on -- do you see the highlighted portion on the screen?
11:11:20 A. Correct.
11:11:22 Q. What was your understanding, she needed the written sales -- the written and delivered sales, for what month?
11:11:28 A. October.
11:11:29 MS. ALI: All right. Let's scroll up.
BY MS. ALI:
11:11:35 Q. Let's look at your response on November 2nd, 2019. So that same day at 9:20 p.m. Here we have highlighted in green, written 5 million, delivered 5.5 million.
11:11:51 Mr. Martinez, is this information from Profit?
11:11:55 A. That information possibly could be from Profit.
11:11:58 Q. Is it reliable?

11:12:00 A. Written should be, yeah.
11:12:02 Q. How about delivered?
11:12:05 A. Possibly, yes.
11:12:06 Q. Is it reliable?
11:12:08 A. Possibly, yes.
11:12:09 Q. Did you give Ms. Hudson inaccurate information?
11:12:13 A. Without looking into the information, I don't know.
11:12:15 Q. But you provided this information to Ms. Hudson, correct?
11:12:18 A. It's what she requested, yes.
11:12:20 Q. And it includes the written sales for October 2020, which is from Profit, correct?
11:12:24 A. Correct.
11:12:24 Q. And it shows the delivered sales from Profit of 5.5 million, correct?
11:12:29 A. I don't know where the delivered came from.
11:12:31 Q. But you provided it that same day. Is there any other database you could have pulled this information from?
11:12:37 A. DispatchTrack.
11:12:38 Q. So you could have pulled this from DispatchTrack?
11:12:40 A. Correct.
11:12:41 Q. All right. So the 5.5 million could be from DispatchTrack?
11:12:44 A. It could be.
11:12:45 Q. Or it could be from Profit?

A. Possibly.
Q. But you had a way to figure out the delivered for October 2020, correct?
A. That's what -- yeah, depending on where it came from.
MS. ALI: Let's take a look at JTX-40.
BY MS. ALI:
Q. Here, the 38 million written, is that from Profit?
A. Written, it would have been from Profit. Yes.
Q. The delivered 27 million, could that be from DispatchTrack?
A. It probably was.
Q. But it could be from Profit, correct?
A. More than likely, it came from DispatchTrack.
Q. And are these numbers reliable?
A. They're -- that's what the system showed.
Q. And so it's possible these are accurate, correct?
A. Without knowing -- there's no -- so this data came from the corrupt system, so there's no way of telling what is accurate or inaccurate.
Q. Right. But you just provided Ms. Hudson with written and delivered sales amount for October 2020, correct?
A. Yes.
Q. And those amounts could be from Profit, correct?
A. The written could be from Profit, yes.
Q. And the delivered could be from DispatchTrack or

11:13:53 Profit, correct?
11:13:54 A. More than likely, it was DispatchTrack.
11:13:56 Q. And those -- those two numbers were accurate, correct?
11:14:01 A. There's no way to tell.
11:14:02 Q. So you provided Ms. Hudson inaccurate information?
11:14:06 A. I don't know without looking at -- that's what the system at the time said.
11:14:10 Q. But you provided her information from the system and you didn't tell her it was inaccurate, correct?
11:14:14 A. Oh, she knew our system was corrupt.
11:14:16 Q. And she kept asking you for the delivery and written information, correct?
11:14:20 A. Yes.
11:14:21 Q. Okay. And this information could also be possibly accurate, correct?
11:14:25 A. No. It couldn't be.
11:14:26 Q. But it is written sales that are from Profit, correct?
11:14:30 A. It's what the corrupt database shows.
11:14:32 Q. And the delivered could be from DispatchTrack or Profit, correct?
11:14:35 A. More than likely DispatchTrack.
11:14:37 Q. And you didn't provide this to Mr. Vermette, correct?
11:14:40 A. Right.

MS. ALI: All right. Let's take a look at -- let's go back to the e-mail with Ms. Hudson.

BY MS. ALI:

Q. Mr. Martinez, if you want to scroll down -- let me know if there's any -- any place in this e-mail where it's notated that the numbers you provided Ms. Hudson were inaccurate?

A. Over the phone. So she knew from the very beginning. She -- as soon as September -- because she wanted September's information before this October e-mail and that's where they were aware that we had a problem with AR module.

Q. All right. Here she's saying, "To make our meeting tomorrow most productive, could you please provide us Request Number 11, Wells Fargo bank statements for October, today, so Liz can update our analysis to the end of the month."

It was your understanding that Ms. Hudson and her team were doing an analysis of Han Nara's numbers, correct?

A. That's what she said.

Q. And she was asking you for information that was accurate, correct?

A. She was asking me for the information out of the system.

Q. All right. And she was relying on you for accurate information, correct?
A. She knew that the information was inaccurate.
Q. And you had been using Profit for 13 years, correct?
A. We have.
Q. And -- and it was your testimony that from -- DSG employees didn't know how to use Profit, correct?
A. I was -- so the conversation that I had with any of the DSG employees, they made it aware that none of them were experts in Profit.
Q. So they were relying on you for Profit reports, correct?
A. They said the reports they asked me to pull.
Q. And they were relying on you because they didn't know how to use Profit, correct?
A. I'm not sure what they did know or did not know.
MS. ALI: Let's take a look at your disclosure schedule, your -- your defendants' rebuttal expert disclosure. Paragraph 11.
BY MS. ALI:
Q. Because plaintiffs almost -- "Because plaintiffs have almost no experience with Profit, no employees who really understood it and no measurable expertise to speak of it, plaintiffs and their pro offered expert's generation, preparation, reliance upon and analysis of reports and

spreadsheets and underlying sales and receivables data allegedly obtained from Profit, in addition to the faulty data contained in the reports and spreadsheets themselves is unreliable."

Mr. Martinez, did you believe DSG employees knew how to use Profits?

A. From what I -- the conversations with them, there was not very many people within that company.

Q. And they were relying on you for those reports, correct?

A. Yes. They were aware that the reports were faulty.

Q. But they were relying on you for information from Profit?

A. They asked me to pull the reports when they had access to Profit themselves.

Q. But they didn't know how to use Profit, right?

A. They asked for access.

Q. And you put it in your disclosure that they didn't know what they were with doing, correct?

A. That's my understanding.

MR. ANDERSON: Objection.

THE COURT: Overruled.

MS. ALI: All right. Let's go to JTX-68.

BY MS. ALI:

Q. All right. Mr. Martinez, this is an e-mail from you

to Justine, copying Fedeliz, on 11/24/2020.

Did you tell Justine and Fedeliz about "ghost accounts"?

A. I did.

Q. Is the word "ghost account" in here?

A. I'm not sure.

Q. Did you want to take a look?

A. Doesn't look like it's in this specific e-mail.

Q. But you are -- I'm sorry. Go ahead.

A. It doesn't look like it's in this specific e-mail.

Q. But you are talking about different accounts in the AR subledger report, correct?

A. They had asked some questions about some accounts, yes, in the subledger.

Q. And here under Martinez, it says, "Ransomware erase data."

Is that a ghost account?

A. Without seeing like the whole communication of this e-mail, I'm not sure what was being spoke of at the time.

Q. But if these accounts were inaccurate because of ghost accounts, that should be reflected here, correct?

A. I can't answer that question, not seeing what the full -- because I know this e-mail is a whole lot longer than this.

Q. Oh, no, no. You don't have a binder.

11:19:37 Do you have your documents in front of you?
11:19:45 Go ahead and go to JTX-68.
11:19:50 MS. ALI: Your Honor, may I approach?
11:19:53 THE COURT: Yes.
11:20:00 MS. ALI: Sorry. Mr. Martinez, it's in here.
11:20:05 MR. KEITH: And, Your Honor, I have copies for
11:20:08 the Court. May I approach?
11:20:09 THE COURT: That's fine.
11:21:17 THE WITNESS: Is there an attachment to this
11:21:20 original e-mail that's dated October 27th?
11:21:23 BY MS. ALI:
11:21:23 Q. There doesn't appear to be an attachment. If you
11:21:26 look at the e-mail, the top e-mail, subject line says "AR
11:21:31 customer deposit subledger." There's no attachment.
11:21:33 A. The first line reads, "Attached are eight customers I
11:21:41 would like you to look into."
11:21:45 Q. What page are you on?
11:21:50 A. It's the e-mail dated October 27th at 12:37.
11:21:56 Q. If the attachment is not there, Mr. Martinez, it's
11:22:00 not in there.
11:22:22 MR. ANDERSON: Can we look on the screen --
11:22:32 MS. ALI: We're just at the first page of
11:22:36 JTX-68.
11:22:36 MR. ANDERSON: I can't see the whole document.
11:22:38 He's saying there's an attachment to the e-mail in the

chain.

BY MS. ALI:

Q. Can you say the Bates numbers that you're looking at?

A. What is the Bates number? The number at the very bottom?

Q. Yeah. So you see JTX-068.0001.

A. It's 0010.

Okay. What was your question?

Q. Is the word "ghost account" in there?

A. Not on that particular page.

Q. So you are talking about the AR subledger report in the various accounts, correct?

A. In this e-mail, yes.

Q. And what are you explaining to Ms. Hudson?

A. Looks like she asked questions about eight customers in the system and how they needed to be handled.

Q. And what did you tell her?

A. It looks like it says specifically Martinez needs to be written off from 2011.

Q. Could that have been a possible ghost account?

A. Possibly.

Q. How about the other accounts listed on here?

A. They look like they vary.

Q. So the AR subledger had some valid accounts, correct?

A. It says zero balance, zero balance, zero balance.

Customer needs to be written off. Customer needs to be written off. All research 1. Customer owes 10,000.

Q. And you were explaining to them how you would determine if it was a valid account, correct?

A. Through research, yes.

Q. All right. Let's take a look at JTX-69.

MS. ALI: Oh, Your Honor, we move to admit JTX -- we move to admit PTX-101 into evidence if I haven't already done so.

MR. ANDERSON: I don't know what that is anymore.

THE COURT: Well, you know it's 101.

MR. ANDERSON: No objection.

THE COURT: All right. It's admitted.

(PTX Exhibit No. 101 was admitted into evidence.)

MS. ALI: And we also move to admit JTX-68 into evidence.

MR. ANDERSON: No objection.

THE COURT: It's admitted.

(JTX Exhibit No. 68 was admitted into evidence.)

BY MS. ALI:

Q. All right. Now JTX-69, please. All right. This is an e-mail on December 30th, 2020 from Fedeliz to you, copying Justine.

11:25:44 It says, "October 2020, Hey, Michael can you please" -- scroll down. "Can you please send me October 2020 delivered report, same as above."

11:25:58 MS. ALI: Let's scroll up. Let's look at the attachment.

BY MS. ALI:

11:26:09 Q. Is this from Profit?

11:26:10 A. It is.

11:26:12 Q. Is this -- what's reflected here?

11:26:15 A. That is titled "Accounts Receivable by Term Code Delivered."

11:26:19 Q. So what would that reflect?

11:26:22 A. That would reflect what Profit thought was deliveries for October the 1st through October 31st.

11:26:30 Q. Is this accurate?

11:26:32 A. There's no way to tell.

11:26:34 Q. Is this complete?

11:26:36 A. That's what's in the system.

11:26:38 Q. And you provided this to DSG's accounting team. Did you tell them it's inaccurate?

11:26:45 A. They knew the information was inaccurate.

11:26:48 Q. And they still asked you for it?

11:26:49 A. They continued to ask.

11:26:50 Q. Did you realize they were using this for their true-up analysis?

11:26:54 A. I didn't know what they used the information for.
11:26:56 Q. What did you think they needed the information for?
11:26:58 A. I didn't think.
11:27:03 Q. Mr. Martinez, how much in sales did Han Nara do in 11:27:07 2019?
11:27:10 A. I think 60 to 70 million.
11:27:13 Q. Okay. 60 to 70 million. So you have a very 11:27:16 high-volume business, very profitable business, correct?
11:27:19 A. Correct.
11:27:19 Q. So how is Han Nara tracking all these deliveries and 11:27:23 keeping track of the 70 million?
11:27:25 A. We had DispatchTrack.
11:27:27 Q. And were you using Profit as well?
11:27:29 A. We were.
11:27:30 Q. And so you had to have reliable accounting 11:27:34 information to make sure you're bringing in $70 million, 11:27:37 correct?
11:27:38 A. The data we input was correct. We couldn't control 11:27:41 the back end.
11:27:42 Q. Right. But the deliveries, that's a big part of your 11:27:45 job, correct?
11:27:49 Tracking delivery information, that's important 11:27:52 to your job, correct?
11:27:53 A. Yes, we would want to know what we delivered.
11:27:56 Q. So the $70 million of sales that were being

delivered, how were you tracking that?
A. We had DispatchTrack.
Q. And you didn't use Profit to track deliveries?
A. Profit was used, yes.
Q. And Profit had reliable delivery information, correct?
A. It was case by case. You'd have to go case by case.
Q. All right.
MS. ALI: Let's look at PTX-104. This is an e-mail dated December 31st, 2020.
BY MS. ALI:
Q. Can you tell me what's going on here?
A. Looks like there was an e-mail sent by Fedeliz and she's asking for AR by term code delivered for both November and December.
Q. Did you provide her those reports?
A. If I replied, yes.
Q. And you did. So you replied on December 31st, 2020, and there's two attachments.
MS. ALI: Let's look at those two attachments.
BY MS. ALI:
Q. And this is the AR by term codes delivered dated December 2020, correct?
A. December 1st through December 31st of 2020.
Q. Is this from Profit?

A. That is a Profit report.
Q. Is this accurate?
A. There's no way to tell.
Q. Is this complete?
A. There's no way to tell.
Q. And you provided this to DSG's accounting team, correct?
A. They requested it. They received it.
Q. And you knew Ms. Hudson and Ms. Diones were calculating the actual working capital, correct?
A. I did not know anything.
Q. But you were a part of DSG's accounting team at this point, correct?
A. They did not tell me that they were involved in calculating anything.
MS. ALI: Your Honor, we move to admit PTX-104, 104a and 104b into evidence.
MR. ANDERSON: No objection.
THE COURT: It's admitted.
(PTX Exhibit No. 104, 104a and 104b were admitted into evidence.)
MS. ALI: And, Your Honor, I'd also like to move JTX-69 and JTX-69a into evidence.
MR. ANDERSON: No objection.
THE COURT: They're admitted.

11:30:03 (JTX Exhibit No. 69 and 69a were admitted into evidence.)

11:30:05 BY MS. ALI:

11:30:05 Q. Let's take a look at the final calculation, so
11:30:09 JTX-73. This is a spreadsheet so you won't have it in your
11:30:14 binder.

11:30:25 All right. Mr. Vermette writes on January 19th,
11:30:33 2021, he sends it to Aggie and you're copied here along with
11:30:38 Sam Hawthorne, James Francis, Delaney Vun, Mike Linton and
11:30:42 yours.

11:30:42 Who is Sam Hawthorne?

11:30:43 A. He is an attorney in Lubbock.

11:30:45 Q. Did he represent Han Nara?

11:30:46 A. He did.

11:30:47 Q. And who is James Francis?

11:30:48 A. He's Han Nara's accountant.

11:30:51 Q. All right. And it says, "Aggie, as per Section 1.9
11:30:55 of the APA, we had until January 28, 2021 to finalize the
11:31:00 components that factor into the working capital to finalize
11:31:03 the cash payment. I had intended to get this to you
11:31:05 earlier, but it apparently took a substantial amount of time
11:31:09 for members of DSG's and Michael Martinez's respective
11:31:14 accounting groups to work through the detail of the accounts
11:31:17 receivable and customer deposit liabilities."

11:31:21 Mr. Martinez, do you see that?

A. I do.
Q. Did you work with DSG's accounting team in connection with the final working capital?
A. I did not.
Q. Did you explain to DSG's accounting team how Han Nara did their accounting?
A. Yes.
Q. And did you walk through the AR subledger report with DSG's accounting team to explain some of the discrepancies in the data?
A. They knew the data was corrupt, yes.
Q. And you provided them with delivery reports, correct?
A. I provided them with the data they requested.
Q. All right.
MS. ALI: Let's take a look at the attachment, 73A.
BY MS. ALI:
Q. All right. So you see all these separate tabs on the bottom?
So there is AR by customer --
MS. ALI: Let's go from the left to the right.
BY MS. ALI:
Q. AR by customer. Then there's customer deposit and then it's account receivable. And then there's AR delivered, October through December.

You provided those reports, correct?
A. I don't know what reports were reflected in this spreadsheet.
Q. All right. But you did provide an AR delivered report to Ms. Hudson for October, November and December 2020, correct?
A. I did.
Q. And those possibly could be reflected here, correct?
A. I don't know that.
Q. But that's what it says here, right?
MS. ALI: Let's click on it.
BY MS. ALI:
Q. Do you see that -- does this look familiar to you?
A. It does not.
Q. Did you look at this spreadsheet when you received it?
A. I'm sure I looked at it.
Q. Did you tell Ms. Choi, "I provided them these reports"?
A. I did not.
Q. Did you think it was important to tell Ms. Choi, "I provided them delivery reports for Profit"?
A. I don't know what reports they used for this spreadsheet.
Q. Right, but Ms. Choi wanted her $17 million, right,

and she understood that the actual working capital reduces that number, right?

A. Can you repeat that?

Q. Sure. So you received this Excel spreadsheet. Ms. Choi has testified that everyone on her team knew and Evan knew that she had this deal because she wanted $17 million. The deal would be impacted by the customer deposit liabilities, correct?

A. That was calculated by Evan, yes.

Q. No, but that's in the contract, correct?

A. Evan calculated, yes.

Q. So now we're doing the actual working capital, and that impacts the purchase price, correct?

A. That's my understanding.

Q. And if there's an adjustment, that's going to impact the purchase price, right?

A. That's my understanding.

Q. So did anybody -- we have a CPA James Francis. We have you, who has been running the company for 13 years as a CFO or controller -- did you guys look at this say, "Hey, these are reports from Profit that are unreliable. Maybe we should do our own calculation"?

A. We don't know what reports are reflected in this spreadsheet.

Q. Right. And you didn't know, but did you think, hey,

these could possibly be Profit reports because where else is DSG getting this information from?
A. Yeah. DSG and Evan created these. So I don't know.
Q. Right. And the fact that you didn't know, was that like, hey, Ms. Choi, we want to make sure you get the -- we get the right actual working capital, right?
A. We trusted Evan. Evan said he was going to calculate it.
Q. And DSG's team trusted you to provide them accurate, complete reports from Profit, correct?
A. They knew the information was inaccurate and incomplete.
Q. But they were asking you for information, correct?
A. They were asking for incomplete and inaccurate information.
Q. And that inaccurate information is right here in this report, correct?
A. I don't know what reports are in the spreadsheet.
MS. ALI: All right. Let's take a look at the -- what everyone agreed to. So go back to COO, the first tab. Let's scroll down.
BY MS. ALI:
Q. Here it says, "Customer deposits, 4. -- 4,747,210.58."
Do you see that?

A. I do.
Q. Did you tell Ms. -- Ms. Choi or did you -- what did you do when you saw this number?
A. Nothing.
Q. Why?
A. We trusted in Evan, and his team said they were going to do the true-up. They got a different number from what it was at close and just moved forward.
Q. The APA is between the seller parties and the buyer. Evan is the buyer. Ms. Choi and her team are the seller. Did you do anything to make sure that number was accurate?
A. I did not.
Q. Did James Francis do anything to make sure that number was accurate?
A. You'll have to ask James.
Q. Are you aware if James Francis did anything to make sure that number was accurate?
A. You'll have to ask James.
MS. ALI: Let's take a look at the accounts receivable. $581,591.73.
BY MS. ALI:
Q. What did you think of that calculation?
A. I didn't think anything.
Q. Did you do anything to check that number?
A. I did not.

Q. Are you aware if Mr. Francis did anything to check that number?
A. You'll have to ask James.
Q. But Ms. Choi wanted to make sure that she received as much money as possible, correct?
A. I don't know what her intentions are.
Q. Was it your understanding that Ms. Choi made this deal because she thought she was going to walk away with $17 million?
A. I know she requested -- was requesting $17 million.
Q. And you understand as an accountant that the actual working capital impacts the purchase price, correct?
A. I understand that the calculations that Evan did are these numbers that are in the APA.
Q. So what did you do to protect Ms. Choi?
A. I didn't do anything.
Q. What did -- do you know if Mr. Francis did anything to protect Ms. Choi?
A. You'll have to ask Mr. Francis.
Q. And do you know if the parties agreed to the terms in the APA?
A. I believe so.
Q. And are these the numbers that the parties agreed to as the actual working capital?
A. I don't remember.

Q. Okay. Then we'll take a look. And Mr. Martinez, you didn't do anything with respect to these calculations, correct?
A. I did not have anything to do with this spreadsheet.
Q. But you did do a calculation on March 2nd, 2020, for KPMG, correct?
A. I did.
Q. And you could do a calculation of a 120-day period of the customer deposit liabilities if you wanted to, correct?
A. Correct.
Q. But you didn't, correct?
A. We did not. There were 10,000 to 20,000 accounts in in the system.
Q. And you did do a calculation or you found a calculation that was 7.1 million in customer deposit liabilities, correct?
A. No.
Q. The JTX-40, we want to look at that? On September 24th, 2020 --
A. That was no manual calculation. That was just raw data that was produced out of the system.
Q. But that was a calculation of the customer deposit liabilities, correct?
A. If that's the way you want to look at it, sure.
Q. And it didn't concern you that that calculation out

of Profit was unreliable, and you provided reports from Profit to DSG teams that could potentially be unreliable?

A. They knew the reports were unreliable. And that's why they were going to calculate it themselves.

Q. Have you done a calculation of the customer deposit liabilities as of September 30th, 2020?

A. Outside of this, like, litigation, no.

Q. So Mr. Fahlman's number of 9.2 million could be correct, right?

A. Absolutely not.

Q. How do you know that?

A. Because after, like once this litigation started, I looked into each one of those accounts.

Q. And so do you have a number?

A. I do not. I didn't have enough access to the data. DSG would not grant me enough access to the data to get what I needed to get a solid number.

Q. So Mr. Fahlman's number could be correct, right?

A. No, it's not.

MS. ALI: I pass the witness.

REDIRECT EXAMINATION

BY MR. ANDERSON:

Q. Just a couple questions, Mr. Martinez.

Ms. Ali pulled up the financial statements that were prepared and put in the Asset Purchase Agreement, do

you remember that, that Mr. Francis prepared?
A. Yes.
Q. So in the Asset Purchase Agreement, those financial statements that she pulled up earlier and looked at, those were prepared by Mr. Francis. Do you recall testifying that way?
A. Yes.
Q. Did the financial statements that were created that she looked at earlier, were they reliable?
A. Not the accounts receivable. And it's got to be -- anything prior to 2019, yes, they were reliable.
Q. Anything prior to 2019 was reliable?
A. Correct.
Q. Anything afterwards in the accounts receivable number wasn't reliable?
A. Correct.
Q. Did those financial statements reflect what the system was showing?
A. They did.
Q. So even though they were suggest- -- they were reflecting what the system was showing, they weren't reliable. Is that what you're saying?
A. Correct.
MS. ALI: Objection. Leading.
THE COURT: Overruled.

11:40:51 BY MR. ANDERSON:
11:40:51 Q. The answer is correct? The one thing that I
11:40:57 neglected to ask you when I was up here earlier with you --
11:40:57 do you know Shawn Roberts?
11:40:58 A. Yes.
11:40:58 Q. Who is Shawn Roberts?
11:40:59 A. I believe he's the finance manager for DSG.
11:41:02 Q. Did you tell him that Han Nara prefunds with Comenity
11:41:07 Bank?
11:41:07 A. He was aware as well. Johnny Martinez had to send
11:41:11 him reports on a weekly basis.
11:41:13 Q. Who is Johnny Martinez?
11:41:14 A. He was the -- our AR or finance manager.
11:41:18 Q. Is he related to you?
11:41:20 A. No.
11:41:21 Q. So it's your understanding that Johnny Martinez told
11:41:27 Shawn Roberts that Han Nara prefunds with Comenity?
11:41:29 A. Yes. And they knew because they had -- they made us
11:41:33 create, like, new log-ins to our merchant accounts, and if
11:41:37 anyone logged in from DSG's side into those new merchant
11:41:41 accounts that they made us create, they would recognize.
11:41:47 MR. ANDERSON: Thank you. I have no further
11:41:49 questions.
11:41:49 THE COURT: Thank you. You may step down,
11:41:51 Mr. Martinez.

THE WITNESS: Thank you.

MR. ANDERSON: Your Honor, the defense calls Troy Dahlberg, our expert witness.

COURT CLERK: Please remain standing and raise your hand. Please state and spell your name for the record.

THE WITNESS: Troy Anthony Dahlberg. T-R-O-Y, A-N-T-H-O-N-Y, D-A-H-L-B-E-R-G.

TROY DAHLBERG, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ANDERSON:

Q. Good morning, Mr. Dahlberg.

A. Good morning, Mr. Anderson.

Q. Could you please introduce yourself to the Court?

A. My name is Troy Dahlberg. Let's see. I'm a partner or managing director at HKA Global and I'm one of the senior partners in our postacquisition national practice.

Q. Can you please describe your professional experience?

A. So like I said, I'm currently a lead partner in our postacquisition disputes. I should have said practice. Prior to that, I had 11 years with KPMG as their national partner in postacquisition disputes, based out of New York, and that was pre my retirement because they have a mandatory age 60 retirement, so I moved on from there.

Q. Do you have any litigation in arbitration experience?

A. I do.
Q. Can you please describe that for the Court?
A. So I've -- well, lots of it within the forensic accounting career that I've had. But I've had 22 times where I've testified in either arbitrations or trial testimony. And then I think it's about 35 times that I've testified in depositions.
Q. Have you acted as a neutral accountant?
A. I have. In over 40 matters. And most of the time when I was serving as a neutral or an arbiter, it was in postacquisition disputes, because like this contract, they built accounting provisions in for neutral accountants for the arbiters for mainly working capital disputes like here, but it can also involve other types of assets, debt, cash, that kind of thing.
Q. Is it unique to be a neutral accountant?
A. It's unique to have the opportunity to do it as much as I have. And the reason I did get to it is because I was KPMG's lead person. And in the disputes, people, a lot of times, like to go to a big four accounting firm or at least a big international firm.
And so if you're with PricewaterhouseCoopers or Ernst & Young or Deloitte or even BDO or Grant Thornton, those would be the preferred choice because of the recognized accounting name.

Q. Can you please describe your educational experience?
A. I have a BA from the University of California, Berkeley. I have a JD from Southwestern Law School in Los Angeles. I have a CPA from New York State. I have a CPA from the State of California.
I'm a member of the bar in the State of California. I have an accredited business valuation from the American Institute of Certified Public Accountants. And I have a certified in forensic -- financial forensics from the American Institute of Certified Public Accountants.
Q. Thank you. Have you published on the subject of representations of warranties?
A. Yes. So on the top two bullet points here, I actually was co-author in the only real guidance the AICPA has put out about having to do with forensic accounting in mergers and acquisition disputes. I was with -- the co-author with about 12 other people from big accounting firms in the field of consultant firms, and a couple of lawyers actually on that one, and that was in 2012.
And then the top one was an updated supplemental because of sort of the increase in reps and warranties in insurance dispute matters. So we felt -- we came back to the AICPA and said we would do a supplemental one, sort of update with guidance as to how those cases were moving along.

Q. Can you please describe your experience in representation of warranty claims?

A. So I've served as an expert witness and testified primarily in arbitrations in the reps and warranties because that seems to be the preferred -- at least from my experience, the preferred place that those disputes go.

Some of the private ones, like this where it's just buyer and seller, kind of a mix of courts and arbitration, but I've done a number of ones involving the insurance companies. And they pretty strongly -- not always, but pretty strongly push for arbitration clauses in the insurance policies for reps and warranties. So I've done that.

And then probably been a consultant, to either insurance companies and/or buyers and sellers on over 25 reps and warranty matters. There are a lot more disputes in these types of matters now, especially with the insurance, than there used to be, let's say, 15 years ago. A number of insurance companies came out and started selling policies. A lot of times, they're private equity in a deal, but just in general. And so these kind of disputes in the insurance area have become much, much more common than they used to be.

MR. ANDERSON: Your Honor, I'd like to move Mr. Dahlberg -- I'd like to move to qualify him as an expert.

MS. ALI: Your Honor, we object and we renew our objection under Rule 702. We ask that his substantive testimony be excluded because under Rule 702, it's not reliable, it's speculative, and it is not helpful to the trier of fact.

THE COURT: All right. So what I'm going to do is I'm going to conditionally admit the testimony subject to a later Rule 702 determination by the Court, which the parties can address in their post-trial briefing to the extent they still want to raise that objection.

MS. ALI: Thank you, Your Honor.

THE COURT: And that is expressly permitted under Third Circuit law.

Go ahead, Mr. Anderson.

MR. ANDERSON: Thank you, Your Honor.

BY MR. ANDERSON:

Q. Please describe for the Court what you were engaged to do by the defendants.

A. Well, I was primarily engaged to be a rebuttal expert. I was aware, when I was engaged, that Mr. Fahlman had been retained by plaintiff to do an analysis relating to the amount of customer deposits that were existing at the time of the closing.

And so at the time I was hired, his first report hadn't -- I don't think it had been issued yet. So that was

when I was retained, but that was my understanding of what I would do.

Q. Can you just summarize your findings?

A. Let's see here. Well, there is a slide that would make it just a tad bit easier.

Q. There we go.

A. Okay. So the overall finding is that the evidence -- the best evidence supports, based on everything I've reviewed for information here, that the customer deposit liability should have been determined to be -- and it actually was, by the parties, determined to be $4,747,211.

And that this comes out of basically an agreement the parties had in the purchase price -- I'm sorry, in the Asset Purchase Agreement, Section 1.9, as to how the customer deposit liability amount would be determined.

And both parties sort of agreed to it, and they gave out a 120-day period after the closing for -- in that section, for the buyer to go ahead and prepare a detailed analysis including the names and the amounts that were related to specific customers for the actual customer deposit liability.

Q. Okay. And are these the four points that summarize your opinions?

A. Yes. So basically the four points kind of go over

sort of the fundamental building blocks for how I arrived at the top opinion.

So the first point, A, is pretty much that -- based on my review of the information that was available through depositions and I have sat in on some testimony here in the last of couple days, which has just sort of reinforced what I already sort of understood through depositions and other e-mails and other evidence, that there was just no way that I believe that Mr. Fahlman could believe that the underlying data that he did his analysis on was accurate or reliable, or basically it's clear that from the information I've seen that the information was considered to be -- by many people -- to be inaccurate and unreliable.

And he seemed to not even really consider this sort of factual base. And then just decided, I guess for whatever reason, he was going to go off and do his own calculations without taking into consideration the various, you know, statements people have made who knew quite a bit about the information.

Then the next point there is that the parties actually agreed to, as we talked about before, in the Purchase Agreement in Section 1.9, how to come up with the customer deposit liability, because at the time of the close, the information pretty much clearly shows nobody at

DSG or at Han Nara knew how to calculate this. They didn't have the underlying information to do it.

So they agreed upon a methodology as to do it and I feel that the methodology they had used was a reasonable methodology. It's not uncommon based on what I've seen in looking for working capital adjustments. And I think there was a pretty solid effort put forth by the DSG team to try and arrive at the best information that was available in that 120-day period to give us a good shot at how to do the calculation.

Then I did an analysis under C of the actual calculations and analysis that Mr. Fahlman did as far as his selection of the data and then his testing of the data. And I found that to be pretty questionable and quite frankly, a lot of the testing he did to be not even really testing.

He basically claimed he had tested and tied out a lot of the information that he had pulled in this sample of 159 items but, in fact, and we can get into this a little bit later, what I came to find out is almost half of what he was claimed he was tying to underlying source material was not tied to that at all. So I just really left the question as to how he even believed that the information he was looking at was reliable.

And then the last thing was that, based on my experience as both working for buyers and sellers, as well

11:53:53 as seeing them and making determinations as a neutral, I
11:53:58 thought there was a clear path as to how this was normally
11:54:02 done in my experience with working capital disputes. And if
11:54:05 there were open items or things that needed to be figured
11:54:08 out, especially liabilities, how, under the period that the
11:54:11 parties allowed, which is 120 days, how you would go about
11:54:15 doing this calculation.
11:54:18 And the buyer didn't do it this way. They did
11:54:21 something kind of like it at the end, which got to the 4
11:54:26 million 7 number; but, in fact, they didn't do really what
11:54:30 they should have done under the agreement.
11:54:33 But the 4, 7 is the closest number to that, to
11:54:37 what the parties agreed to.
11:54:38 MR. ANDERSON: All right. Go to the next slide,
11:54:41 Matt.
BY MR. ANDERSON:
11:54:42 Q. Let's talk about the ransomware attack and the
11:54:46 reliability of the data in this case.
11:54:49 What's your understanding of the ransomware
11:54:51 attack and the reliability of the data?
11:54:54 A. So I think the information, at least as I understand
11:54:57 it, and it's been talked about a lot here, I don't probably
11:55:00 have to rehash this too much, but there's no doubt that
11:55:04 there was this ransomware attack. It was well-documented.
11:55:07 And it was also well-documented that besides

completely messing things up at the time of the ransomware attack, that there was really no evidence that all of the information was ever completely rehabilitated or fixed on a go-forward basis. And specifically as time went on, this became more and more an issue related to accounts receivable information, both the general ledger account balance or net accounts receivable, as well as the subledger information for accounts receivable. And then that tied into the underlying data which fed into that, which, in this case, we've talked about Mr. Fahlman pulled that underlying data from the AR tables and the sales tables.

So it's pretty clear that the ransomware attack, as bad as it was at the time, for whatever reason had a lingering effect on part of the accounting system, which was in Profits. And some of the things appear to have been restored so they could operate the business, you know, to a fairly accurate level.

But then this particular area was called out, especially at the time prior to the closing and doing the due diligence relating to the underlying accounting subledger information, that that was not reliable and couldn't be used or relied upon to even figure out what the liabilities might be related to the customer deposits.

Q. Did you look at any depositions or talk to anybody to form your opinions about the reliability of the data?

A. So I did have some conversations with Mr. Martinez about this and then I read his depositions and his discovery -- what is that called, the document he produced?

Q. The interrogatory responses.

A. What was that?

Q. The interrogatory responses.

A. No. He put out a proactive statement.

Q. Oh, the expert disclosure.

A. Yeah, sorry about that. Anyway, I read that as well.

But what was striking about this was, okay, he had, you know, his explanations about why the data was unreliable. But it seemed to be corroborated by people on the DSG side of the fence as well.

Mr. Vermette clearly didn't believe he had reliable information at the time of the close, which is why the two parties basically ended up agreeing on this $4.6 million kind of plug number to be adjusted 120 days after the close.

Mr. Francis was involved in those discussions with Mr. Vermette and Ms. Choi is, too, indirectly. So they basically all substantiate that you can't -- that prior to the close, there was just no way to get good information as it involved customer deposit liabilities. I don't think there's a real question about this from what I can tell.

And then we'll get into this later, but then

11:58:02 there's information after the close, you know, the true-up and then this conversion was done in July of 2021, which just further substantiate, that at no point in time, did anybody ever really fix this underlying data or was the customer deposit liability information really any good that it could be relied upon?

Q. Did you review KPMG's quality earnings report?

A. I did. And I would say that that is really common when you do postacquisition dispute stuff, that you want to take a look at the quality of earnings reports by the accounting firms that are doing the due diligence.

In this case, KPMG was doing the due diligence for the buyer and then in a lot of cases, although it wasn't the case here, there's also sometimes accounting firms that do due diligence for the seller. And usually they prepare a report and it's referred to as a "quality of earnings report."

In this case, I think the code name -- they also have cute code names for these things because they don't want people to know what -- the transactions the people are working on but this, I think, was Project Raider or something like that. So that's what's on the cover of the KPMG report.

But the reports are basically -- you know, you're hiring a Big 4 international accounting firm to give

you their best advice. This is the buyer now, only to the buyer. The seller is not usually seeing these, okay, as to what flags, red flags, they're calling out to their client that may have an impact on whether or not they -- how they're going to value the transaction or if they're even going to go forward with the transaction.

Q. Let's take a look at that report.

MR. ANDERSON: Matt, can you pull it up, it's JTX-025. And can you turn to the page that ends in 12, JTX-25.12.

THE WITNESS: Let's see if I can get this here. So this is actually -- why don't we go to the other one first, if that's okay?

BY MR. ANDERSON:

Q. Sure.

MR. ANDERSON: Let's go to Page 14.

THE WITNESS: This is kind of the conclusion. It's probably better to do the buildup to what --

So somewhere in here, they're talking about the integrity of the data.

BY MR. ANDERSON:

Q. Can I direct your attention to the third bullet point from the bottom?

A. Third bullet point from the bottom. There we go, sorry. I highlighted these in my version of this so it was

easier to find.

So under the remediation recovery and impact, you know, KPMG is busy gathering their information, they're going to people like Mr. Martinez and various other types of information, and they're trying to give their client, DSG, what they think is really critical stuff, okay, that could have an impact on their valuing of the business or going forward with the deal.

So anyway, in this one, the third bullet point in this section that says: "As a result of the breach" -- and, of course, they're talking about the ransomware thing, "management explained that certain information was permanently lost, including most of the detailed financial records prior to April 2019."

And then I think the second part here is kind of a lot more important, which has been discussed periodically through direct testimony and whatnot here, is that: "As well, the go-forwardability for Profit to generate certain detailed financial reports," and then they call out specifically subledgers, "with any integrity was lost."

So what KPMG is basically saying is -- in this, as far as they know, the seller has no ability to generate accurate AR subledger information at this point in time, and they're basically telling their client this. So that ability is gone, lost, with no indication that it could be

12:02:05 recovered, at least KPMG doesn't know any way it could be recovered at this point in time.
12:02:10 Q. As somebody who used to work for KPMG, is this pretty significant?
12:02:14 A. Well, what it means is that you don't know, the buyer, the client, what kind of liabilities they're taking on, because the accounting system doesn't have the ability to tell you that. And you're kind of relying on that, because it could have an impact on the business going forward for liabilities you discover a year or two later, or claims that come against you.
12:02:36 It's -- there's always usually -- in most deals, there's a target number that's set up for working capital and then based on what that final working capital is, you pay less or more, kind of like Aggie did here for this deal.
12:02:51 And so if this working capital number has a lot more liabilities, it's a dollar-for-dollar impact on the value of the business potentially.
12:03:01 Q. As a result of their findings here, did KPMG issue a scope limitation?
12:03:06 MR. ANDERSON: Let's turn to the next --
12:03:08 THE WITNESS: Yeah, that was the first page that we had.
12:03:10 MR. ANDERSON: Page 12.
BY MR. ANDERSON:

12:03:12 Q. How significant is a scope limitation in an earnings report?
12:03:18 A. So under scope limitations, the first bullet point, it basically talks about the scope limitation that, "including but not limited to" in the second line. So it starts out with, "The target was unable to provide..." and then, "due to a material inaccuracy, a number of key details or subledgers, including but not limited to those for accounts receivable." All right.
12:03:42 And then they go into customer number of deposits, which is what, really, we're talking about from Mr. Fahlman's report.
12:03:52 Accounts payable, not so much here.
12:03:54 Management largely attributes this to the breach. They sort have said this previously in their report: "As a result of our analysis, these balance sheet accounts was limited in scope."
12:04:04 So basically, they're basically saying, we can't really take any kind of responsibility for what the right numbers are going to be, and you're kind of stepping into -- buyer, potentially a risky situation where you just don't know what you're going to get with this business because the accounting information is so messed up.
12:04:27 Q. Is this a red flag?
12:04:29 A. Yes. And to be fair, a lot of the clients I've

worked with would go -- would move past this and do the deal anyways because there's reason they wanted to do the deal that may be tied on to the amount of sales, the amount of income, how successful the business is.

So the balance sheet -- they may say we'll take our chances with the balance sheet and we'll go forward, but the accounting firm, your due diligence firm, is going to say, just be careful, you could be acquiring some liabilities here that you don't know about and they could be problematic down the line and could be very expensive for you down the line.

So they're doing their job in due diligence calling out potential issues and problems that the buyer would be basically taking on if they bought the company.

Q. So after reading the -- a report like this, DSG was on full notice of potential problems?

A. Yeah. I don't think that there's any question here that KPMG understands this. I think the evidence from the testimony and depositions, and what I've heard from Martinez and stuff, it's pretty clear there was a lot of open communication. And there needs to be because if you -- as a seller, if you don't cooperate with the due diligence people that the buyer provides, you run a risk that the deal is not going to go forward.

So it sounds like sellers, and Mr. Martinez in

particular being the main accounting person, as it related to accounting issues, was pretty open about what was going on and what was not going and the problems with the system. Pretty much full transparency to the buyer.

Q. Let's turn to the -- your opinion about the true-up period and what was done there to get to the number that they arrived at to make that seem like the best estimate of liabilities in this case?

A. So as we talked about, and I think there was -- I've heard pretty good evidence about how that was negotiated in Section 1.9 and -- between DSG and primarily Aggie, I guess Mr. Francis was involved too, but that they couldn't come up with a -- an actual customer deposit liabilities number as of the closing. What they came up with, and I guess Mr. Vermette came up with this, was a net accounts receivable number, which was the 4.6, and there was at least, no understanding in the purchase agreement or based on what -- the evidence as to what the actual customer deposit liability portion of that number was.

MS. ALI: Objection, Your Honor. He's not talking about the true-up. He's talking -- speaking to stuff that's not in his expert report.

THE COURT: Overruled.

THE WITNESS: So the true-up has to do with the 4.6. The parties agree in Section 1.9 that the buyer is

going to go ahead and prepare this true-up 120 days after the close as a way to figure out what the correct number is related to the -- instead of the 4.6 that was the estimate that went into the purchase agreement, they are going to go ahead and calculate and gather the information and data to actually come up with what they think the accurate number is for the net account receivable number, which would be comparable to the 4.6. And then the largest component of that, which would be the customer deposit number, which there -- like I said, there really wasn't a customer deposit number as of the time of the purchase agreement the parties had or could agree on, but they were going to have to figure that out. And that customer deposit liability is specifically called out in Section 1.9. I don't know, do we want to pull that up?

BY MR. ANDERSON:

Q. Yeah. Let's go back a slide.

A. Of the purchase agreement.

Q. Let's take a look at what the parties agreed to in the Asset Purchase Agreement.

MR. ANDERSON: So this, Matt, is going to be the reference to JTX-001, which is the asset purchase agreement.

And if you could go to Exhibit A of that agreement.

BY MR. ANDERSON:

Q. So, Mr. Dahlberg, have you seen this Exhibit 1, the Asset Purchase Agreement?

A. Yes. And I think it's been brought up before even. I think some of the witnesses were asked about this or talked about this.

But -- so the accounts receivable note number 1, which is the third line down, which has a $4.6 million number, that was specifically agreed to through the discussions between DSG and Mr. Vermette, and then Mr. Francis, Ms. Choi and whatnot.

But notably, there is no customer deposit liabilities portion of that, that is just a net number with the accounts receivable added together with the customer deposits liability to come up with this estimate.

MS. ALI: Objection. Beyond the scope of this -- his disclosed opinions.

THE COURT: Overruled.

THE WITNESS: So the note at the bottom kind of clarifies and ties back to what's in 1.9, which basically says the accounts receivable represents a net customer deposits, that we just talked about, and valid accounts receivable.

Okay. The estimated balance is for purposes of the closing. So they're basically saying we just took a shot, we estimated the 4.6, we don't really know what the

components of it are, as far as the customer deposit liability or the actual accounts receivable, but we got this 4.6. That will be sort of trued-up based on Section 1.9 of the AP. And then they put on this collar that Mr. Francis talked about, the $500,000 up or down, as I guess that was to protect Ms. Choi so she wouldn't end up paying any more than $500,000 of a reduction from the 4.6.

But I think what goes along with this then is the Section 1.9, where it specifically calls out how they're going to deal with the true-up to get the right number for the 4.6.

MR. ANDERSON: So let's look at Section 1.9.

THE WITNESS: So the -- the first couple of sentences there. We need a color highlighter here, but anyway.

"Within 120 days," so it's right at the beginning here of the cash payments determination, "after the closing, buyer shall prepare and deliver to the seller a statement setting forth the buyer's calculations of working capital as of the closing date the customer deposit liabilities," and then right next to this, "including a detailed report of the names and the amounts related to the determination of the customer deposit liability."

So it seems like, and I think the evidence supported this that I could hear from testimony and some of

the e-mails and stuff, that the parties couldn't before closing reach a determination on what the customer deposit liabilities were and they tried. It seems like they really tried hard and could not do it. And so then what they agreed to was, all right, we'll have to figure out some way to make this work and I think to make the deal go forward and get the closing, DSG then stepped up and said, fine, give us 120 days once we've taken over and we will gather the information in a detailed format to go ahead and determine what the customer deposit liability is and also the net accounts receivable to go along with that.

BY MR. ANDERSON:

Q. Is this burden shifting fairly common?

I mean, burden shifting in that the buyer is taking on the responsibility to figure out what the liabilities are. Is that standard?

A. Well, yes and no. I mean, so in a normal deal, the buyer will have a certain amount of time after the closing to calculate out what it thinks the working capital is. And usually that time period is somewhere between 60 and 90 days.

Okay. 120 is a long time. And in that time period, they can do their calculations to determine what the final working capital is, including accounts receivable or something like that, but they don't have to change anything

from the estimate. You know, estimated numbers that existed prior, they can just leave it or they can go in and gather additional information during that period and come up with their own closing working capital and compare that to whatever the targeted number 1 or the estimated number was.

This is a little unusual that there's a specific burden being placed on them to come up with a number, and I believe this is done because they know they've got an estimated number that isn't accurate. So they want to find out what the accurate number is and they're going to need time to do that.

Q. So here in this parenthesis, it says that the buyer has the obligation to provide these customer deposit liabilities, including a detailed report thereof, including names and amounts.

So are you saying that that's sort of unusual, the level of detail?

A. Yes. And that it was shifted on the buyer. Because a lot of times the buyer can just say, I'll just take what's in the general ledger, I'm comfortable with what's in the subledger at the time of the closing from the seller. I'm comfortable with the general ledger balance, I'll just accept that. And then the buyer, if they want to, but not a duty under the agreement, can when they prepare the final closing numbers, the working capital, they can make

adjustments saying, okay, we found out this additional information. But it's not a called out duty like this is.

Q. Okay.

MR. ANDERSON: You can take down the APA, Matt.

And go to Page 10 of Mr. Dahlberg's deposition.

Let's go to Page 11 of the slide deck.

BY MR. ANDERSON:

Q. Okay. So what is your understanding of what happened during this 120 day true-up period?

A. So based on listening to sort of -- mainly testimony of the controller, which was Justine Hudson, it sounds like they got towards the near -- towards the end of the 120-day period, maybe somewhere in December or something like that, and she sort of led a team on behalf of DSG to begin to start trying to put together this information. And it looks like -- well, the best way to understand what they did was to probably go into the documents that Mr. Vermette forwarded Mr. Francis, Ms. Choi, I think Mr. Martinez might have been copied on this, too, which was actually the true-up documents. Because Justine Hudson as the controller is leading the charge. She's the one who has got her accounting people doing it and trying to figure out a way to come up with what the customer deposit liability is going to be and what the net accounts receivable number was going to be.

MR. ANDERSON: Okay. Let's take a look at JTX-73.

THE WITNESS: So I think this has been made into evidence, I mean, a whole bunch of different times. But it's basically Mr. Vermette saying per Section 1.9, buyer is doing what its obligation was, is to come up with the net accounts receivable, the working capital number and also the customer deposits. And so then there's attached information here that, again, I think that's been put forward in the Court before but -- in evidence, but it's going to layout kind of the process that the accountants under Ms. Hudson for DSG did to sort of get this project done.

MR. ANDERSON: Let's take a look at that Excel spreadsheet. It's 73B. Sorry, I think it's 73A.

THE WITNESS: Kind of small. I don't know if everyone can see this or not.

BY MR. ANDERSON:

Q. There you go.

A. So at the top here, they do what a normal accountant would do is just sit there and say, well, maybe I can start figuring out what the accounts receivable balance is on the general ledger and maybe that will help me because that's what's coming off of the accounting system and you kind of hope, in most situations, it was reliable or accurate.

So they pull this number, which is 7 million, 9

hundred -- I'm sorry, 92,729, and that's the amount of net accounts receivable that's sitting in the balance sheet in the GL.

So when you run your inventory cash, whatever, for the balance sheet, the accounts would show up there for the accounts receivable, that net number is a negative 7 million. So then what they basically say here, she says this, is that, okay, I'm going to try and figure out then what the subledger is saying because normally the subledger is supposed to tie out to the balance sheet account, to the general ledger account, okay.

So if you slide down to the bottom -- or not the bottom, go up just a little bit. Okay. Go up just a little bit.

So they do something where they're looking at on the subledger, posted and unposted numbers. And that's going to the subledger. And the subledger is showing that if you look at the posted and the unposted numbers together, that the total subledger balance is 11 million. And I think what Ms. Hudson is kind of saying here is we've got a problem. We've got a subledger that's 11 million 2. And we've got a GL account that's 7 million. So you've got a $4 million delta, and now they're going to sort of see, well, why? What's going on?

So then she goes down, I believe, her and her

team, okay. They go down to this next level, which is Line 36 and Line 37. They say, "All right. What are the customer deposits per the subledger?" And they get a number, which is 15 million -- a negative 15,800,000 and change. So that's what the subledger is showing as customer deposit -- liability or deposit liabilities, and then the subledger is also showing accounts receivable, the subledger of 4,592,000.

So then she's just reconciling back with the 11 million she had up there for the subledger, and basically what she's saying with the 15 million is that makes absolutely no sense. That can't be. I mean, she basically comes up with a reality check and says, way too much. This 15 million dollars makes no sense based on what they know about how the business works, how it operates. So we're stuck with not knowing, not having a reliable number coming off the subledger, which she may or may not have had some understanding of based on communication she had with people prior to what was going on, so she may not be surprised by this because she's at least taken a look. Okay.

So then what she does is, she slides down -- look at bullet point number 4 -- and her testimony will back this up. She basically says, she says, "Forget it. I can't go with what's in the general ledger. I can't go with what's in the subledger. Basically, I can't go with what's

in the Profits system, okay, for information.

So I'm going to look at the deliveries that were done after closing, and I'm going to track those because those are real liabilities to DSG." DSG had to deliver furniture based on monies that had been collected either through cash or credit cards or prefunding or whatever. That money had been collected by seller before the closing. So those are real liabilities that DSG has incurred to get furniture out related to those monies that have been collected. Pretty solid thinking, okay.

And what I would argue, anybody who really understands accounting, this is where you would go, you'd immediately go to let's look at the real liabilities that were incurred after the closing. We negotiated 120 days to get to see those liabilities. Again, they are not fake liabilities. They're not some phantom credit or something there. It's real furniture that was delivered to satisfy these deposits or monies that were received in advance.

So she does that, and she comes up with 4,637,800. I have some understanding, although it sounds like -- I think it's from her testimony that she might have had Mr. Martinez help her pull that number on the deliveries that were actually done. Okay.

And then she makes some sort of small adjustments to it, just because she only had deliveries for

whatever reason as of the 28th. She adjusts out some customer deposits from the 29th and 30th, not overly critical. There's some additional AR, she says, that was in there that was delivered. So she makes an adjustment for that.

She gets down to 4,200,000. And then she factors in -- and this is interesting -- not deliveries but what she sees in the system as credit balances, so one way or another, either credits that were given by Han Nara that existed on the books or whatever, so she adds that back in on top of the deliveries and says, in total, the customer deposits that she believes that they're really going to be on the hook for after 120 days of operating this business is the 4,747,210.

So that's what she's coming up with as her customer deposit liability, and I would argue anybody with accounting experience -- and she certainly had a lot of accounting experience. This is a legitimate way to go after this, trying to figure out the real liabilities that they actually had to pay or ship furniture for.

Q. So is that DSG's best estimate of what the customer deposit liabilities were as of close?

A. Yeah, but I would say it's a little bit more than an estimate. I mean, if I know I delivered furniture for monies that were received before, that's, like, a real

liability. That's not -- I'm just taking a shot in the dark about what might be out there. That seems to be what people were doing in a large extent prior to the closing, is kind of guessing what the liabilities might be, okay.

This is somebody saying, no, I can actually track the actual deliveries that were done and probably one way or another out of DispatchTrack or I don't know how they reconciled it, but they potentially had the ability to get that information.

Q. So this is the best actual liability number?

A. Right. It looks like a real liability. It's not an estimate or guesstimate. The only thing that might be an estimate is these credit balances. They might not know exactly what they are, but they're thinking there's a reasonable potential. We still have some obligations related to those. So they're adding in the 541,000 to be a little safe. That might be more of an estimate, so whether those are going to be a liability or not.

But the actual delivery of the furniture, that's really kind of what it seemed that the parties negotiated for in 1.9, was, give me a name and the amount for the actual deposits that were liabilities and that makes total sense to me, but that's exactly what they would have done to resolve this.

Q. Did Mr. Fahlman in his report address this at all?

A. No. It's just striking to me that he has said, I think, repeatedly, he was hired to do his own independent analysis. And so I guess he believed none of this mattered.

What the parties agreed to and 1.9 didn't matter. What -- that what KPMG said about the information not being reliable and Mr. Martinez -- even though he basically cites Mr. Martinez and Ms. Choi as his basis for why he thinks the information is reliable, I've always thought their deposition testimony, and when I spoke to them, it was very clear they did not think the information was reliable. I thought their interactions with DSG indicated the information was not reliable because they wouldn't have estimated the 4.6 million in the closing APA if they knew what the information was. So I really am confused, but he's basically said, from what I can tell, when he's testifying here, is that this stuff doesn't really matter. He's hired to do his own calculation also and not really consider what this stuff is.

Q. Is that something a forensic accountant does?

A. No. I know he says it is, but you don't get to put blinders on. You know, you walk into a situation, you conduct interviews, you talk to people, you talk to controllers who understand the business, CFOs who understand the people, finance people -- you go to all these sources of information to at least consider what they have to tell you.

You don't just block them out and say, I just don't think it's relevant, or, I was hired to do an independent thing and I don't need to consider any of this.

That's not a type of forensic accounting I'm familiar with.

Q. So you've never heard of that type of forensic accounting before?

A. I think it's a little different. I think you're hired as an expert to go in and do a calculation. I mean, I think that's what he was really doing here was he got retained to say, forget about all that other stuff, grab this data, and do a calculation based on this data and see what kind of number you get.

Q. Okay.

MR. ANDERSON: Let's put down this Exhibit 73A. Let's turn back to Mr. Dahlberg's slide deck. Let's advance to page 12.

THE WITNESS: So this is just a summary of what we basically saw in there. And this does go down -- you know, if we would have went a little further down in the schedule to the net accounts receivable, you just add back the accounts receivable that they actually identified, Ms. Hudson and her team, when they were doing the work at the 120-day period. So this net number of 4,165,69 -- 619, that is basically the equivalent of the 4 million 6, so that 4

million 6 number that was estimated at the time of the purchase agreement and the closing now is adjusted based on the 120 days in Provision 1.9. It's adjusted down now to a negative 4,165,619 as opposed to a negative 4.6 million.

BY MR. ANDERSON:

Q. So is that pretty close to an actual number?

A. Yeah. I think -- I think -- and we can go to Ms. Hudson's deposition if we've got it. I think she was tasked to do this job. She understood it was something she needed to do. I think they pulled the resources in that they could to do it, and I think she felt pretty good about this number.

Q. Okay. Let's pull up her deposition testimony, which you referred to. And it starts on Page 33, line 18.

A. Yes.

Q. Is this what you were referring to, Mr. Dahlberg?

A. Yeah, so on Line 18 here, okay. The question, "What did you try to do in the 120-day true-up period?" The $10 million isn't really true. It was more like a $4 million number.

Q. Let's start on Page 18.

A. Yeah. So it says, "Okay. What did you do to try and reconcile the two?"

And what she's talking about "reconcile the two," actually goes up a little higher. That might be Line

11.

MR. ANDERSON: Go up, Matt, actually a little bit higher.

THE WITNESS: So she notes that the subledger and the GL disagree sometimes, but there's a materiality factor. And it depends on how big the company is so I can't really compare. She's just saying it's a big difference between the subledger and the general ledger, so she's not going to go with the subledger and the general ledger, which is what she showed on the schedule.

And then I think you got to slide down to below 24 even.

BY MR. ANDERSON:

Q. So we're on Page 34 here.

A. Okay. So then -- I think you're asking her the questions right, Mr. Anderson.

Q. Yes. Me?

A. Right. Okay. So anyway, well, so what do you do? You asked her the question, Line 1 and 2 there.

What are --

(Reporter clarification.)

THE WITNESS: So, specifically, that includes customer deposit liabilities when she's talking about the true-up.

"What did you do to try and reconcile the two

ledgers, subledger and the general ledger, and we're talking about accounts receivable here?"

Ms. Hudson answers: "I would say we reconcile -- I wouldn't say we reconciled the two."

I.e., she never could figure out how to make them work, which is what the schedule we just reviewed showed. So what she says is "We rebuilt a subledger, kind of a new subledger, doing testing of subsequent deliveries post of the acquisition."

And that's pretty much what the schedule showed that she did. She looked at deliveries after the acquisition to figure out what the customer deposit liabilities were.

BY MR. ANDERSON:

Q. And that's something that you find would be typical to see in this kind of situation?

A. That's exactly what happens. And actually just as far as companies go, like, if you're doing a year-end audit and you're closing your books, a lot of times, you keep the books open for a couple weeks to see what new bills come in and everything so you actually know what the liability amounts are for certain accounts to get the right liability numbers. So it's kind of common in accounting that you leave periods of time open to get additional information to try and get a more accurate liability number.

12:31:36 BY MR. ANDERSON:
12:31:36 Q. And, again, here they gave themselves 120 days, and you said that's sort of the outer limits from what you see in deals?
12:31:43 A. I don't think I've seen hardly any that are 120 days long. I'd say 90 is usually the longest -- about the longest that you see to allow people, giving the buyer time to get additional information to try and make adjustments and catch all the liabilities.
12:31:58 MR. ANDERSON: Let's take down Ms. Hudson's deposition and move to Slide 14 of Mr. Dahlberg's opinion.
BY MR. ANDERSON:
12:32:11 Q. All right. Let's turn to this Part C of your opinion. What is Part C?
12:32:18 A. So the first bullet point here is basically -- just to be clear that -- so you've got -- from the beginning of the ransomware through the closing and probably through the true-up where we have pretty solid information by both DSG folks and by Han Nara folks that you don't have accurate underlying information in the accounting subledger system in Profit to be able to determine customer deposits. You just can't do that. Okay.
12:32:50 So the first point I'm bringing up here as it relates to the kind of Mr. Fahlman's assumption about all the information being accurate that he used in the tables,

how does he believe that. Nobody went in and ever cleaned it up. There is no evidence that, at least through the true-up calculation, anybody had any belief that that information, underlying information, information coming through the subledger, nobody at DSG or at Han Nara believes that that stuff is accurate.

So I don't know how he believes it's accurate, because that's kind of a fundamental principle. If he thinks that the data has a lot of problems with it, then it's very difficult to do statistical testing. But as accountants do it, you could generally test stuff that you think is right, and then you find out some of it is wrong, but you don't test things that you know are wrong because then you can't really make a reliable statistical statement about it.

And at least from what I can tell, he never cites any evidence and I'm not aware of any evidence that anybody ever was able to go in and clean this stuff up. All right.

So as just a fundamental basis, the evidence he cites is that he -- I guess he believes that Mr. Martinez and Ms. Choi say the information is correct, which I don't think they say that. I think it's pretty clear they don't say that. So I don't understand that. But anyway, that's my first point.

Q. So let's talk about the second point here, and this part relates to the conversion. So we know at some point in in the summer of 2021, well after the deal is closed, DSG gets in there and they convert the data from Profits to their own system, which is called STORIS.

Mr. Fahlman ignored that. Why is that a problem?

A. Because they went into try and clean up the accounting system to run the business going forward. And in this conversion from one accounting system to another, it's not uncommon you want to go through and clean up some stuff, if there's some issues or problems. And what you sort of find here is that some pretty dramatic things that occur in this conversion related to the reliability of the data for the AR subledger. And then what's in the AR table and sales table as well, the underlying data.

And the e-mails that -- and the deposition testimony of Ms. Fitzgerald, who was tasked on behalf of DSG to come in and sort of oversee this conversion, they are striking from an accounting perspective about exactly how bad the information is that she's dealing with at the time of the conversion.

Q. Let's take a look at a couple of Ms. Fitzgerald's e-mails during the time of the conversion.

MR. ANDERSON: Let's pull up DTX-066.

THE WITNESS: All right. So this is from Ms. Fitzgerald and I believe it's one of the senior people at DSG that she's writing this to. And I think it was mentioned before that the Han Nara acquisition is kind of referred to by these guys as West Texas.

BY MR. ANDERSON:

Q. West Texas or the Project Raider?

A. Yeah, the DSG world or whatever.

So she's coming in and she's not a full-time-working-at-this-Han-Nara businessperson. She's not like Ms. Hudson, that's the controller. She's a specialist who works with DSG to come in for conversions, amongst other things that she specializes in. Okay.

So anyway, first it's saying okay, in June -- that the conversion actually completes itself in July, I think 17th or something like that. So they're about a little over a month from the finishing date they want, but this is kind of an update status to senior folks, I guess, at DSG.

And in the first line item, "knee-deep" means they're well into it, and then it goes, "To put it bluntly, the data is a total mess." Okay. So you've got someone pretty sophisticated in accounting systems and data, in accounting systems, saying we've got a big problem here in this conversion. We're trying to figure out what

information to bring from the accounting system in Profit and bring it over to the new STORIS system that DSG likes to use.

And she's, like, having a heck of a time figuring out what's reliable data and what's not reliable accounting data to bring over in this conversion.

So then she -- and then she goes on to say, "We have been digging into this for well over 45 days." So this is not a one-week, two-week, three-week flyby. This is they're looking at the information and then they're probably trying to go back and do what Mr. Martinez did, which is -- when you guys had the analysis here, trying to go back to the DocuWare, the actual original documents, like the sales orders, you know, the payment information, maybe they're going back to DispatchTrack.

I mean, they're looking at all the underlying documentation to figure out what's right and what's wrong in this accounting system, and then what do they have to clean up. What do they have to get rid of because it's just inaccurate, or they have to make decisions about what they're going to do with a lot of the data here.

Let's see here. Under A, this is kind of striking, okay. Only importing -- okay. So what they're coming up with is, the data looks so bad that right now at this point, they're thinking about only importing orders

after the acquisition date.

And so basically they're saying we aren't going to trust any of the information in certain areas in the accounting that was put in before the close, before the transaction occurred on October 1st. Okay. We think it's so messed up that we're just going to get rid of it, we're going to basically treat it as though it doesn't exist, void it out, cancel it out, get it off the books, okay. And it's not coming over to the new accounting system.

And then she gives an example of this 16,000 open sales orders at the date prior to the acquisition. And then she's basically saying, well, based on my experience at DSG, there probably should have been something like less than 2,000 sales orders still in the system, based on the type of activity and the same kind of time period.

So she's basically saying there's 16,000 sales orders with related information, accounting information, may or may not affect accounts receivable; could be cancellations, could be voids, whatever, that is still sitting on the books that should have been off a long time ago. And we're trying to work our way through them but we don't know what we're going to do with them. Right now, what we're thinking is just don't bring them over because they've just got to be wrong.

Q. Do you know whether they actually brought them over?

A. All the information she provides indicates they did not. And apparently they took that pretty high up in the DSG. She just didn't make it as an accounting decision, she basically told the senior folks, this is about the only way we can pull off this conversion is just to not bring this data over.

Q. So this suggests the data is not reliable?

A. Right, in some kind of dramatic fashion, like lots of issues with it.

Q. Okay.

A. Oh, she does say at the bottom -- okay. And B, just to cover this real quick, "We cannot trust AR."

So just to be clear, although there's a lot of problems with open sales orders, them not being closed out and whatever, she's specifically saying, we can't trust accounts receivable information, which of course, includes the customer deposits, that's the biggest piece of it, prior to the conversion.

MS. ALI: Objection, Your Honor. He's been testifying to e-mails. This is beyond the scope of his disclosed opinions.

THE COURT: Why don't we take a look at his expert report. Mr. Anderson, do you have a copy for the Court?

MR. ANDERSON: Yeah. Oh, by the way,

Your Honor, this was fully brought up in his deposition, if you'd like a copy of his deposition transcript as well.

THE COURT: That would be fine. Thank you.

MR. ANDERSON: You want to pull it up on the screen or do you want --

THE COURT: I'll take a paper copy. Thank you.

MR. ANDERSON: We could take a break and I can get you a copy?

THE COURT: All right. Why don't we go ahead and take our lunch break and then we'll take up this issue. And why don't you see if you can work through with Counsel where you think some of the testimony has been previously disclosed to them, either in the deposition or the expert report.

All right. It's 12:42. We'll take half an hour. We'll be back at 1:15.

COURT CLERK: All rise.

(Luncheon recess.)

COURT CLERK: All rise.

THE COURT: All right. Please be seated. So when we took our break, we had a pending objection to a line of questioning about a particular e-mail. I noticed on the bench here someone has handed up a copy of Mr. Dahlberg's rebuttal report as well as his deposition.

So why don't we have -- Mr. Anderson, you

respond to that objection.

MR. ANDERSON: Yes, Your Honor, on page 5 of Mr. Dahlberg's report, he opined about the conversion. He talked about Ms. Fitzgerald and what she did there and he cited to her deposition, which is also a part of his materials considered.

During his deposition, Ms. Ali asked Mr. Dahlberg extensively about Ms. Fitzgerald and why that formed part of his opinion the data wasn't reliable. I flagged all of the times that Mr. Dahlberg talked about Ms. Fitzgerald based on Ms. Ali's questions. There's no doubt that this is part, now, of his opinions.

THE COURT: You were asking him about a particular e-mail when there was an objection. Was that e-mail listed in his expert report as something he considered?

MR. ANDERSON: The e-mail was an e-mail that I used with her in her deposition.

THE COURT: Okay. So he read the deposition. Did exhibit --

MR. ANDERSON: Included the exhibits.

THE COURT: The exhibit was attached to her deposition transcript and he's now talking about the e-mail?

MR. ANDERSON: Yes.

THE COURT: Okay.

Ms. Ali.

MS. ALI: Your Honor, I did ask him about why he believes the data was unreliable, and he talks about Ms. Fitzgerald. He didn't go into the details of all the e-mails, and now he's just reading e-mails and adding his own interpretation.

These are e-mails that Ms. Fitzgerald didn't even write -- well, she may have wrote some of it, but the underlying slides that he's speaking to, that's not from Ms. Fitzgerald. That's from someone else. She testified in her deposition that she doesn't know what that slide means.

MR. ANDERSON: Your Honor, Mr. Dahlberg specifically quotes the e-mails in the deposition transcript, which I have in front of you.

THE COURT: Can you just show me where that is, the particular e-mail we're talking about?

MR. ANDERSON: There's 16,000 open orders, that e-mail we were just looking at before we broke.

THE COURT: What page is that in the deposition?

MR. WINTERLE: 384.

THE COURT: Okay. Stand by.

Okay. All right. The objection's going to be overruled. Let's proceed.

Do you need these back.

MR. ANDERSON: I don't. I have now multiple

copies.

THE COURT: Okay.

BY MR. ANDERSON:

Q. Mr. Dahlberg, let's look at a couple of other e-mails to and from Ms. Fitzgerald during the time of this conversion and what DSG was looking at. Let's pull up DTX-067.

Did this form part of your analysis?

A. Yes, and I believe this e-mail was actually brought up yesterday in someone's testimony, but basically on the first line, she's giving a further update. This is about 10 days further along in June during the conversion.

And this issue has to do with her asking one of her colleagues who was kind of involved with her on the IT conversion or the conversion of the accounting systems, to change the word "crap" when he's referring to how bad the data is in the accounting system, to just "bad." And then if you go down to the actual -- what she's commenting about.

Q. Next page?

A. Yeah.

So he's basically saying again, "West Texas, okay, source of data crap." That's the second bullet point down. And then he kind of starts talking about what's wrong.

So the first bullet point is inventory, fine.

The next: "Sales orders, booked is overstated." So there's a bunch of sales orders that are in the system that are -- apparently, they're deeming to be not even real sales orders.

And then things that directly affect Mr. Fahlman's analysis, they did not delete canceled orders. So that means there's information in the system that could indicate credits or monies owed or something like that related to canceled orders and they're sitting on a bunch of them, which has to do with probably the -- something to do with the 16,000 orders that they found that really shouldn't have been there in the books.

And then the last bullet point is: "Customer receivables and deposits are almost indecipherable."

So they are looking at the core data for the receivables and the deposits, exactly what we're talking about here. They're two months into this analysis and they're basically saying, this stuff is not reliable, not accurate, not good.

And as we discussed in the first e-mail, they're going to end up not moving almost any of it into the new accounting system.

Q. And this is coming straight from DSG?

A. Yes.

MR. ANDERSON: Let's look at the next document

regarding Ms. Fitzgerald. JTX-085.

THE WITNESS: Yes.

BY MR. ANDERSON:

Q. Did this e-mail help form part of your opinions?

A. Yes.

So the part that's probably the most interesting is down at the bottom. Okay, so -- and again, this is from Ms. Fitzgerald: "Okay. Here's the new issues, kill me now." Apparently things are not going well for her on this whole conversion thing.

"Okay. We find a whack load of orders." I'm not sure what the technical term is for "whack." Okay, that means basically a lot of orders that are not billed and not posted.

"Our first intent was to go back in and clean it up, if we knew when it was delivered prior to the conversion. Now it's just become a cluster doodoo" -- there's a lot of highly technical accounting terms she's using here.

So, basically, this is pretty graphic discussion about exactly how messed up and how bad all this is.

And I would point out that the information that Mr. Fahlman is using as his base data source, goes all the way, the AR tables and the sales tables carry information all the way through the time of the conversion. They go

pretty much to July.

So right in this period of time, he's got data that he's using in his analysis or that he's extracted in his -- the data tables that is coming right out of the stuff they're going through, trying to clean up and figure out how much of it, if any of it -- and they're not going to take most of it -- into the new accounting system.

Q. So, Mr. Dahlberg, Mr. Fahlman looked at 159 orders or transactions.

Did you take a look at -- do any testing on the 159 orders or transactions that Mr. Fahlman looked at?

A. Right. So he claimed that the 159 items that were selected to sample out of the 6,000 items that he pulled together for the AR and sales table.

Q. The 6,000, which is a smaller subset, right, of an even bigger large?

A. Oh, yeah, that was huge, I don't know how many, but the 6,000 that met the SQL, you know, sort -- or criteria that he had to get the 6,000.

Then, I think, he worked with Dr. Diver -- excuse me, and they came up with this 159 items of unique sales orders that they were actually going to test, because I think Mr. Fahlman rightly had some concerns about how accurate this information was.

So in his first report, he basically said, I'm

going to go in and I'm going to look at DocuWare, which is where Mr. Martinez pulled some sales stuff from earlier today. Okay. And showed them how he was trying to tie them back to the original information. He's also going to go into DispatchTrack.

And then, I think, he was going to go into third-party funding information or whatever, and he was going to try and tie out the various data that he was pulling off the AR tables and the sales table.

And the big pieces have information that he was relying on, and there's a big schedule he's got that was a part of his report, which -- I mean, you don't need to show now, but anyway, it's got the 159 items, it's got, like, the sales date, it's got the sales amount. It's got, if there's credits or debits against the sales amount, then it's got a delivery date and it's got a delivery amount.

And he's basically testing these pieces of information back to transactional documentation; so documents that were created in the normal course of business. So that would be -- a sales order that would be maybe copied and put into DocuWare, might be the copy of a credit card thing. Could be one of the summary schedules they got from the prefunding, Comenity people about how much they were funding in a given week for various transactions.

Anyway, he goes back and says, he's tied out all

13:28:44 these 150, except for the -- a few I'll talk about later on. But we went back and looked. And when -- he actually put in Bates stamp numbers as to what the source of the document was that he claimed verified the amount and the date for both the sales that was done and for the deliveries that were done.

13:29:05 And what we found was -- is that almost over half of the items he claimed to test, 80 of them, okay, referenced back not to, you know, a copy of a purchase agreement -- a purchase order or a credit card receipt or dispatch -- distrack --

13:29:26 Q. DispatchTrack.

13:29:27 A. DispatchTrack, right. Instead, they referenced back to the actual database he got the information from, the AR sales -- AR table and the sales table.

13:29:37 And we were like, okay, this seems like a circle, like, you got the information out of this table, now you're referencing a support back to this table. So where is the transactional documentation that you supported this with?

13:29:50 And basically, we came to the conclusion that we didn't know what he was doing, because these actual Bate stamps reference the actual AR table and the actual sales table. There's, like, thousands of line items. I mean, there's no reference to where he was going to, just back to

this big database again, okay.

It did come out a little bit later in his rebuttal report or response to my thing, or report, he basically said: Well, there were some notes there that we kind of used and I'm referencing back to those.

You could not tell that from the original work he did. But even with these notes, they're just guidelines -- guidance to get you back to original documentation about if something was canceled, if something was credited, original business records that would help support the numbers and the dates. They, by themselves, are no more than guidance to help you get to those documents.

So for half of the items here, and you'll have to break it down, but I've kind of got the areas here. For payment dates and whatever, payment dates, payment amounts, we found 74 individual either amounts and/or dates or 51 of the 159 overall orders that did not have supporting documentation. And were referenced back just to the AR table.

And then similarly with the delivery dates and amounts, there were 61 times where the dates or the amounts just referenced back to the sales table. And that was 49 of the 59. So with the 49 and the 59 together, 80 of the 150 items did not tie back to DocuWare documentation or DispatchTrack documentation and just went back into the

database he got the information from.
Q. Let's take a look at the next slide in your report.
A. Yeah.
Q. How significant were those 38 adjustments that he had to make to his own 159 orders that he looked at?
A. You know, I mean, they were small dollars, to be fair but a lot of what he was doing was small dollars, because he only took 159 items to test. He took a very small amount of the whole 6,000 but that, to me, that was striking that, again, he only tests 159 unique sales orders and he finds 38 errors that he needs to adjust to get the right amount of, you know, credit, customer deposit liability that supposedly was supposed to be there.
Q. So what does that indicate about his testing, his methodology?
A. Basically, that he's got a lot -- he knows there's a lot of problems with the data. He knows that he can't find the underlying data. And I'm not saying it's easy to do, because I think, as Mr. Martinez described, it is a "painstaking task" to go through DocuWare. It's not well-organized.

We were able to trace to the Bate stamps numbers for DocuWare stuff that he was able to identify, that worked out pretty easily.

We were able to go to the Bate stamps for the

DispatchTrack stuff that Mr. Fahlman was able to tie to. But to go back into those systems and actually find this information, extremely difficult, extremely time-consuming and may not even be achievable at this point.

Q. Direct your attention to the last bullet point.

Do you want to address that?

A. So -- just to make this clear for the record, okay, he's never fixing the problems with the data. He is making an assumption that that underlying data is correct. And that's what he's stated here on the stand.

He stated that because of Ms. Choi's testimony, because of Mr. Martinez's testimony, that there's just lots of evidence to indicate that this documentation, that the underlying data was accurate.

And then he got into sort of internal controls, indicated this too. And I just don't -- when I hear their testimony and when I read their deposition transcript, I didn't get that at all, okay, I didn't get that they were staying this stuff was reliable.

I thought they were pretty clear that the information was unreliable. So I don't really see how he doesn't -- he doesn't change that documentation, he doesn't find the cure to it, he doesn't fix it. He takes it as it is and basically tries to say, because of what they said, it's all right.

Q. And you sat here today listening to Mr. Martinez talk about the problems with the data, didn't you?
A. Very consistent with his deposition testimony I read and when I talked to him previously.
Q. All right.
MR. ANDERSON: Let's look at the next slide.
BY MR. ANDERSON:
Q. It's part of your presentation.
A. All right.
Q. So basically, based on your experience in accounting and forensic accounting, Mr. Dahlberg, how would you have done this, what was the best way -- best way, moving forward, how would that have been done?
A. So basically the purchase agreement sort of outlaid what they were going to do under 1.9. The buyer was going to track all the names and amounts of deliveries that were going to occur and/or liabilities that would have been paid by DSG after the closing.
So with that kind of notice and knowing that the documentation was this messed up on the underlying accounting system, they could have just tracked every time they made a delivery for the 120 days and when they made the delivery, as Han Nara did, they would have gone in and had to true-up all the monies that had been paid previously, all the monies that were still owed that needed to be invoiced

and they would know exactly for every delivery how much of that related to a customer deposit that had been received prior to the close.

So they could have just done this on an ongoing basis because they were doing this to run the business anyways. They're not going to deliver furniture until they've got the numbers right, about how much has been paid previously and how much needs to be paid before you're going to get the furniture.

So that could have been, in the normal course of business, they would have just had to say fine, we got to do this. We're going to start within a couple of days after the transaction or a week or whatever and start just putting together a schedule that's got the name and the amount and, you know, what the customer deposit amount was preclosing. They did not do that.

The evidence from Ms. Hudson, the controller that they -- at some point in time prior to the 120 days, it looks like maybe in December, January is the end of the 120 days, middle of January. Sometime in December, they decide they're going to go and just get information about the deliveries that they had, which wasn't terrible. I mean, it was an effort to try -- it would have been easier to do it on a real time basis as -- while the business was dealing with the deposits, but they went and got the deliveries in

13:36:40 December that had occurred since the closing and then they calculated it in the true-up and came up with the $1.7 million number. So it's not terrible the way they did it. But the cleaner way would have been knowing they had to track it, just documenting it along the way as the business was going along.

Q. Mr. Dahlberg, Mr. Fahlman got up here yesterday and told the Court that his calculation of Han Nara's liabilities, the customer deposit liabilities as of the close, was an actual -- it was actual.

Do you agree?

A. No. I think -- he has to basically -- he didn't really track whether or not Han Nara actually made good on these negative accounts that he's got. There were negative accounts in the system, he didn't -- the way his query went, it wasn't just based on deliveries. It was sales that were before -- or monies received before the transaction and then credits and/or deliveries that were done after the transaction. Okay. And he never showed that those credits ever resulted in a real liability or money that was actually paid to a customer or that they made good on.

And I think the evidence we just looked at about how many things got cleaned out for the conversion would indicate that a lot of those credits probably went away at that time as well.

Q. So do -- do Mr. Fahlman's opinions support his calculation of customer deposit liabilities of $9,209,785 at closing?
A. Yeah. I kind of think it's a deal with database -- the database where it's kind of, excuse me, garbage in, garbage out. I mean, he has unreliable data that he's bringing into his analysis and then he's coming out of the analysis with a number that's no better than the reliability of the information he went in with.
MR. ANDERSON: Thank you. Pass the witness.

CROSS-EXAMINATION

BY MS. ALI:
Q. Good afternoon, Mr. Dahlberg.
A. Hello.
Q. We met during your deposition, correct?
A. We did, but this is in person. We had to do the other one on video.
Q. And at that time, we went through your opinions, correct?
A. Yes.
Q. You did not perform your own calculation of customer deposit liabilities as of September 30th, 2020, correct?
A. That is correct.
Q. And you did not perform any testing of DSG's calculation of 4.7 million of customer deposit liabilities,

correct?
A. I mean, I reviewed the schedules. But as far as tying them back to, like, something from DispatchTrack like for the deliveries, that component of it, I didn't do that.
Q. You didn't audit the 4.7 million, correct?
A. I reviewed it. I went through the schedules and looked and saw what they did, okay, but I didn't tie it back to underlying documentation.
Q. And you didn't review the reports that DSG used to calculate the $4.7 million, correct?
A. Yeah. No. The source data, yeah, I did not see that.
Q. And you said the source data was outside the AR subledger, correct?
A. I don't know where they got it.
Q. But you said the $4.7 million number is correct because it's outside the AR subledger, correct?
A. Fair enough. They got the -- the deliveries from outside the AR subledger information. That's correct, they did that.
Q. Mr. Martinez provided them the reports from Profits, correct?
A. I don't know where Mr. Martinez got the delivery information and Ms. Hudson didn't say where the delivery information came from.

13:40:14 MS. ALI: Let's take a look at her deposition.
13:40:16 THE WITNESS: Okay.
13:40:18 MS. ALI: Page 35, line 4.
13:40:22 THE WITNESS: Right.
13:40:23 MS. ALI: Through page 36, line 7.
13:40:25 I'm going to read it in to the record.
THE WITNESS: Yeah.
13:40:27 MS. ALI: So --
13:40:27 "QUESTION: So Fedeliz did testing. So when you say that she "tested," what did -- what does that mean?
13:40:33 "ANSWER: She received reports from Michael Martinez that he ran out of Profit to a report that would show deliveries that occurred since acquisition. And she tied those back to see if there was a customer deposit or AR related to those deliveries."
13:40:49 THE WITNESS: Okay.
MS. ALI:
13:40:50 "And we used the amount of the delivery to build what we believed to be an AR customer deposit balance.
13:40:55 "QUESTION: Okay. When you say that she received reports that showed deliveries and tied them back, how did she tie them back? What did she do?

"ANSWER: If a report -- if the delivery report said the customer's order had been delivered on a particular date, subsequent to acquisition, we then confirmed if there was a related AR customer deposit as at the opening balance sheet date.

"QUESTION: Did she get into any specific accounts -- look at any specific accounts?

"ANSWER: What do you mean?

"QUESTION: Did she open up in Profit?

"No.

"QUESTION: Did she get into Profits at all?

"No.

"QUESTION: So she was just looking at reports that Michael Martinez provided?

"ANSWER: Yes.

BY MS. ALI:

Q. Ms. Hudson relied on reports provided by Mr. Martinez, correct?

A. That's correct.

Q. And those reports are from Profits, correct?

A. Well, she says here they are. Today, Mr. Martinez, I thought, was not completely clear where he had gotten the delivery information from, if it was DispatchTrack or Profits.

Q. Well, we'll take a look at those reports as well?

A. Okay.
Q. And did you audit the AR subledger report used by DSG's accounting team?
A. No.
Q. So the only basis you have for providing an expert opinion is weighing the evidence, correct?
A. Well, people that are very knowledgeable, like the controllers or CFOs of a business that are trying to get in and understand the data, I find that very compelling.
Q. And you also relied on Mr. Martinez's deposition, correct?
A. I didn't -- did read it? Yes.
MS. ALI: All right. Let's take a look at Mr. Martinez's deposition, Page 163. All right.
"QUESTION: Okay. But everything post-ransomware was accurate and reliable?
"ANSWER: Correct.
BY MS. ALI:
Q. You were aware Mr. Martinez answered that under oath, correct?
A. He's explained that answer repeatedly.
Q. But you understand in his deposition that you reviewed that he answered under oath that the information was accurate, correct?
A. I've talked to him subsequently and he talked about

13:43:09 this today. I think maybe he was confused, it happens. There's a lot of pressure in depositions. But I don't think this accurately reflects what he's testified about today or what he thinks.

13:43:20 Q. Well, let's see if I asked him again.

13:43:22 A. Okay.

13:43:23 MS. ALI: So let's go to Page 138, Line 7 through 14.

13:43:29 "Okay. So if you could, you could recognize those ghost accounts that were --

13:43:34 "ANSWER: No.

13:43:35 "QUESTION: Okay. But as far as accounts, the sales orders and transactions that were happening after you got Profits running again, those would be reliable and accurate?

13:43:44 "ANSWER: Yes.

13:43:46 "QUESTION: Because you were -- that was happening in real time, ransomware was resolved, there was no way for you to differentiate between the new sales orders and the ghost sales orders. Is that what you're saying?

13:43:59 "Yeah. Without going into each account individually."

BY MS. ALI:

13:44:01 Q. Mr. Dahlberg, did Mr. Martinez get confused twice?

A. So you've done this a lot here where you're confusing the AR subledger information and the underlying data with other accounting data that's actually in the system.

So as he told KPMG and they wrote in their QOV, they're very clear. He's been very clear that AR subledger information in the system -- the Profit system was not reliable. He's also clear that other aspects of the information in the accounting system are reliable.

So the sales orders, for instance, he basically felt at some point in time they were able to bring that back. So the main issue here is not talking about the general Profit system or general data that they were using at various times to run the company.

The issue is the reliability of the information that comes into the AR subledger, the AR general ledger account. That's what we're talking about. You're talking with him about a bunch of other stuff here.

Q. "QUESTION: But as far as the accounts, the sales orders and transactions that were happening after you got Profits running again, that would be reliable and correct?

"Yes."

A. I don't disagree with what he says but I know what his -- he's clarified exactly what he meant here numerous times.

Q. And he said this under oath here, correct?

A. Yes.
Q. And you've read his deposition, correct?
A. Yes.
Q. But you didn't take that into consideration, did you?
A. I just told you, I'm aware of what he said. I'm aware of how you basically tried to manipulate or twist him into corners with little bits of information. But he's been very clear about exactly how this worked.
MS. ALI: Let's take a look at Aggie's deposition -- Ms. Choi's deposition. Oh. Page 263.
BY MS. ALI:
Q. And you relied on Ms. Choi's deposition, correct?
A. I certainly read it and considered the information, yes.
Q. And you understand she was testifying under oath, correct?
A. Yes.
Q. All right. So let's -- and Ms. Hudson was also testifying under oath, correct?
A. Yes.
MS. ALI: All right. So Page 263, Line 15 through 18.
"QUESTION: Everything predating April 19, 2019, is inaccurate. And everything going forward is accurate. Is that what you're saying?

"ANSWER: Yes."

BY MS. ALI:

Q. Mr. Dahlberg, did you consider this?

A. Yes. And I think Ms. Choi was very clear in her testimony yesterday exactly what this meant. And I do believe that she thought at the time the way she was answering it was correct, but I think she did a very good job yesterday of clarifying exactly what she meant by that.

Q. Let's see if I asked her again. So let's go to Page 277 of her deposition. Line 2 through 10.

"QUESTION: But did you tell them that the information, going forward, from April 19, 2019 was accurate, and wasn't impacted by the ransomware attack?

"ANSWER: It seems like what happened afterward is correct, but before it's not.

"QUESTION: Did you explain that to Evan?

ANSWER: I'm not -- I'm sure that we had a conversation."

Did you understand that Ms. Choi told Mr. Vermette that everything going forward from April 2019 was reliable and accurate?

A. That's not consistent with all of her testimony and/or the facts. I understand what -- here, you might interpret it that way. I think if you considered all of the

statements she's made, all the things, including even what's in the quality of earnings report that we talked about with KPMG or Mr. Vermette, his testimony, and e-mails back and forth, it's very clear that what she's saying here, whether she understands it or not, is not really the way things actually worked out.

Q. And she answered this under oath, correct?

A. Well, to the best of her ability, yes.

Q. She was under oath, correct?

A. Yes.

Q. Let's talk about the KPMG report.

So you heard Mr. Martinez testify this morning about this back-end bug that continued to corrupt the data, correct?

A. Yes.

Q. If KPMG was aware of this back-end bug that continually corrupted the data, would it be in KPMG's report?

A. Not necessarily.

Q. If the ransomware attack is in KPMG's report, would the back-end bug that continued to corrupt the data also be in KPMG's report?

A. The result of it would be in their report, and I actually read the results of it actually into the record when I was testifying. KPMG cares about is the underlying

accounting data accurate and can it be used and relied upon by the buyer. And they explained to the buyer. It absolutely cannot be relied upon. They are completely clear about this, so much so that they put a scope limitation on it. So KPMG is very clear there is a big problem with the reliability of the accounting information as it relates to the subledger.
Q. Did KPMG say accounting information or AR subledger reports and financial reports?
A. I think they said AR subledger, and then we'd have to go back -- we can pull up the actual quote --
Q. Well, let's pull up the report. I don't know what page it is.
A. It's two pages.
Q. Two pages, I believe. It's page 41, but I don't know for sure. Let's take a look.
There it is. We found it. Can you type in ransomware? Keep going.
A. Well, it was first bullet point. Well, there's two different places but the one place was in the scope limitation on the first bullet point back thereaways.
Q. Okay. Let's look at bullet point 3.
A. This is bullet point 3, too.
Q. All right. "As a result of the breach, management" -- did you understand management was Aggie Choi

and Martinez?

A. Well, I don't know what it meant here when they wrote it. It sounds like based on Mr. Martinez's deposition -- I mean, testimony, sorry -- it might have mainly been him. I know Ms. Choi may have made a couple things, but I think they were going to him as the CFO to get the accounting information.

Q. Okay. So Mr. Martinez?

A. Yes.

Q. "Explained that certain information was permanently lost, including most detailed financial records prior to April 2019. As well, the go-forward ability for Profit to generate certain detailed financial reports, i.e., AR subledgers with any integrity was lost."

Did I read that correctly?

A. Yes.

Q. And does it talk about accounting data?

A. Well, that's implied. If you're an accountant. I mean, the -- the AR subledger doesn't come out of thin air. It's developed from the underlying data that's in the Profit system, like, the tables from the AR table and the sales table.

Q. But the AR subledger report is a prepopulated report that's drawing from different modules in Profit, correct?

A. Prepopulated. I'm not sure about that, but you have

the back part right. It's like software is going into the underlying data, grabbing information and then pulling it together to prepare that subledger report.

Q. And were you aware as far as the predefined reports in Profit, those were incorrect. Is that what you're saying?

A. Predefined report? Are we talking about what they're saying here?

Q. Yes. What are they saying here?

A. Okay. What they're basically saying is that on a go-forward basis -- that's what they care about. They don't care that much about what happened back in April of '19. I mean, they're saying, "Can we rely on the information we're looking at now during our due diligence," okay, which was in 2020. Okay. On a go-forward basis, Profit to generate certain detailed financial reports without any integrity. Basically that means the accounting system cannot produce detailed reports specifically as it relates to subledgers.

Q. And if KPMG thought the entire Profit database was corrupt and all of the accounting data was corrupt, would that be in here?

A. If all of the accounting data and all of the -- they're saying that the data that relates to the AR subledgers is not reliable.

Q. The AR subledger report is unreliable, correct?

A. No. I mean, normally when you're thinking about the ledgers and everything, you're not talking about this imaginary top layer of a report. You're talking about where is all the information coming from that's exactly creating the report, that you're actually seeing there because you're relying on that for those actual liabilities that you're going to have to pay that that detail is flowing up. And it's normally assumed that that is actually going to be -- the information for the subledger will pull the information accurately.
Q. How many hours have you spent in Profit?
A. Zero.
Q. How many hours have you reviewed DispatchTrack documents?
A. Well, actually a fair amount, because Mr. Fahlman cited DispatchTrack documents, the Bates stamp numbers to tie out to, you know, about half of the 159 that he actually had delivery and amounts and dates to. So we went back into those Bates stamp numbers and actually saw the DispatchTrack documents he was able to find to support his 150 -- portion of his 159.
Q. How many hours have you spent in DispatchTrack, the database?
A. The actual -- I don't know that we ever had access to that.

Q. You had access. Did you go into DispatchTrack?
A. When you say I had access --
Q. Your client had access. Did you get access to DispatchTrack?
A. Not that I'm aware of.
Q. So you didn't go into DispatchTrack and look up deliveries, correct?
A. That's true.
Q. Okay. How about DocuWare? How many hours did you spend in DocuWare?
A. None. We actually looked at what Mr. Fahlman's team did as far as Bates stamps they put on or for information they extracted, but we didn't go into DocuWare and actually try and find anything.
Q. So you spent zero hours in Profits, correct?
A. Right.
Q. Zero hours in DispatchTrack, correct?
A. Right.
Q. Zero hours looking up documents in DocuWare, correct?
A. Yes.
Q. All right. Okay. You talked about the APA and I was confused. So I want to talk about Section 1.6, the estimate, the illustrative estimate that is in the APA. So Mr. Dahlberg.
A. Yes.

Q. 1.6.
A. Okay.
Q. You were talking about this $4.6 million estimate.
A. Yes.
Q. Where did you get that from?
A. 4.6?
Q. Mm-hmm.
A. That came from the schedule that was referenced in the APA.
Q. And that schedule relates to this provision, correct?
A. I'd have to go back and look at the schedule.
Q. And we'll take a look at the schedule.
A. I thought it related more to the 1.9, but that's fine.
Q. Correct. You --
A. It related to multiple.
Q. You testified earlier as to 1.9, but I want to clean this up.
A. Okay.
Q. So 1.6, determination of estimated cash payment and closing payments, do you want -- can you read that into the record, or you can read it to yourself?
A. So this is saying the seller is going to deliver to the buyer. The customer deposit liability. Okay. So what are you asking me a question about?

Q. So what is your understanding of the determination of estimated cash payment and closing payments?
A. Is there a part of this document -- is it coming out of this, are you talking about or what?
Q. Sure. Let me focus in on the last sentence.
"An example of the calculation of the working capital provided for illustrative purposes only is attached hereto as Exhibit A and an example of the calculation of the estimated cash payment provided for illustrative purposes only is attached hereto as Exhibit B."
So let's go to Exhibit A. That is Page 80.
A. Okay.
Q. This is what you -- this is what you were talking about as the actual working capital calculation, but this is not the actual working capital. This is just an example of what's going to be used for purposes of closing and providing a cash payment to the seller at closing, correct?
A. Well, they're going to -- I don't know if there was money transferred at this point in time or they waited until they got the numbers -- the final numbers, the true-up and then used that, but this was about some kind of a true-up that was going to be made based on the working capital calculation.
Q. This is just an example. Any numbers could be in here, correct? This is just to get a payment to Ms. Choi as

of closing?
A. Well, if it's -- if it's being used to calculate out how much she needs to pay to pay off or they pay her, it's more than an example. I mean, they're actually running, based on a number to calculate.
Q. Let's see what it says. Draft for discussion purposes only subject to internal review?
A. Right.
Q. Did anyone actually crunch these numbers to make sure they were correct?
A. I don't know.
Q. But you were talking about this 4.6 million as if it was an actual working capital. It's not, correct?
A. No, I thought I was pretty clear. The 4.6 million has always been the net accounts receivable,.
Q. That's the net account receivable showing up in this example, correct?
A. It's the number they agreed on prior to the close that they were going to use until after 120 days when they did the true-up and came up with what they believe would be a more accurate number.
Q. All right. Let's talk -- so you have a lot of M&A experience, correct?
A. Mergers & acquisition. Yes.
Q. So there's a working capital target, correct?

A. Yep.
Q. And that impacts the purchase price, right?
A. Well, the target doesn't, but the target is used to something that could impact an actual calculation.
Q. Well, doesn't the target determine if there's an surplus or a deficit, which will adjust the purchase price?
A. No. Well, I mean, it's part of the calculation, but it, by itself, is not determinative.
Q. There's other components; correct?
A. That's correct.
Q. All right. So then we've got the working capital target. Here, we'll say it's 1 million 89.
A. Right.
Q. The working capital estimate is just a reasonable estimate so the buyer can pay the seller something as of close, correct?
A. Different agreements work different ways. I think that's kind of how it worked here.
Q. But no work has been done to determine any number at this point, correct?
A. That's not true. The estimate is actually -- usually, the estimates and I would assume here kind of came off the system if they thought the information in the system was reliable, the accounting system. So the estimate isn't just pulled out of thin air; right? The working capital is

a little -- the target is confusing about how that's done because a lot of times you can't actually go to a particular balance sheet and say, that's where the numbers came from. It's kind of a negotiated thing, but the estimate usually comes of -- off of the general ledger, right at the time of the close, like, right before the seller is actually going to sell the business, they pull off about the GL. And in this case, I think, they probably did this with the rest of it except for the 4.6 because they didn't think that was reliable in the accounting system for the net receivables.

Q. Well, do they calculate any of these numbers at that point? Mr. Dahlberg, this is an example for discussion purposes only. We looked at 1.6. This is only to determine the cash payment as of closing. This doesn't impact the actual working capital because that hasn't been calculated right, yes?

A. Well, accounts receivable, it's kind of along the way. The way people think about this is is that, I guess, in a perfect world because you're literally looking at what's in the general ledger, like, a couple of moments before the deal closes, that the final working capital should be pretty close to what the estimated working capital was because if it's not -- it's near the close that they do the estimated, so normally there's not a big swing between the time of the actual close and the estimated.

Q. And here, this was based on a presumption without any -- anyone looking in -- taking a deep dive into the numbers, correct?

A. I don't -- we haven't gotten into the inventory number, how they actually arrived at that, how they got to the accounts payable. I mean, the focus here in this dispute is whether or not the customer deposit liability number is right or whether it could have even been right or determined and along with whatever the actual net accounts receivable were that were netted together. That's -- the vast majority of all the evidence I heard discussed focuses on that issue.

Q. Right. And this is not the actual working capital. This $4.6 million, negative 4.6 net AR, that is not the actual working capital. This is just an estimate for purposes of closing the transaction that was included as an example in the APA, correct?

A. Well, it's an agreed-upon estimate.

Q. It's an agreed-upon estimate --

A. By DSG and by Han Nara.

Q. And can you read the top for me, the top two lines?

A. "For discussion purposes only, subject to internal review."

Q. And the next line, please?

A. "Exhibit A, example, calculation working capital."

14:02:29 Q. All right. So that Section 1.6, I was confused this morning because you were talking about the actual true-up and an estimate of negative 4.6 million.
14:02:38 This is 1.6, this is not the actual working capital, this is the -- an estimate for purposes of closing?
14:02:46 A. Right.
14:02:46 Q. All right. Now let's take a look at the actual working capital. So that is JTX-73. And Mr. Dahlberg, does the actual working capital impact the purchase price?
A. (No response.)
14:03:04 Q. In your experience in these types of disputes, does the actual working capital matter?
14:03:10 A. So normally what they do is the difference between the target and the estimate, which is what we were just looking at before, that usually results in an adjustment of the purchase price, okay, up or down, all right.
14:03:22 And then the difference between the estimate and the final working capital that was calculated in this case 120 days later, would result in another estimate, either up or down on the purchase price.
14:03:33 Q. And the working capital calculation took place 120 days -- 120 days after close, correct?
14:03:41 A. Yeah, roughly, yes.
14:03:42 Q. And you talked about Section 1.9 and that was agreed to by the parties?

A. Yes.
Q. And DSG prepared the calculation, correct?
A. For the true-up, yes, for the working capital.
Q. And you looked at this calculation, correct?
A. Yes.
Q. But you didn't look at any of the underlying reports that Justine and DSG's accounting team reviewed to analyze and come up with the working capital, correct?
A. Well, I looked at the -- the workbook, you know, the COO and then there was CO-1, CO-2, but the underlying data that fed into that, yeah, I don't know where that was.
Q. Let's look at 73a. So if you look at the workbook, here's the delivery reports, it's CO-2 AR delivered October through December.
A. Okay.
Q. Mr. Dahlberg, you didn't talk to Ms. Hudson about her calculation, did you?
A. I did not have the opportunity to speak to her. You kind of offered her up, but I didn't get a chance to talk to her.
Q. Did you talk to anyone on behalf of DSG's accounting team to understand how they did the calculation?
A. Unfortunately, I had to go with the depositions that I had. That was the best I had.
Q. And is it fair to say the only person you talked to

about accounting in this whole matter is Mr. Martinez?

A. Yeah, pretty much, because Ms. Choi doesn't really know much about accounting as it relates to the company. So yes, Martinez is the one I relied upon for that.

Q. And you didn't look at this CO-2 AR delivered tab, correct?

A. Oh, I did.

Q. And what did you find?

A. I just looked to see if things kind of looked like they made sense. In other words, the way the numbers were sort of spread and everything. I didn't have the underlying information to test anything to. You know, and I really wasn't doing that. I try to rely on Ms. Hudson. She's the controller, she's the one who's running the business, she knows what she's got to do, okay. She picks her team and tells what accounting people to do what for her. That's the way controllers run their work, right.

She knows this matters because someone's going to have to -- you know, it's going to affect the purchase price. Somebody is going to have to write a check a little bit here one way or another. So there's nothing in her deposition or nothing based on these documents that I saw that didn't made it look like it was a sincere effort on or and her team's part to come up with the best number possible based on the information they had.

Q. You relied on Ms. Hudson's deposition, correct?
A. Well, I relied on what she said to indicate what her intent was.
Q. And what did she say about these reports, were they complete?
A. I don't know that she was asked in the deposition about that.
Q. Let's take a look at her deposition, Page 126.
A. Okay.
Q. Lines 6 through 14.
"Okay. I want to talk about that. So at the time that Martinez was an employee, do you feel like he provided everything that you asked him to provide?"
"Answer: No, because we asked for a report of all deliveries made subsequent. And that's not what the report was, but at that time, we weren't aware of that."
You understand that Ms. Hudson answered this under oath, correct?
A. Yes.
Q. So the reports provided to her were not complete, correct?
A. Well, I understand that she believed -- I don't think she thought that at the time. Okay. Because, I mean, that would have been -- I don't think she would have done that.
I think she may have -- what I understand is at

some point in time later on, a couple months later, she is made aware by somebody named Darlene, who is a DSG person, that there's an allegation that some information might not have been included in those delivery reports. So I think she was using her best efforts at the time to use the best information she thought was possible, okay.

Then I think at some point in time later, a number of months later, she was told by somebody else that maybe what Mr. Martinez gave them was not right.

But then the thing that was really confusing about that is, is that if I'm the controller and I really believe there's a problem with the data, I'm going to go back and find out what it is and fix it. I'm going to have somebody else go back in and do some investigation and all right, if these delivery numbers were not right, what is the right information? And I'm going to go back and get it. Nobody did that.

Q. Isn't that what Mr. Fahlman did?

A. No.

Q. He didn't go back and look at the actual source data and all the sales transactions in Profit for the right time frame?

A. No. What he would have needed to do is he would have gotten an updated run off of what the actual deliveries were, okay, not all this hoopla he did of going into this

massive database. It would have been very simple. He would have had to go back in and tie out what these alleged missed deliveries were, find them out out of the system, probably go back into DispatchTrack or wherever he's going to do it, maybe look at DispatchTrack and Profit, and then figure out what these alleged errors were.

But nobody does that here, which kind of makes me think that Ms. Hudson is not too worried about this.

Q. Do you agree with me, though, that Ms. Hudson did not have the complete reports, correct? That's what it says in her deposition?

A. I think what she says is she found out they were -- she doesn't explain what's really wrong with them or that she really figured this out. I think she's saying she is aware now that somehow these reports were not complete.

Q. If Ms. Hudson and DSG don't stand by that calculation, do you?

A. They do stand by that calculation.

Q. Do you stand by a calculation that you did not test, that DSG doesn't stand by?

A. Do I -- I'm confused. I'm sorry.

Q. Sure. So you're saying 4.7 million is the best estimate of the customer deposit liabilities?

A. Based on the information that's available, yes.

Q. And you're saying that based on Justine Hudson's

deposition testimony, correct?

A. Yes.

Q. And Justine Hudson said she didn't have the full reports, correct?

A. Yes.

Q. So if Justine Hudson did her best job to get the actual working capital, which she believes was 4.7 million --

A. Right.

Q. -- in January of 2021, and now subsequent, then after doing the investigation, she realizes that number is not the correct number of customer deposit liabilities, then do you agree with Ms. Hudson that that number isn't correct?

A. I believe it's possible it's not correct. I believe that someone would have to actually go in and do an investigation, look into what delivery information was not included, and then if you want to, go ahead and rerun the calculation based on what alleged information was missing.

She doesn't do that. It's very weird that a controller is going to be told the information is wrong and then do nothing about it.

Q. Were you here when Ms. Darlene Goertzen testified?

A. I was not.

Q. Do you know if an investigation was made by DSG to determine the actual customer deposit liabilities?

A. Well, I know they ran some estimated calculations that were sort of -- but when you're saying "the investigation," I don't know and I haven't read anything about an actual investigation that went back in and looked at the deliveries that they got from Mr. Martinez. And then going into some other data source and saying, okay, what were the deliveries at that point in time that Mr. Martinez somehow missed, what the dollar amount is and how many they were and specifically what they were. I'm not aware of that ever happening.

Q. Have you read the plaintiff's complaint?

A. Yes.

Q. Have you read Darlene Goertzen's deposition?

A. Yeah.

Q. Do you know if an investigation was done when DSG found out there was millions of undisclosed liabilities?

A. Are you talking about that 11 million dollar number that came up within the complaint?

Q. Mr. Dahlberg, are you aware of DSG investigating if the customer deposit liability was correct?

A. They went back and started from scratch, on what I'm aware of, to come up with this $11 million -- excuse me, wave the wand, make a bunch of estimates, project a bunch of things, and then come to 11 million.

And then I'm aware Mr. Fahlman says I'm not even

hired to look at that, I don't even consider that as being relevant, I'm going to go out and do my own independent thing.

So as far as I know, DSG has even dropped any reference to that $11 million thing you're talking about.

Q. They have. Mr. Fahlman came in and did his own independent analysis, correct?

A. Yeah, and basically didn't look at anything that you're talking about for DSG. So I'm really confused if you're saying DSG became aware of some problem and then all of a sudden, they just drop it?

Q. And you didn't do any of your own testing, correct?

A. We tested Mr. Fahlman's work.

MS. ALI: I pass the witness. Thank you.

MR. ANDERSON: Your Honor, I just neglected to put in DTX-196, Mr. Dahlberg's CV. If I could move that into evidence?

THE COURT: Any objection?

MS. ALI: No objection.

THE COURT: It's admitted.

MR. ANDERSON: I'd also like to move in Mr. Dahlberg's PowerPoint presentation that we used today.

MS. ALI: Objection.

THE COURT: You mean the demonstratives?

MR. ANDERSON: Yes. The demonstratives.

THE COURT: Yes, that objection is sustained. Those are not coming into evidence.

MR. ANDERSON: Your Honor, thank you. I have no further redirect.

THE COURT: Thank you very much.

THE WITNESS: Thank you, Your Honor.

MR. ANDERSON: Our next witness will be by deposition testimony. It will be Ms. Justine Hudson.

THE COURT: Do you know how long the times are for these? We haven't made a final calculation of the time, taking into account the disputes this morning about the testimony. What do you have left and about how long is it?

MR. ANDERSON: I thought we had 47 minutes left.

THE COURT: Okay.

MR. ANDERSON: And it should be about -- about that.

THE COURT: For the depositions? Okay. All right. That's not inconsistent with what -- when you say "about that," do you mean...

MR. ANDERSON: We will go until we're done.

THE COURT: In this litigation, the power of two seems to be totally reasonable to everybody, so I want to make sure it's not an hour and a half.

MR. ANDERSON: No, we plan on going -- the times here look like they're about 42 minutes.

14:14:05 THE COURT: Okay.

14:14:06 MR. ANDERSON: We can read them in, though, so
14:14:09 it might be off a couple.

14:14:12 THE COURT: Okay. Understood.

14:14:25 Do we have counter-designations you want read in
14:14:27 at the same time?

14:14:29 MS. ALI: Yes, Your Honor.

14:14:30 MR. ANDERSON: We would be happy to read those
14:14:32 in if they would like us to.

14:14:35 THE COURT: Do you want to play it by video or
14:14:38 do you want them to read it in?

MR. McKAY: We can read it in -- we provided
14:14:48 them --

14:14:48 THE COURT: What they are? Okay. Why don't we
14:14:49 take a 10-minute break and what we need to do, is we need to
14:14:55 get -- so, the questioner and the person who is going to
14:14:58 read the answers has got a full set of what needs to get
14:15:04 read and answered just so we can do this in an orderly
14:15:07 fashion.

14:15:07 I think the record is going to be a lot clearer
14:15:10 if we hear them both at the same time. So let's take a
14:15:13 break. We'll check back in and just make sure you all are
14:15:18 on track for those.

14:15:20 COURT CLERK: All rise.

14:15:25 (A brief recess was taken.)

COURT CLERK: All rise.

THE COURT: Okay. I understand that we're ready to proceed.

MR. McKAY: Yes, Your Honor.

THE COURT: So the only thing I would ask is this: Taking Counsels' representation about how long this should take, I hope -- I hope this isn't a situation, and I have no reason to think it is, where this is two hours of deposition testimony that we were going to read real fast. I think my hope and expectation is that you were planning to shave off a little time by reading it out loud, which is fine.

The situation I don't want to be in, is that our long-suffering court reporter is trying to catch up and so if we run over by a couple minutes because we're making things clear for the court reporter, that is okay with me, as long as we are good faith thinking about how long it should take. Does that make sense to everyone?

MR. McKAY: Yes.

THE COURT: All right.

MR. ANDERSON: Just one thing, Your Honor, we were doing this -- originally, under the expectation, we would be reading it in. I don't know what the time is now.

THE COURT: I understand -- and I understand that's the case as well. Is this about, like, 90/10, half

and half, recognizing that back of the envelope calculations haven't been working out for anybody in this room. Do you have a sense?

MR. ANDERSON: Actually, I don't. Maybe Ryan has a better sense.

MR. NOSCHESE: It is about an hour and ten total.

THE COURT: Okay. And you agree that 20 minutes or 30 minutes of that is yours?

MR. NOSCHESE: Yes, Your Honor.

THE COURT: Okay, all right, sounds good.

MR. NOSCHESE: Your Honor --

THE COURT: Yes.

MR. NOSCHESE: -- the only other item that we have is that we did reserve the right to call Mr. Fahlman back.

THE COURT: Okay.

MR. NOSCHESE: And we want to maintain that and what I didn't want to do is get to a point where they've used all their time and we're calling Mr. Fahlman back and they claim that there's a prejudice by that.

THE COURT: Because they can't cross-examine him?

MR. NOSCHESE: Exactly.

THE COURT: All right.

14:50:54 MR. ANDERSON: Can I address this, Your Honor?
14:50:56 THE COURT: Well, I can see exactly how this is going to play out. So let's start with these and then we'll go from there.
14:51:01 MR. McKAY: Thank you, Your Honor.
14:51:03 Ryan McKay for defendants, reading in the deposition transcript of Justine Hudson.
14:51:10 MS. KING: And I'm Melissa King, reading for the witness.
(Deposition testimony of JUSTINE HUDSON is read into the record as follows:)
14:51:13 Q. Good morning, can you say your full name for the record.
14:51:16 A. My full legal name is Justine Diane Loxton. My maiden name is Loxton and I go by "Hudson" at work.
14:51:23 Q. And do you understand that you're giving sworn testimony under oath that can be used in a court of law?
14:51:28 A. Yes.
14:51:28 Q. Do -- you understand that you're to tell the truth today, right?
14:51:33 A. Yes.
14:51:33 Q. And when you started working -- let me ask you another question about that.
14:51:37 So what is your -- what was your title when you first started in 2020?

14:51:41 A. Corporate controller of Dufresne Spencer Group, same title I have now.
14:51:45 Q. Okay. So you started in September 2020?
14:51:48 A. Yep.
14:51:51 Q. Profit, had you had any experience with Profit when you started at DSG?
14:51:56 A. No.
14:51:56 Q. Still learning.
14:51:58 Did you look into Profit at all? Did you learn how to use that?
14:52:01 A. No.
14:52:02 Q. Did you ever get into the module and look around?
14:52:05 A. No.
14:52:06 Q. Did you ever ask Michael Martinez if he would give you access to Profit?
14:52:10 A. No.
14:52:11 Q. How come?
14:52:12 A. I did not need access.
14:52:14 Q. Why didn't you need access?
14:52:15 A. I had Michael Martinez to give me what I needed and then later, we had other people at the company get access as required. By "later," I mean, when we became aware he would be leaving the company.
14:52:29 Q. What work did you do with respect to the subledgers and liabilities?

14:52:34 A. We agreed them to the GL and I believe they agreed, materially, with the GL, the subledgers for the --
14:52:41 Q. Are you --
14:52:42 A. Sorry.
14:52:43 Q. No, go ahead.
14:52:44 A. -- for the liabilities not including customer deposits.
14:52:48 Q. Okay. I need to understand that statement a little bit further.
14:52:52 So are you aware that during the preclosing diligence phase, that Han Nara's subledger did not match its general ledger?
14:53:00 A. Yes.
14:53:00 Q. Okay. What did you do, you or your team, what did you do to reconcile the two that were not matching preclosing, what did you do to ensure that they were matching post-closing?
14:53:13 A. Well, they never matched.
14:53:15 Q. Okay. They never matched preclosing. Did they ever match post-closing?
14:53:20 A. I don't know that they match right now. I don't know.
14:53:24 Q. I'm talking about in the true-up period, are you aware that there was a 120-day true-up period?
14:53:31 A. Yes.

14:53:32 Q. The 120-day true-up period was approximately four months after close, right, approximately the end of January or early February, right?
14:53:40 A. Uh-huh.
14:53:41 Q. So I'm asking specifically about the true-up period and what was done to -- you said -- I think you used the word, "you're matching the subledger with the general ledger"?
14:53:53 A. Not for AR and customer deposits because they did not agree.
14:53:56 Q. So customer deposit liabilities and AR never agreed?
14:54:00 A. Correct.
14:54:01 Q. And we know they didn't agree post-closing, which was why the true-up period was built into the APA?
14:54:07 A. Uh-huh.
14:54:07 Q. So did you -- what did you do -- first of all, let me ask this: How far apart were those numbers? How far apart was the subledger with the general ledger preclosing when you got involved and post-closing when you got involved?
14:54:22 A. I don't remember the exact numbers.
14:54:24 Q. Were they off by millions?
14:54:27 A. Yes.
14:54:28 Q. How many millions?
14:54:29 A. I don't remember the exact number.
14:54:31 Q. Three million?

A. More.
Q. Five million?
A. More.
Q. Ten million?
A. I believe it was around that.
Q. Okay. So the general ledger and subledger were off by approximately 10 million?
A. I don't remember the exact number.
Q. Approximately?
A. Sure.
Q. Okay. So in your experience as an accountant at Ernst & Young, have you ever seen that before, where the subledger and general ledger were that far off?
A. I don't remember.
Q. You don't remember at all?
A. No.
Q. Was this something that you had seen before when you got involved with this transaction?
A. I don't remember.
MR. NOSCHESE: Objection to form.
Q. You don't remember, you don't recall ever saying, wow, this general ledger and subledger is off by 10 million, or approximately, that's different. That wasn't different. Was that normal?
A. Subledgers and GL can disagree sometimes but

14:55:30 materiality is a factor. So the dollar value depends on how big the company is so I can't really compare it to another company.

14:55:36 Q. That includes customer deposit liability. What did you do to try and reconcile the two ledgers -- subledger with the general ledger?

14:55:44 A. I wouldn't say we reconciled the two. We rebuilt a subledger by doing testing of subsequent deliveries post-acquisition.

14:55:54 Q. Was the subledger rebuilt during the 120-day period?

14:55:56 A. Yes.

14:55:57 Q. So the subledger was rebuilt during the 120-day period?

14:56:01 A. We were rebuilt to come up -- we came up with a number that we believed would be reflective of the subledger amount.

14:56:07 Q. Okay. Who came up with an amount that reflected the subledger amount?

14:56:12 A. The testing we did.

14:56:14 Q. Okay. I need to understand both of those parts of that statement?

14:56:18 A. Okay.

14:56:18 Q. So when you say "we came up with that amount," who is the "we"?

14:56:23 A. Fedeliz --

14:56:24 Q. Okay.
14:56:25 A. -- did the testing.
14:56:26 Q. Fedeliz did testing?
14:56:28 A. She prepared the workbook.
14:56:30 Q. So Fedeliz did testing.
14:56:32 So when you say that she tested, what does that
14:56:35 mean?
14:56:35 A. She received reports from Michael Martinez that he
14:56:38 ran off of Profit to reports that would show deliveries that
14:56:42 occurred since acquisition and she tied those back to see if
14:56:46 there was a customer deposit or AR related to those
14:56:50 deliveries. And we used the amount of the delivery to build
14:56:53 what we believed to be an AR and customer deposit balance.
14:56:57 Q. Okay. When you say that she received reports that
14:57:00 showed deliveries and tied them back, how did she tie them
14:57:04 back. What did she do?
14:57:05 A. If a report -- if the delivery report said that a
14:57:10 customer's order had been delivered on a particular date
14:57:13 subsequent to acquisition, we then confirmed if there was a
14:57:16 related AR customer deposit and at the opening balance sheet
14:57:22 date.
14:57:22 Q. Did she get into any specific accounts -- look at any
14:57:26 specific accounts?
14:57:27 A. What do you mean?
14:57:27 Q. Like, did she open up in Profits?

14:57:29 A. No.
14:57:30 Q. She didn't get into Profits at all?
14:57:32 A. No.
14:57:32 Q. She was just looking at reports that Michael Martinez
14:57:35 provided?
14:57:36 A. Yes.
14:57:37 Q. Okay. Let's talk about the reports that you asked
14:57:41 Michael Martinez to give you.
14:57:42 What reports did you ask Michael Martinez to
14:57:44 give you?
14:57:45 A. Reports showing deliveries that occurred subsequent
14:57:48 to acquisition date.
14:57:50 Q. Did he give these reports directly to you?
14:57:53 A. Yes. I was on the e-mail, whether I was cc'd --
14:57:57 whether I was to or cc'd, I don't know.
14:57:59 Q. I will mark Han Nar 0006815 as Exhibit Number 1. I'd
14:58:05 like to ask you about this document, Ms. Hudson. Please
14:58:08 take your time to review it and then let me know when you're
14:58:13 ready.
14:58:16 Oh, I'm sorry. Have you had a chance to review
14:58:19 that?
14:58:19 A. Yes.
14:58:19 Q. Okay. I'd like to direct your attention to the
14:58:23 e-mail that is from you to Michael Martinez dated
14:58:26 December 30th, 2020. It starts on 6817?

A. Okay.
Q. It's at the bottom of that page.
A. Uh-huh.
Q. And you say, "Hi Michael, I believe the report we require from Profits is the cash disbursement report. Are you able to provide that report as well as the two reports you mentioned in your e-mail for September 27th to 29, and can we take a look at them to ensure they are what we need?
Do you see that?
A. Yep.
Q. Does this refresh your recollection that you were asking Michael for a cash disbursements report?
A. Yeah.
Q. So preclosing, you're asking Michael for a cash disbursements report; is that right?
A. Yep.
Q. Did he send you a list of all the available reports in Profit?
A. I don't know if that's all of them.
Q. Did you ask him after he sent this e-mail if this was all of them?
A. No.
Q. No?
A. I don't remember.
Q. Don't remember.

14:59:21 So Michael Martinez responds to you and he says, "Please -- first of all, he says, "Here are the reports available, I do not show a cash disbursement. Please have your Profit expert give me direction and I will get it done."

14:59:35 Do you see that he said that?

14:59:36 A. Uh-huh.

14:59:37 Q. Did you have a Profit expert at the time for him?

14:59:39 A. No.

14:59:40 Q. There was nobody that knew Profits?

14:59:43 A. Somebody that knew Profits, I wouldn't call them an expert.

14:59:47 Q. And then Michael said, "I do have the capability of running such a report and will get it done for you."

14:59:53 Do you see that?

14:59:54 A. Yes.

14:59:54 Q. Did he get it done for you?

14:59:56 A. Yes.

14:59:57 Q. Okay. So is it your understanding that Michael provided the reports that DSG was looking for?

15:00:03 A. As it relates to this request, yes.

15:00:06 Q. Okay. What about any other request?

15:00:09 A. We did receive reports that weren't what we were looking for throughout our interactions with Michael.

15:00:14 Q. That were or --

A. Were not what we needed.
Q. Okay. When he gave you reports that were not needed or not what you were looking for, did you ask him to provide what you were looking for?
A. We asked him to provide -- so I'm referring to our request for subsequent deliveries. We did request specifically for reports showing deliveries subsequent to acquisition date.
Q. Did he provide them?
A. He provided reports that at the time we believed to be what we needed.
Q. So you can't recall whether you ever asked for a report that he didn't give you that you needed?
A. I can't recall if that ever happened.
Q. So he sent you at some point you can't recall --
A. Yeah.
Q. -- the detailed subledger of AR?
A. Yes.
Q. And you're aware that that subledger had problems, right?
A. Yes.
Q. And he also sent you a trial balance sheet?
A. Yes.
Q. Okay. And are you -- do you recall whether he sent you monthly reports reporting the AR of Han Nara?

15:01:15 A. Yes.
15:01:15 Q. So you're aware he sent you monthly AR reports?
15:01:19 A. Yes.
15:01:19 Q. So that's another report he sent you in addition to the cash disbursement report he sent you, right?
15:01:28 A. Yeah.
15:01:28 Q. And he sent you that because you asked him for those, right?
15:01:31 A. Yes.
15:01:32 Q. This is an e-mail from Michael Martinez to you dated October 23rd. We don't have the attachments here, but in the e-mail, it talks about the attachments he's providing. He's providing attachments that are titled, "AR by terms code, September 2020, delivered." That's in the attachment title. He's also including a report called "AR by terms code written. It looks like he's providing a third report called "Rents."
15:01:59 Are you aware those are reports that Michael Martinez reported to you every month?
15:02:03 A. I don't know if he sent these exact reports every month, but he did send us reporting every month to do our month-end close.
15:02:10 Q. So what were these reports used for -- that he was sending?
15:02:15 A. I don't remember exactly these ones. I expect, for

15:02:18 our opening balance sheet work based on the September date.
15:02:21 Q. For your opening balance sheet for when? Monthly
15:02:25 opening balance sheet?
15:02:26 A. Opening as at -- at acquisition date.
15:02:30 Q. Okay. So you're using these to determine the opening
15:02:33 balance sheet as of the acquisition date?
15:02:35 A. Yes.
15:02:36 Q. So how are these balanced -- how are these being used
15:02:40 to determine the opening balance?
15:02:41 A. As we discussed earlier with tying in subledgers to
15:02:46 the GL for the liabilities, not including customer deposits
15:02:49 and for rent, we had to understand the various agreements to
15:02:52 take over those under our -- that we account for leases,
15:02:57 rent payments.
15:02:57 Q. Okay? So what specifically was, maybe you said --
15:03:01 you already said this already, but I just want to be clear.
15:03:04 You said you forwarded these to Fedeliz for her review?
15:03:07 A. Uh-huh.
15:03:07 Q. What did Fedeliz do with these reports?
15:03:10 A. I don't know. Do you have -- without seeing the
15:03:14 attachments, I'm not sure specifically.
15:03:16 Q. I can find them. I will look for them at the break.
15:03:20 A. Okay.
15:03:21 Q. I'm talking now in generalities.
15:03:24 What do you believe it was Fedeliz's job to do

once you forwarded these reports to her?
A. To determine our opening balance sheet.
Q. Just explain to me how that sauce is made. She's getting reports that show deliveries made by Han Nara, she's getting reports that show accounts receivable for Han Nara by month. What is she doing with that information, to put into the opening balance sheet as of close?
MR. NOSCHESE: Objection to form.
A. I don't know what that first document is and the next two are AR, which we wouldn't have used because it wouldn't have agreed in and we had to do testing on it. And rent, I'd have to see what the document is.
Q. So for AR, you said you wouldn't have used them?
A. No. I mean, at this time, no. We would have used -- I don't know if it was that report or not without seeing it.
Q. Did you say that you wouldn't have used them because they were not reliable?
A. No.
Q. Why then? Why wouldn't you have used them?
A. At this time -- we weren't doing testing on AR at this time.
Q. You weren't -- why weren't you doing testing on AR at this time?
So Fedeliz and/or you, or both, started doing testing in December and January?

A. The testing that we ultimately used was started, I believe, in December.
Q. And describe for me, again, what it means to test. She was testing the AR, what does that mean?
A. Well, we determined the approach we would use, which would be to receive reports of the deliveries that occurred subsequent to acquisition.
Q. So you're using the reports -- the delivery reports to do that testing. What does that mean?
So they get a report saying "delivered." These are all the accounts we delivered to, all the customer, all the guests, I think it's described.
So it's the reports here there -- the report, here there are, how do you test that?
A. Well, if they're delivered we say there was a customer deposit and at the day they acquired them, and there should be.
Q. So what report are you going back to look at?
A. We were looking at the subledger, but the number we used was the number based on the delivery report. That is the number we were relying on.
Q. So you went back to the subledger after getting a delivery report?
A. We built it up using the delivery report. We built up the customer deposit that we believed the subledger

balance to be based on testing deliveries.

Q. Just so I'm clear, when you say testing customer deliveries, you have a report that says it's been delivered, right? You're getting that report. It's been delivered. I just don't understand, like, what are you doing to test that? You got a report, these have all been delivered. What's being tested?

A. That they're -- if something delivered postacquisition.

Q. Yes.

A. We would expect that if it was an open order at the time of acquisition, that there would be a customer deposit associated with it and that portion built up our customer deposit liability balance. And so we built that balance by taking all the deliveries that occurred subsequent where the sale had been written before close to build up what we believed that number to be.

Q. Okay. So that's helpful. So you're going back and you're testing the delivery with some kind of open receivables report?

A. Yes.

Q. So you said yes?

A. You know what, I don't know. I don't remember what we did to confirm that it had been -- when it had been written. I'd have to see the workbook.

Q. So you can't tell me today -- you're testing deliveries might have been an open order or some kind of report you're going back and reviewing, comparing, right?
A. Uh-huh.
Q. But you're not exactly sure what you're comparing with?
A. I don't remember the report we would have compared with.
Q. But some kind of report that shows open orders or some kind of report that showed written sales?
A. Uh-huh.
Q. And it was all preclosing written sales or preclosing written orders?
A. It would have had to be for it to be a customer deposit.
Q. It doesn't have to be preclosing, but you're going back and looking at preclosing?
A. Well, I mean, if a sale was written after we acquired and delivered after we acquired, then there wouldn't be a customer deposit as at acquisition. The customer deposit would have happened after acquisition at the time the order was made.
Q. So you're not worried about anything that's occurring afterwards?
A. Right.

15:07:53 Q. Yeah. Do you know whether Han Nara prefunded any customer sales -- whether their customers prefunded? Do you know what prefunding means?
15:08:01 A. I do.
15:08:01 Q. What does it mean?
15:08:03 A. That a finance provider funded the purchase prior to delivery.
15:08:06 Q. Do you know whether Han Nara was doing that?
15:08:09 A. I know that now.
15:08:10 Q. Did you know at the time?
15:08:12 A. I did not.
15:08:13 Q. So when this conversation was happening, October, did you know that they were prefunding?
15:08:19 A. No.
15:08:19 Q. Nobody ever told you?
15:08:21 A. No.
15:08:21 Q. Shawn Roberts never told you?
15:08:23 A. No.
15:08:24 Q. Evan Vermette never told you they were prefunding?
15:08:27 A. No.
15:08:27 Q. Would that have been important for you to know?
15:08:29 A. Yeah.
15:08:32 Q. So the way that reporting went between Michael and DSG after Michael becomes a DSG employee --
15:08:40 A. Uh-huh.

15:08:40 Q. You don't know who he's reporting to?
15:08:42 A. My understanding was he was to deal with me as his primary contact, but I can't speak to how much anyone else dealt with him without my knowledge.
15:08:53 Q. So, Ms. Hudson, we were talking earlier about Han Nara's accounts receivable and, specifically, the accounts receivable had a problem, right?
15:08:59 A. Yes. Sorry, got to say yes.
15:09:02 Q. And one of the reasons why it had a problem was because there was issues with knowing whether the customer deposit liabilities were accurate or not. Is that true?
15:09:10 A. Yes.
15:09:11 Q. And one of the exercises that you're doing post-closing is to try to verify the accuracy of the customer deposit liabilities.
15:09:19 Is that fair to say?
15:09:21 A. We were doing testing to build up what we believed the customer deposit liability to be.
15:09:26 Q. To try to get an accurate number?
15:09:28 A. Correct.
15:09:28 Q. And all of this information that was unreliable was in Han Nara's system called Profit; is that right?
15:09:35 A. Yes.
15:09:36 Q. Let's take a look at the next exhibit. First of all, let me ask you this.

Did you ask Michael -- while you were trying to build up the accounts receivable subledger, did you ask him about any specific customer accounts?
A. Not while we were building up. Prior to that we did.
Q. Okay. So let's -- that's -- let me break that down a little bit. You said not while we were building it up but prior to that. So what do you mean by that? What time frame are we talking about here?
A. So we did our testing to look at the subsequent deliveries and build up what we believed the balance to be for customer deposits in the December, January time frame. Prior to that, we did ask some questions about AR and customer deposit balances.
Q. Okay. Why were you asking about certain specific customers?
A. Because prior to the decision to do the testing, we ultimately did, which was the subsequent delivery testing. We were going to have Michael's team do work on the AR balances to -- and customer deposits, and so we wanted to try to understand kind of a little bit more about the balances and how they worked in Profit. We ended up regrouping. Time had passed.

It was November, and we decided, hey, we have the benefit of hindsight. Some time has passed. We're going to change our approach. We're going to do the

subsequent delivery testing instead.
Q. Okay. That's -- let me break that down. So the approach changed. Tell me what the original thought was, the original approach?
A. I don't know we had all the details ironed out, but as, I guess, in the earlier time frame after acquisition, Dawn had suggested to me that we get Michael's team to work through cleaning up the AR and customer deposit balances and building up the balance, and then, like I said, we regrouped and ultimately did the subsequent delivery testing.
Q. Okay. So the original approach was for Michael and his team, hey, you're now DSG employees. We want you to clean up all the customer deposit liabilities. That was the original thought and the original approach?
A. Yeah, yes.
Q. So the subsequent delivery testing was just as good or better at determining what all these customer deposit liabilities were?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. I just want to ask you about an e-mail in the context of what you just said. I'd like to mark as Exhibit Number 4 Han Nara 0008673.
When was your second approach decided? When did

you pivot from the first approach to the second approach?
A. I don't remember the exact date, but I know it was before Christmas.
Q. So the first approach involved getting in and looking at the underlying data behind the customer deposit liabilities, right?
A. Yep.
Q. So how were you going to test it? In the first approach you're going to do something more detailed, maybe?
A. Yeah. Like, I guess a full -- we were going to deploy Michael's team to get into, I guess, the details of the accounts.
Q. Would that --
A. I don't know exactly what that would have entailed because we didn't get that far down the path.
Q. You didn't know if that involved him getting into the accounts one by one and looking at specific customers?
A. Yeah. I don't know what it would have entailed.
Q. Okay. I want to show you a specific e-mail to see if this refreshes your recollection. This is marked as Exhibit Number 5, and it's a series of e-mails between you Michael and Fedeliz. And I'd like to focus on the e-mail that begins this thread, and it's at the very bottom, starts on Page 0008264. It looks to me like this thread starts with an e-mail from you to Michael, copying Fedeliz; is that

right?
A. Yes.
Q. And it is dated October 27th, 2020?
A. Yes.
Q. First of all, do you recall sending this e-mail to Michael?
A. I don't specifically recall that e-mail, but I do recall this topic and this -- what this exhibit is referencing.
Q. Let's talk about the next part of this time line. So you spent about 60 hours in the second approach working through deliveries and testing accounts receivable and customer deposit liabilities based on deliveries, right?
A. Uh-huh.
Q. And then you come up with -- you said, I think, working papers or a report to present to Evan?
A. Well, the testing was done in Excel, which we call our workbook or our working paper.
Q. Exhibit Number 6, DSG 521660. Okay. Let's look at the -- so I want to ask you questions about this e-mail from Evan sent on Friday, January 22nd, to you.
A. Uh-huh.
Q. Do you recall receiving this e-mail from Evan?
A. I do.
Q. So Exhibit 6 is now the document that's Bates Number

DSG 521660, Exhibit 7. This is right before Exhibit 6 that we just looked at. The date of it is January 13th, 2021. It's from Fedeliz to you and copying you. Exhibit 7, DSG 440266.

Question about these numbers. Did you -- is the $4,747,210.58, is that the number that you provided to Evan as a result of the second approach of looking at customer deposit deliveries?

A. I don't know if this is the final number in this e-mail that was in our workbook. I don't know if that is the exact number.

Q. So whether that was final or not, you don't know, but that number was the result of the approach looking at the deliveries?

A. I don't know if it was that exact number, but our approach would have come to a conclusion that looks like this. I just don't know if those are the exact numbers based on the date of this e-mail, and those numbers are reasonably close to what I call.

Q. In March he leaves the company, then you ask for access to Profits. Who do you ask access from?

A. I don't recall exactly how Lauren Sanchez who is the person in accounting that got access -- I don't recall who was asked or if it was me or her that asked, but I understand she got access about a month before he ended his

employment.

Q. She had access about a month before?

A. Uh-huh.

Q. And do you know whether she was speaking to him or talking to him about Profit and how it worked?

A. She knew -- she had Profit experience from a previous time, I guess. I don't recall if she spoke directly with Michael or not.

Q. The true-up has now been done?

A. Yeah.

Q. You provided you ever best efforts to come to a number about what the customer deposit liability was, correct?

A. Yes.

Q. How confident were you in that number being accurate?

A. Based on the reporting I was provided, we felt we had done sufficient procedures to determine the balance.

Q. And again, the reporting provided from --

A. From Michael.

Q. Based on all the reporting that he gave you, all the reporting that you asked for, you were confident that it was pretty accurate?

A. Based on our explanation to Michael, the testing we were performing, and the report we required or wanted to do in order to do this testing, we felt that the number we came

up with was reasonable.
Q. And is there any information that you were doing in your testing that you felt like you needed and didn't get from Michael?
A. In our testing of customer deposits and AR, if we asked for something, he gave it. Like, we asked for a report and he gave it to us, yeah.
Q. Yeah. Do you feel like Michael Martinez fulfilled his responsibilities to provide all the reporting that you asked for?
A. We asked for --
MR. NOSCHESE: Objection to form.
THE WITNESS: For the purpose of our AR and customer testing, we asked for reporting to show all deliveries made subsequent to acquisition. The report he provided did not include all deliveries. We didn't know that at the time, so I don't feel the report he gave was appropriate, but at the time, we weren't aware that it was an incomplete report.
BY MR. ^
Q. Okay. I want to talk about that. So at the time that Michael Martinez was an employee, do you feel like he provided everything that you asked him to provide?
A. No. Because we asked for a report of all deliveries made subsequent and that's not what the report was, but at

15:17:54 the time, we weren't aware of that.
15:17:55 Q. So at the time --
15:17:57 A. We thought what he was giving us was what we asked
15:18:00 for.
15:18:01 Q. You thought he was giving you everything you asked
15:18:04 for?
15:18:04 A. Yes.
15:18:04 Q. Do you feel like Michael Martinez intentionally
15:18:08 didn't provide what you were asking for?
15:18:09 A. I don't know.
15:18:10 Q. At the time you were receiving the reports, you
15:18:13 believed that he was providing accurate information from
15:18:16 Profit, correct?
15:18:17 A. That's what I would expect.
15:18:18 Q. Okay. And you didn't ask him anything that you --
15:18:22 you didn't ask him to provide anything that you needed that
15:18:25 he had. Let me rephrase.
15:18:27 There was nothing that you needed that he didn't
15:18:29 provide at the time, correct?
15:18:33 MR. NOSCHESE: Objection to form.
15:18:35 THE WITNESS: I mean, I needed a complete
15:18:37 listing and he did not provide that.
15:18:39 Q. You didn't know that at the time?
15:18:40 A. That's correct.
15:18:41 Q. Okay. Let's talk about this complete listing that

15:18:45 you believe you didn't get. So what information do you
15:18:48 believe that Michael didn't provide?
15:18:50 A. So my understanding is that the report we used in our
15:18:53 testing did not include anything that was prefunded. So if
15:18:57 there was a delivery that went out that had a customer
15:19:01 deposit but it was prefunded, it was not on that report.
15:19:04 Q. So prefunded deliveries were not included on the
15:19:07 report?
15:19:07 A. That is my understanding now.
15:19:09 Q. How did you -- so it's your understanding now?
15:19:12 A. Uh-huh.
15:19:13 Q. At what point did you come to that conclusion?
15:19:16 A. I did not come to that conclusion.
15:19:18 Q. You did not come to that conclusion?
15:19:21 A. No.
15:19:21 Q. Who came to that conclusion?
15:19:23 A. That would have been work that was done on my
15:19:26 maternity leave, led by Darlene and the conversion team.
15:19:30 Q. So Darlene and the conversion team came to the
15:19:33 conclusion?
15:19:34 A. I don't know exactly who it was, honestly. I am
15:19:37 aware now. But I was not aware of that prior to the
15:19:40 conversation -- prior to conversion.
15:19:45 Q. Okay. You keep on talking about your awareness.
15:19:48 A. Yeah.

Q. And what you were aware of. I want to know who made you aware of this. So who made you aware that the prefunding delivery report -- or sorry, that the delivery report did not include prefunded deliveries?
A. I believe it would have been Darlene told me that.
Q. Darlene told you the report did not include prefunded deliveries?
A. Yes.
Q. None? And you never even got into Profit and looked at any reports, right?
A. I never had Profit access.
Q. Okay. Because you never asked for it?
MR. NOSCHESE: Objection to form.
THE WITNESS: I don't recall if I asked for it or not.
Q. Yeah. You didn't ask for it because you didn't need it, right?
A. I relied on Michael providing the information we requested.
(Reading concluded.)
MR. McKAY: Your Honor, defendants move JTX-062, which is Exhibit 1.
MS. ALI: No objection.
THE COURT: Why don't you read the whole list if there's more than one.

15:20:49 MR. McKAY: Okay. DTX-098, which is Exhibit 4; JTX-068, which is Exhibit 5; DTX-100 to the extent it's not already admitted as Exhibit 6; and JTX-072, which is Exhibit 7.

15:21:05 MS. WILSON: Your Honor, before we move on to the next witness --

15:21:08 THE COURT: All right. We just want to make sure the record is clear.

15:21:10 We're going to admit all of those?

15:21:12 MS. ALI: Yeah, no objection, Your Honor.

15:21:13 THE COURT: Okay. All right.

15:21:13 MS. WILSON: My apologies. There were two of plaintiffs' designations that were not read towards the beginning. We would ask that they be read along with one of defendants' designations for context. And I have those numbers right here.

15:22:38 If we could, if we could read them again, Your Honor, we are fine with it not counting against their time. It's not that many lines. It's about 50 lines.

15:22:53 MR. ANDERSON: I don't understand the objection. Were these not read or --

15:22:58 MS. WILSON: Excuse me, I didn't mean to interrupt. I was reading along with the transcript, Your Honor, there were portions of what we designated that I don't believe I heard being read.

15:23:08 THE COURT: All right. Why don't you hand them up to me and show me what the portions are. I can very quickly confirm this faster than we can read all 50.

MS. WILSON: Thank you.

15:25:06 THE COURT: Okay. Page 29, Lines 17 to 36 appears verbatim in the transcript.

15:25:38 Page 30, Lines 21 to 32, 11, those appear in the transcript.

15:25:49 MS. WILSON: Okay.

15:26:34 THE COURT: I'm confident that the transcript reflects these.

15:26:38 MS. WILSON: Thank you, Your Honor.

15:26:40 THE COURT: You're welcome.

15:26:40 MR. McKAY: Thank you, Your Honor. Moving on to the deposition of Patricia Fitzgerald.

(Deposition testimony of PATRICIA FITZGERALD is read into the record as follows:)

15:26:48 Q. Can you please state your full name for the record?
15:26:50 A. Patricia Marie Fitzgerald.
15:26:52 Q. Do you understand that you're under oath?
15:26:55 A. Yes.
15:26:55 Q. Who makes the decision about when to convert?
15:26:59 A. Can I ask a clarifying question?
15:27:03 Q. Sure.
15:27:03 A. The actual day that we are going to convert the data

or the data start, the whole conversion process?
Q. Let's talk about both of them.
So first of all, who makes the decision about when to start the process?
A. The executive team, though I get direction from Chad or Andrew or the business. Andrew Covington, he is the president of retail.
Q. Is there anybody else on the Executive team?
A. The executive team of DSG?
Q. You said the executive team makes the decision about when to convert.
A. The executive team of DSG.
Q. Of DSG?
A. Yes. No, I would consider those are the two individuals that I get direction from of when to start conversions.
Q. Working back just a little bit in the time frame of the Han Nara transaction and conversion, what was your title?
A. Director of strategic realization office.
Q. So, director of strategic realization office?
A. SRO, we called it SRO.
Q. Explain to me all of your responsibilities.
A. As director of the SRO, I was responsible for all the standard operating procedures for the organization. I was

responsible for any large -- leading any large-scale projects, responsible for taking vision and executing it as part of change management activities. I did all the conversions, led all the conversions for both Canada and the U.S.

Q. Okay. So let's talk about just conversions in general.

A. Uh-huh.

Q. How many have you been a part of?

A. 21.

Q. What is your -- what platform, what point-of-sale system are you typically converting to STORIS?

A. So HOMES/Profit is the number 1 because almost all our conversions have been Ashley stores and that is the platform that the majority of licensees use.

Q. 14 Profit conversions. And do you recall -- let me just ask this. Some of the conversions, I mean, are bigger projects than others?

A. Yes.

Q. In these 21 conversions that you've been involved in, how soon after the acquisition does that kick-off meeting typically occur?

A. We have done it the day of acquisition, up to seven, eight months, nine months after acquisition.

Q. So March 5th was when you --

15:29:26 A. Had the kick-off meeting.
15:29:28 Q. So the only person from the original team that was on the conversion or doing anything on the conversion was Deserea?
15:29:34 A. Deserea, but again, at that point, one of the things we do is we say please identify who the people we need on the teams, the actual--
15:29:44 Q. Uh-huh.
15:29:44 A. -- people doing the work. And so Deserea would have been a subject matter expert. Johnny Martinez would have been identified as a subject matter expert. Lelani Moe is another one that would have been identified as an expert. Edgar would have been identified as the retail sales expert but he was replaced with an existing DSG person after Ray left. And then Jeremy, the DC manager -- I'm sorry can't remember -- Jeremy Bradley.
15:30:14 Q. What does DC manager mean?
15:30:16 A. Distribution manager in DC.
15:30:20 Q. Thank you. Do you recall Johnny Martinez's subject matter expertise?
15:30:24 A. What do you mean by do I recall his expertise?
15:30:28 Q. You said he was a subject matter expert, I think.
15:30:31 A. Yep.
15:30:32 Q. What was he the subject matter expert in?
15:30:35 A. Would have been accounting, financial or finance.

15:30:38 Q. So accounting and finance?
15:30:40 A. Yes.
15:30:41 Q. What about Lelani Moe?
15:30:44 A. Lelani Moe would have been store operations, front desk, to give you the context.
15:30:51 Q. Okay. Because you've done so many Profit conversions, did you have anybody on your team at DSG that had a lot of expertise in Profit?
15:30:58 A. No.
15:30:59 Q. Okay. So there's nobody at DSG that can manage Profit from beginning to end?
15:31:04 A. No.
15:31:05 Q. That expertise doesn't exist at DSG?
15:31:09 A. No. We utilize the expertise within the licensees. We did have somebody that kept -- that we kept on from a later acquisition who was a Profit expert. They have since left the organization.
15:31:20 Q. Can you say that one more time? I'm writing slower than you're talking.
15:31:24 A. That's all right. There's two types of orders in Profits. STORIS doesn't matter. There's an open order, which means the guest has said I want to buy this product, and may or may not have given us money for that. Could be a partial payment on an order, right. So those ones are top priority because a guest is still dependent on us for

15:31:45 something. And so we do those and then we make sure that any money that they've given us has been applied to those orders.

15:31:53 All right. For a delivered order, you purchased it and it was delivered a month before conversion. That's considered an invoiced order. There's no reconciliation because we would never deliver a product, hopefully, that hasn't been paid in full.

15:32:06 So we just import that history on here's the sales order, here's the customer, here's the delivery date, and that it was delivered on --

15:32:16 Q. So that is the important, that delivery information is important, if it's a conversion, it's imported from Profit to STORIS?

15:32:27 A. Yes.

15:32:27 Q. For five years?

15:32:28 A. Five prior.

15:32:30 Q. Going back five years?

15:32:31 A. Yes.

15:32:32 Q. So did that happen for Han Nara?

15:32:34 A. Yes.

15:32:34 Q. So --

15:32:36 A. For deliver- -- for invoiced orders, it did, not for open orders. We only reported the open order book for any order that was written October 1st, 2020, or later or to

15:32:50 conversion date.
15:32:50 Q. Okay. So for open items, where you're matching up
15:32:53 sales and payment information, did they -- that was selected
15:32:56 to import starting October 1st, 2020, is that -- was that
15:33:00 typical?
15:33:01 A. No.
15:33:02 Q. How come?
15:33:04 A. The reason we made that decision is because we could
15:33:07 not accurately match the sales orders to the deposits.
15:33:10 Q. Had that ever happened in your experience before?
15:33:12 A. No.
15:33:13 Q. Did anybody ever explain why that was at Han Nara to
15:33:19 you?
15:33:19 A. No.
15:33:20 Q. Did you ever hear after the fact of what the reason
15:33:24 why was?
15:33:25 A. No.
15:33:26 Q. So no one ever told you it was because of a
15:33:29 ransomware attack at Han Nara?
15:33:30 A. No.
15:33:31 Q. Never heard that?
15:33:31 A. I knew that they had had a ransomware attack.
15:33:35 Q. And?
15:33:36 A. But that -- your question was: Did anybody ever say
15:33:39 that was the reason? No.

Q. How did you hear there was a ransomware attack?
A. As part of the IT/IS component, I believe they were notified. So as part of the action plan, would have been, we are sure -- are we sure that it's secure? So normal security protocol.
Q. So as far as ransomware, you had to make sure that the IT and the database wouldn't be corrupted as a result of the importing of the data?
A. Correct.
Q. Okay. So what kind of -- that, obviously had to have been a huge problem, when you can't match orders and deposits, so why October 1st, 2020, why did you select that date?
A. That was the date that we acquired.
Q. And is that the date you felt like you had a -- fairly accurate information?
A. No. That was a decision made by Mike Linton.
Q. I want to show you a few documents.
Let's mark as Exhibit 1, DSG 0343544.
(Reporter clarification.)
MR. McKAY: Exhibit 1, DSG 0343544.
Q. (Reading.)
So this is an e-mail to you from Andrew Covington dated June 7th, 2021. The subject matter is: "West Texas."

Do you recall writing this e-mail to Andrew Covington?
A. No, but I obviously did.
Q. After having reviewed it, does it refresh your recollection?
A. Yeah, it does.
Q. What are you -- what's the purpose of this e-mail?
A. The purpose of this e-mail is to advise the retail leader that this is a decision that is going to be made and we need their blessing as well.
Q. So what's the decision that needs to be made?
A. The decision that needs to be made is only importing orders from acquisition date but ultimately, I'm looking to get feedback from them and it's Mike that makes the final decision.
Q. So this point, A, here, when it says only imported orders from acquisition date, had Mike Linton already made the decision by the time you sent this?
A. Mike Linton was already part of discussions at that -- at this time.
Q. So at this point in time, do you recall if that was set in stone, you're only importing orders from acquisition date?
A. I do not recall the exact date that Mike Linton said "X, this is the date." I do recall that Mike Linton made

15:36:03 the decision.
15:36:04 Q. Here, just focusing here on point A, they have over 16,000 open sales orders dated prior to acquisition?
15:36:12 A. Uh-huh.
15:36:13 Q. So is that an abnormally large number of open sales orders?
15:36:18 A. Extremely.
15:36:18 Q. Have you ever seen such a large order of sales?
15:36:22 A. Open sales orders prior to date of acquisition for this number of stores, no.
15:36:28 Q. And to put it bluntly, as you say up above, that was because the data was a "complete mess"?
15:36:34 A. Correct.
15:36:35 Q. Okay. So for the open sales orders that were dated prior to acquisition, those were just -- there's 16,000 of them. They were not just imported, they were left out?
15:36:48 A. Those 16,000 were not imported.
15:36:51 Q. Okay. What does it mean by, "will still result." So you're talking about the open orders after October 1st, in part C here, right?
15:37:01 A. Correct.
15:37:01 Q. So what do you mean by, "it's still going to result in order cancellation of over $2.4 million?
15:37:09 A. Open orders, we review each one of them for validity, whether there's payment on them, if there's errors or if

15:37:17 they should have been canceled; and out of those orders, we
15:37:20 would still need to cancel a total number of $2.4 million
15:37:24 worth of sales orders that we considered were open sales
15:37:28 orders.
15:37:28 Q. So how did you determine that dollar amount?
15:37:31 A. Because the store operations team goes through every
15:37:34 single open order and tries to match up to the point of --
15:37:38 they'll even call the customer and say, "Are you still
15:37:40 waiting for your product?"
15:37:42 Q. Have you ever heard of the concept of prefunding?
15:37:46 A. I know the term prefunding, yeah.
15:37:48 Q. What is prefunding?
15:37:50 A. Prefunding is when you request the money from a --
15:37:53 where you tell the finance lender that we have delivered the
15:37:56 product to the guest and therefore, they need to give us
15:37:59 money, because we've delivered the product to the guest.
15:38:02 Prefunding is when you do it before you've
15:38:04 delivered the product to the guest.
15:38:06 Q. So prefunding is when you tell the finance company to
15:38:09 provide payment before delivery?
15:38:12 A. Prefunding is when you tell the finance company that
15:38:15 you delivered the product before you've actually done it, to
15:38:18 request the money.
15:38:20 Q. Okay. Did you ever hear that Han Nara was engaging
15:38:23 in the practice of prefunding that didn't match that

definition?
A. So, we were advised that they were prefunding orders as part of their standard operating procedures of getting ready for delivery and we stopped that practice since we found out.
Q. Right. So did anybody ever tell you, though, that Han Nara was engaged in a practice where they were reaching out to the finance provider before delivery to accept payment?
A. We -- during our review of current state, we found out that part of their practice was to send in the request for funding days before the product was delivered. We weren't told that. We found that out when we started asking questions.
Q. So you just did some investigation?
A. No, we do current state. We go through every single procedure. How do you schedule an order, how do you -- what's your workflow for delivery process, what's your hiring process, what's your training process, what's your financial process, what's your AR process? We go through all of those.
Q. Right. So you're going through those processes, you're doing investigations of open orders and at some point in this investigation and going through this process, you come to understand Han Nara is engaged in the practice of

prefunding. Is that what you said?

MR. NOSCHESE: Objection to form.

You can answer.

THE WITNESS: We found out they were prefunding, yeah.

Q. So nobody told you, prior to your investigation and prior to looking into these open orders, that Han Nara was engaged in the practice of prefunding?

A. No.

COUNSEL: I'd like to mark as Exhibit 2, DSG205170.

Q. I'm looking at the e-mail from James Jensen to you dated June 17th, 2021. First question is: Who is James Jensen?

A. James Jensen is the -- I don't know his exact title. He is our STORIS subject matter expert within the organization.

Q. So he attached, I guess -- he attached this slide. So I guess before I get to your e-mail, we can look at the slide he attached. It's -- this page is DSG205171. That talks about the west Texas conversion, that's Han Nara, correct?

A. Correct.

Q. And scheduled for July 17 or 18, and then he says, "source data is crap." He used a fairly strong word but it

looks like you told him to "tone down a little bit." Again, I think we talked about this earlier, about why the data was bad and it was because you couldn't match open sales orders with payments and invoices and that kind of thing; is that right?

A. I believe my exact words were, "they matched the sales orders, open sales orders to the payments that can be applied to the account."

Q. The next exhibit I'd like to mark is Exhibit Number 3. It looks like my printer cut off the Bates number.

Does it say on yours --

No. Yours is cut off too. This mark -- this is actually marked as an exhibit in Ms. Goertzen's deposition as well. Exhibit Number 3, e-mail is dated June 30th, 2021.

Q. I'd like to direct your attention, when you get a chance, to the bottom e-mail of the first page. It's an e-mail from you dated June 30th. Let me know when you've had a chance to review it.

Ready?

A. Uh-huh, yes.

Q. So your e-mail on the bottom of this first page of Exhibit 3 is to Justine Hudson and Evan Vermette, copying Mike Linton and Darlene Goertzen. You're updating them about a new issue.

What is the new issue that you found?

15:42:19 A. That some of the delivered orders still looked like they had a balance owing prior to October 1st.

15:42:25 Q. So orders delivered after October 1st?

15:42:28 A. Before October 1st.

15:42:30 Q. Orders delivered before October 1st still have a balance?

15:42:33 A. But they were marked as invoiced.

15:42:37 Q. When you say "marked as invoiced," what does that mean?

15:42:41 A. So that when you have an order in Profit or you have an order, you have to apply the payment to the order.

15:42:49 Q. Uh-huh.

15:42:50 A. For those delivered orders -- that delivered history, it says that we have a sales order that was delivered to the guest but the guest still owed us money.

15:42:59 Q. And these were all sales made prior to October 1st and deliveries that occurred prior to October 1st.

15:43:05 Why is this a new issue because I thought the decision was made to cut it all off after October 1st?

15:43:13 A. Open orders, October 1st. Delivered orders, five years of history.

15:43:18 Q. So all of those delivered orders, going back five years, that is in STORIS now or it will be. It will be when it goes live?

15:43:28 A. Correct.

Q. So your new issue is that you're inputting five years worth of orders into STORIS and you know they've been delivered, but you don't know if you've received payment for them; is that right?
A. I am not 100% accurate on that or sure of that, so no. I don't know.
Q. Don't know.
So just explain for me, then, what the issue is that you're focusing on for them?
A. The issue that we were focusing on is that there may be some data that is missing from our import. The people that will find that out is generally service because these individuals did get their product but we may or may not have put all the information into STORIS or chose not to import that series of orders and we do that because we had a process to look up information in Profit.
Q. Okay. This is not -- so when we're talking about orders here in your first bullet point, we're not talking about open orders?
A. Correct.
Q. Okay. So I can explain -- so I can understand, can you explain, again, what the orders in your first bullet point are referring to if they're not referring to open orders?
A. They are referring to delivered orders.

Q. But the first bullet point refers to orders that were delivered?
A. I don't know. My e-mail clearly does not say delivered or invoiced.
Q. So sitting here right now, you can't remember what your first bullet point is referred to?
A. Correct.
Q. What about the second bullet point, you say "Our first attempt was to go back, but clean it up so that we knew if it was delivered prior to conversion."
But did that -- did that happen? You talk about it as our first intent, so maybe it didn't happen.
Do you know whether that happened?
A. I do not know.
Q. You say in your third bullet point, "this has now become a cluster doo-doo."
What do you mean by that?
A. A mess, a problem.
Q. You say in this concluding paragraph too, you say, "Most of the" -- first of all, you say you're "100% of the belief the data will never be correct."
That was your belief at the time?
A. That was my belief at the time, based on the information that I was given.
Q. And then you talk about the managers and store ops

15:46:00 team, are those the managers and store ops teams of -- you're talking about of Han Nara, of each individual store?
15:46:08 A. Correct.
15:46:09 Q. And you're saying that they barely know how to operate Profit because of their newness and that's -- is that why they didn't have any knowledge of Profit, because they're all new?
15:46:21 A. I cannot say why they did not -- I don't know why they didn't have knowledge of Profit. I just knew that they were very new.
15:46:30 Q. For the record, Exhibit 6 is marked DSG 037951. It's an e-mail from Pat Fitzgerald to DSG EMT, dated August 10th, 2021. I'm not going to focus on the back page, so...
15:46:49 Okay. So this looks like it's your final update; is that correct?
15:46:55 A. Yes.
15:46:56 Q. I'm sorry. Ms. Fitzgerald, I just have a few follow-up questions.
15:47:00 You talked about -- we talked about how there was a cut off date for open orders as of October 1st, correct?
15:47:08 A. Correct.
15:47:09 Q. Sure. Did you ever have a cut off date for open orders in prior conversions?
15:47:16 A. No.

Q. This was unique?
A. Yes.
Q. Yeah. I think that exhibit said that there was approximately 3,000 orders that were converted over that had open orders that had some issues for their investigation for -- right?
A. I do not understand the question because you are talking about two different things.
(Reading concluded.)
MR. McKAY: And defendants' move DTX-066, which is Exhibit 1. DTX-067, which is Exhibit 2. JTX-085, which is Exhibit 3.
MR. NOSCHESE: No objection.
THE COURT: All right. They're admitted.
(DTX Exhibit Nos. 066 and 067 were admitted into evidence.)
(JTX Exhibit No. 085 was admitted into evidence.)
MR. McKAY: Moving onto Chad Spencer's deposition.
Deposition testimony of CHAD SPENCER was read into the record as follows:)
Q. Can you please state your full name for the record?
A. Chadwick Arwin Spencer.
Q. And you understand that you just took an oath, right?

A. I do.
Q. And you're here to tell the truth to the best of your ability today?
A. Yep. Yes, sir.
Q. So what's your current position at DSG?
A. CEO.
Q. Who else is on DSG's board?
A. Todd Wanek, Ron Wanek, Cameron Wanek, Mark Dufresne.
Q. How long has the Wanek family had a controlling interest in DSG?
A. I don't know the exact date, but 2017.
Q. You mentioned manufacturer, are the Waneks a manufacturer?
A. Yes.
Q. And what manufacturer are they associated with?
A. Ashley.
Q. Are there any companies that own and operate more Ashley Homestores than DSG in the United States?
A. Only Todd.
Q. And what -- so what do you mean by "only Todd"?
A. Todd has his own. He owns his own stores. I have nothing to do with Enterprise stores and they're the largest. I would be the second largest.
Q. So were all of the 15 to 17 mergers or acquisitions, did they involve a purchase or acquisition of a business

15:49:37 that was running an Ashley Homestore?
15:49:40 A. Yes.
15:49:40 Q. So you would say DSG is roughly twice as big as its
15:49:46 next licensee in the Ashley Homestores portfolio?
15:49:49 A. Yes.
15:49:49 Q. What are DSG's sales, roughly, for 2022?
15:49:53 A. 1.1 billion.
15:49:55 Q. And for each potential acquisition deal, you would
15:50:00 get a one-sheeter document?
15:50:07 A. Yes. Yeah, it's -- think of an Excel that, you know,
15:50:11 has a couple lines on it so you can just see the macros of
15:50:16 the deal dynamics, yeah.
15:50:18 Q. Who prepares those?
15:50:19 A. Evan Vermette or somebody on Evan's team, but Evan
15:50:24 presents it to me.
15:50:25 Q. So once you found out that Han Nara might be
15:50:28 interested in selling, and this was a potential opportunity
15:50:31 for DSG, what was -- what was your level of interest in this
15:50:35 opportunity?
15:50:35 A. Really good. I was interested.
15:50:38 Q. Did the -- so Han Nara, to my understanding, was kind
15:50:42 of focused in West Texas and I think one store in
15:50:46 New Mexico?
15:50:46 A. That's correct. I mean, there's synergies too.
15:50:51 We're there already, so...

Q. So did you present the Han Nara opportunity to the DSG board?
A. At some point, yes.
Q. And what's your recollection of how that was received by the DSG board?
A. Great. Move forward.
Q. So when DSG was evaluating the opportunity to acquire Han Nara, was it your impression that Han Nara was a profitable enterprise?
A. Yes.
Q. And what was that based on?
A. The data I'm assume -- well, the data that Aggie gave Evan that Evan gave me.
Q. In your eyes at that time, Han Nara was an attractive potential target for an acquisition?
A. Yeah. Yeah.
Q. And so you said geography was one aspect that was attractive from a target?
A. Yeah. I remember Aggie -- Aggie was super proud of her business, you know. I remember Aggie as she should, brag about, you know, the work she's done there. And so she told us, you know, it was a great, healthy business doing really well. So, yeah.
But, yeah, geography, synergies. And, yeah, I think Aggie's comments around her business and how good it

has done.

I also recall at markets she would get awards from time to time on sales performance. So I knew in order to do that, you got to be doing something right.

Q. In terms of presenting the Han Nara opportunity to the DSG board for its approval to complete the acquisition, you didn't factor in review of the KPMG reports?

A. I do know this was not used.

Q. Did the Ashley Homestores that DSG operates have difficulty obtaining product from Ashley Furniture during the course of the summer of 2020?

A. Oh, yeah. For sure.

Q. All right. I'm going to hand you what I'm going to mark as Exhibit Number 2, which is a three-page document, it's printed on double-sided, e-mail. The beginning Bates number DSG 423009.

A. Okay.

Q. All right. I'll give you a second to look at that.

All right. So this appears to me to be a -- an e-mail chain involving you and the top e-mail is between you and Mr. Wanek.

Do you see that?

A. Yes, uh-huh. Yeah. And then Evan to me. And then I'm assuming -- yep. I think I'm good.

Q. So do you recognize this document?

A. I recognize the e-mail and I recognize this is an e-mail that I sent.
Q. Was that your understanding that that was about the nature of the deal to acquire Han Nara, it was an acquisition, would be around $11 million?
A. You know, so when I look at this and I'm -- I'm -- the things that as a CEO that I look for when Evan starts talk is his lingo --
Q. Uh-huh.
A. -- working cap, goodwill, tax stuff, like I'm out. At the end of the day, when I was reading this thing, the things that draw me in with him almost three million discount from the original offer, that sounds like good news to me. Yeah. Huge win, right.
And so with the 11 million, I can't -- I don't know. At the time, obviously, I thought when I wrote this that that means we're getting the deal for around there. Could be good. I don't know what happened post this e-mail or before leading up to it, but I know that obviously I was excited that Aggie, at some point, agreed to something, it sounds like. That Evan had negotiated and done his job is what it seems like to me.
Q. So if in that moment in time, you understood that this deal was for around $11 million, that would accurately reflect your understanding at that point in time?

A. That's correct.
Q. So you're relying on Mr. Vermette's analysis?
A. That's correct.
Q. You're relying on accurate information from Mr. Vermette here because you need accurate information to make good decisions for the company, right?
A. That's correct. I mean, I can tell you this, with any type of conversion, it's just not something you play with. So doing it really quickly only is just a nightmare. It does damage. There will be training. Salespeople entering orders when you come in and knowing how to do that from one system to the other and how inventory is looked up and all that stuff.
It's very complicated, and so you just don't want to jack with sales. That's what we're always trying to make sure we don't mess up. We don't want to hurt Aggie in any way or the people there. We need those employees to stay there. So we -- there's a lot of conversation around that, and so my job in the end is to make the best decision of when to start. But very -- I would say five months seems to be -- I would say it's probably the median on all of our acquisitions. It would be very close to that.
Q. I've handed you what's been marked as Exhibit 4 to your deposition, which is a four-page e-mail chain beginning Bates number DSG 521660. And let me know when you're ready

to?
A. I'm ready.
Q. Okay. So this last section of his e-mail, that's red text here, it says, for Linton and Chad?
A. Yeah.
Q. Are you taking that as for Mike Linton and you, your information?
A. Yeah, uh-huh.
Q. So I guess my first question is, does this meet your recollection that the deal as originally negotiated with Aggie Choi was a 3X multiple deal?
A. I honestly don't recall. Reading this right here, I trust Evan that he knew what he was talking about.
Q. Do you know what Mr. Vermette was referring to when he talks about changes coming to that region?
A. There's two ways we look at acquisitions in the organization, a closing multiple and then a post-close multiple. And post-close multiples are typically measured about two years in. I kind of look for it for two years in, like what did I really buy for. Because of synergies, so if you think about things I said earlier, like if Aggie tells us -- I'm going to use this example.
I used the term earlier SPG. So if Aggie says, hey, I run 400 SPG in my stores, and we run 500 SPG in our stores, I know that if she's tracking and she tells us she's

tracking the same way we are, that I have a hundred dollars. If I can get her stores to be a good -- be as good as my stores, I would have a hundred dollars for every guest walks in that store optimization point. Probably going to take me two years to get it but if that's the case and the changes that we would put in and build the culture the way we do it, because, frankly, there's nobody better in sales culture than us, it could be if I looked at her Synchrony deal, Tempur-Pedic deal, anything that I've ever been able to negotiate better because I'm bigger and the synergies of that, I would say that it becomes a post-close where we can ultimately do it.

So we measure. Hey, at the time of transaction, it's a three times, 3X. Hey, if we can, Chad, if you can do what you think we can do everywhere else, hey, Chad I'm telling you this might be a 2X by the time you get through implementing culture and all of your changes. And so that's what I believe he would be referring to. 2X is about the post-close average. I think 2X -- if I look at all 15 acquisitions, and you would do a two-year post-close, 2X is about where we end up. We might buy 3 to 4, and we end up about a 2, which is about average.

Q. So sitting here today, I mean, you can't even ballpark for me what the multiple was on the post-close multiple of this deal was?

A. No. Whether it was with a 2 or 2.4 or 2.7, I can't tell you.
Q. Did DSG get a good deal on Han Nara?
A. You know what, I still don't know. I think we'll find out after all of this.
Q. Do you think the lawsuit makes a difference of whether it was a good deal?
A. From everything I understand, yes.
Q. Would -- I mean, would DSG have sued Aggie Choi and Han Nara if it had gotten a good deal?
A. If we believed Aggie Choi was stealing from us, yes, we would have sued Aggie Choi. No matter if it was good, bad or indifferent, it's money.
Q. Do you believe that Aggie Choi was stealing from you?
A. Yes.
Q. What's that based on?
A. My team.
Q. Specifically who?
A. Evan Vermette.
Q. So how is it that you understand Aggie Choi was stealing from you?
A. From what I understand, it was fraud related to undisclosed liabilities particularly in customer deposits.
Q. Do you have an understanding of the agreement between the parties and the Asset Purchase Agreement that there were

up to $5.1 million in customer deposit liabilities?
A. I'm not aware.
Q. But if the -- if the Asset Purchase Agreement says that, you have no reason to dispute that, right?
A. Only if what -- only if she gave us the information to put in the Asset Purchase Agreement, that would be the dispute.
Q. Has anyone ever told you that the ransomware attack that affected Han Nara affected Han Nara's ability to determine customer deposit liabilities?
A. I do not recall.
Q. Mr. --
A. I don't believe so.
Q. Mr. Spencer, are you familiar with the concept of prefunding?
A. Related to finance?
Q. Uh-huh.
A. Yep, sure I am.
Q. What's your understanding of that?
A. Don't do it.
Q. So if you had known that Han Nara was engaged in the practice of prefunding, that would raise a red flag during the diligence for this deal, wouldn't it?
A. If I had known in the pre -- if you were doing due diligence and you knew that they were prefunding, would that

16:01:17 raise a red flag to me? If they were in financial instability, then it would definitely be a red flag. In other words, if they were almost delinquent, then if their balance sheet was good and their assets were good, then you know, it's something that we could correct. So it wouldn't be a deal killer, if that's what you're asking. I wouldn't do the transaction if I knew she was doing it.

But at the end of the day, we would correct it once it's ours. We would work to correct it for sure.

Q. Who would have been the people at DSG who would have been likely to uncover that information during the due diligence period?

A. It would be Evan and his team.

Q. Has there ever been a time when DSG was engaged in the practice of prefunding?

A. Yes, I do believe so in the early, early days.

Q. And what were the circumstances?

A. Ignorance.

Q. You had no idea, no expectation that Mr. Vermette would, once he found out that Han Nara was engaged in the practice of prefunding, actually figure out what percent of their sales were involved in prefunding?

A. I would have an expectation if it's material he brings it to me.

Q. How would he figure out if it's material?

A. That's up to Evan. You can ask him.
Q. Entirely his discretion?
A. Yeah, uh-huh.
Q. Have you seen evidence that Mr. Vermette was, in fact, aware that Han Nara was engaged in the practice of prefunding prior to the close of this transaction?
A. I don't believe so.
Q. Marked as Exhibit 5 to your deposition, bearing Bates number DSG 776710. And I'll represent to you it was produced by your counsel the evening before Evan Vermette's deposition?
A. Okay. I'm good.
Q. Have you seen this e-mail chain before?
A. I have not.
Q. I mean, does this raise any questions for you?
A. No. I kind of -- it just ties in with what I was saying.
Q. Which is what?
A. The materiality, knowing that we're transitioning and also knowing that Comerica is never going to go into our queue. So the materiality of the transition and the focus of it would be immaterial.
Q. You mean Comenity?
A. Sorry, yes, butchered that.
Q. You said before you had no recollection of Evan

Vermette telling you before the close of the Han Nara deal that Han Nara was engaged in the practice of prefunding, correct?
A. That's correct.
Q. But as is shown here, Mr. Vermette was aware that Han Nara was engaged in the practice of prefunding, right?
A. Uh-huh, seems so.
Q. And it's your expectation that if prefunding was material to the deal, Mr. Vermette would have told you that, correct?
A. Yes, or illegal.
Q. Yeah. That's why the question I said, you know, you're relying on Mr. Vermette to form the belief about materiality or legality, correct?
A. I'm relying on Evan Vermette to -- say that last part again.
Q. To form the beliefs regarding materiality or legality?
A. As it pertains to the transaction and whether a deal should be done or not, yes.
Q. And you're relying on Mr. Vermette to bring to your attention anything that is material or illegal?
A. Yes. He didn't do that here.
Q. Well, prior to the -- based on Exhibit 5, at least Mr. Roberts and Mr. Vermette were aware prior to the close

of the transaction that Han Nara was engaged in the practice of prefunding, right?
A. It would seem so.
Q. If the people responsible at DSG were doing financial due diligence into Han Nara and wanted more time, they could have asked for it, correct?
A. Yes.
Q. You mentioned before, you know, a forensic accounting process. If DSG had wanted to perform a forensic accounting process on Han Nara during the due diligence period, it could have done so, couldn't it?
A. Sure.
Q. It chose not to, correct?
A. It would seem so.
Q. Okay. And it says, "The following slides are in what we're presenting," and so the pages, 2 and 3 here, so 2, PowerPoint slides.
Do you see those?
A. Yeah. On the next page?
Q. Yeah.
A. Uh-huh, I see them. Uh-huh.
Q. Are these -- are these familiar to you? Have you seen these slides before?
A. No, I have not.
Q. So did they -- did the conversion team not present

you with slides like this in a meeting on June 17 of 2021?
A. I don't remember. I don't think so, but I don't remember.
Q. Okay. Do you know -- so in the comments from Pat Fitzgerald in her e-mail to James Jensen, she said that it seemed like the entire conversion is going to be horrific?
A. Where are you at? Sorry. Are you on the --
Q. The first, back on the first page, yeah. Yeah. So Pat Fitzgerald's e-mail to Mr. Jensen?
A. Okay. I got you. I'm sorry. I'm following now.
Q. In the third line there, she says, "And it sounds like the entire conversion's going to be horrific. It would be painful, but not horrific."
A. Uh-huh.
Q. Do you have any recollection of the conversion process in terms of how it compared to other conversions that DSG had undertaken for acquisitions?
A. The -- I, the only thing I do recall is who Pat Fitzgerald is, and I've never gotten a -- this is going to be a, you know, birthday cake and rainbows and anything. So she is a -- I wouldn't say the sky is falling, but she definitely -- this feels like every acquisition possibly that I have done.
Q. So nothing sticks out to you from your recollection of the conversion of the Han Nara stores in terms of it

being worse than or more difficult than other conversations?
A. Every one of them is painful, she says, but not horrific, you know. Okay. Maybe I can think of a horrific one, I don't know, but I just go -- all of them are pretty painful for everybody involved.
Q. So sitting here today, you can't describe a lie that Aggie Choi made to you?
A. Made to me specifically, no.
Q. Beyond Evan Vermette, are there any other names of people that you are aware, or believed, that Aggie Choi lied to them?
A. No.
Q. So if Aggie Choi says one thing and Evan Vermette says the opposite thing, you side with Evan Vermette?
A. Yes.
Q. Did Aggie Choi represent anything to you prior to the acquisition of Han Nara that you believe wasn't true?
A. Not that I'm aware of.
Q. So here we are about a week before the October 1, 2020, close of the Han Nara acquisition. You believed at that time that this was a good deal for DSG?
A. Yeah. Based on information I was reading, yeah.
Q. And in -- pull back out Exhibit No. 4.
A. Okay.
Q. All right. So this is January of 2021.

A. Okay.
Q. At the --
A. Yeah.
Q. Conclusion of the true-up period?
A. Yeah.
Q. Mr. Vermette was -- you look on the second page there?
A. Yep.
Q. Where he -- at this point in time when calculating the true-up payment due to Ms. Choi, you still believed this was a good deal for DSG, right?
A. Yep. Seemed to. I wouldn't have gone through it.
Q. So at what point in time -- well, at this point in time, do you think that the Han Nara acquisition was a good deal for DSG?
A. Yes.
Q. Okay. And so that is dependent on whether or not you make a recovery from this lawsuit?
A. In this transaction, from what I understand, the violation being put in here is substantial. It's not -- it's immaterial. Of what was disclosed and undisclosed. So I would just tell you that we will survive and we will be fine.
But it -- but I love the people of West Texas. I love the stores we got. I love the team members we got.

16:09:57 And we're -- you know, enjoying bringing them as part of our closure and trying to continue to improve it and grow it. So I'm not -- you know, I'm not unhappy, I'm not, you know, elated, I'm -- they're part of the family now and we treat them as such.

16:10:13 Q. If Evan Vermette didn't investigate how much prefunding Han Nara was engaged in, in terms of its total business, does that change your opinion?

16:10:24 A. I trust Evan --

16:10:25 Q. So it entirely is --

16:10:27 A. -- implicitly.

16:10:29 Q. Entirely Evan Vermette's judgment to decide whether to investigate how much of a target the business was connected with the process of prefunding?

16:10:34 A. It would be, yep.

16:10:36 Q. Do you know whether Evan Vermette did any investigation whatsoever into how much of Han Nara's business was the result of prefunding?

16:10:44 A. I do not know that.

16:10:46 Q. Do you know whether Shawn Roberts did any investigation whatsoever into how much of Han Nara's business was the result of prefunding?

16:10:53 A. I do not know.

16:10:55 Q. If Evan Vermette did no investigation whatsoever into how much of Han Nara's business was the result of

16:11:03 prefunding, are you fine with that?
16:11:04 A. I would trust that he would believe that it to be
16:11:08 immaterial to the transaction, knowing that we have -- we're
16:11:12 going to put our systems in place and we're going to do DSG
16:11:16 business like we always do.
16:11:17 Q. If Shawn Roberts did no investigation whatsoever into
16:11:21 how much of Han Nara's business was the result of
16:11:23 prefunding, are you fine with that?
16:11:25 A. Prior to the transaction, yeah. Materiality, same
16:11:30 thing.
16:11:31 Q. Would you say that the period of time spanning March
16:11:33 of 2020, when that KPMG report that we looked at was issued
16:11:38 in July of 2021, with the conversion of the Han Nara stores
16:11:43 from Profit to STORIS accounting system was a unique period
16:11:47 in the history of the furniture industry?
16:11:50 A. March 2020 through July, the pandemic was unique for
16:11:54 the world, yes.
16:11:55 Q. It was a unique challenge for the logistics of the
16:11:59 furniture industry in particular, right?
16:12:01 A. Sure, sure.
16:12:02 Q. People were stuck at home, right?
16:12:04 A. Oh, yeah.
16:12:05 Q. Wearing out their furniture?
16:12:07 A. Yeah. That's right. Hopefully getting new one --
16:12:10 getting new.

16:12:11 Q. And but they couldn't get it?
16:12:14 A. I mean, they got it, it just took longer.
16:12:17 Q. Do you believe that you're putting DSG's profits before Aggie Choi as a person?
16:12:23 A. No.
16:12:24 Q. Why not?
16:12:24 A. I'm just not. It has nothing to do with DSG's profits and has everything to do with right and wrong.
16:12:32 Q. Based on Evan Vermette and what he told you?
16:12:34 A. Correct.
16:12:35 Q. All right. So you have Exhibit 5 in front of you, Mr. Spencer?
16:12:39 A. I do.
16:12:40 Q. Do you have any reason to doubt the authenticity of Exhibit 5?
16:12:43 A. No.
16:12:44 Q. Did Shawn Roberts tell Evan Vermette on September 28th, 2020, that Aggie was engaged in prefunding financing?
16:12:56 A. He did not. I do not read that.
16:13:01 Q. And same question for Mr. Roberts. You don't know what, if any, further investigation Mr. Roberts actually did with this information?
16:13:10 A. That's correct.
16:13:12 Q. Despite the fact that Mr. Roberts indicated that he said he will verify the rest?

A. That's correct.
Q. You don't know whether he did?
A. That's correct. I do not know whether he did or not.
Q. And you don't care?
A. That would be a mischaracterization.
Q. I thought you said it didn't matter?
A. No, I said it's -- I trust my people to validate the materiality of it. What I do know is that we are going to be going on our systems and our queue, as I explained, at some point. And so whatever liability is happening would be a very short window of it that would create.

So I just go -- I would trust them to tell me what the materiality of it would be, if there is a concern. But I'm not aware as to research of what they did afterwards. Doesn't mean I don't care, it just means I would trust them to validate the materiality.

(Reading concluded.)

THE COURT: All right. Thank you.

Do we have exhibits?

MR. McKAY: Yes, Your Honor. Defendants move DTX-144, which is Exhibit 2; DTX-100, which is Exhibit 4; and JTX-059 which is Exhibit 5.

THE COURT: Any objections?

MR. NOSCHESE: No objection, Your Honor.

(DTX Exhibit Nos. 144 and 100 were admitted into

evidence.)

(JTX Exhibit No. 059 was admitted into evidence.)

THE COURT: Okay. The only thing I would ask with respect to these depositions is that when we get any corrections to the transcript that the parties meet and confer, and if there are things that need to be changed, that everybody work together to make sure that they propose joint corrections to these. Okay?

MR. McKAY: Yes, Your Honor.

THE COURT: Okay.

You may step down.

MS. ALI: Your Honor, plaintiffs' call Mr. Fahlman.

THE COURT: Okay. Do you need to say anything for the record before we do that?

Mr. Fahlman, why don't you have a seat for just a minute.

MR. ANDERSON: So Your Honor, we designated or we moved to admit Mr. Martinez as an expert just for Profits. What he's about to testify about is not Profits. It's just Excel spreadsheets from Profits, apparently.

So what that exhibit we put up with Mr. Martinez was, it wasn't Profits. It was just somebody's observation, Mr. Martinez's observation of an Excel spreadsheet. So we

don't believe that there's any rebuttal that's necessary.

THE COURT: All right. Okay. Thank you very much.

MS. ALI: Your Honor, I'm going to keep it very short. He's going to speak to the four slides in Mr. Martinez's PowerPoint that relate to his report.

THE COURT: Understood.

MS. ALI: That was not disclosed previously.

May I call Mr. Fahlman?

THE COURT: Yes.

Mr. Fahlman, I'll remind you you're still under oath.

THE WITNESS: Okay.

BY MS. ALI:

Q. Welcome back, Mr. Fahlman. Just a few questions.

You were here this morning when Mr. Martinez testified regarding four entries in your Schedule 2 in your report?

A. I think it's five, but yes.

Q. Okay. Can you tell me his criticism and what your understanding of his criticism was?

A. Sure. So the first two had to deal with somebody taking some small items out of the store, which we talked about. I've made those adjustments in my numbers. It's been extrapolated consistent with generally accepted

practices in statistics. So we're good on those two.

The next two, he showed where there was a spreadsheet that had a different number.

Q. Is it this one?

A. It's going to be the third item.

Q. Okay.

A. Go to the next document. It's going to be the next item. I think this was the second.

Yes, so see the $4,085.99? That's highlighted in green on the table. And he's got the tax there. And if you go to the next document, he's highlighting that the DispatchTrack only shows the 3,696 and he's suggesting that that means the table is incorrect.

But he's incorrect, because what is not in there is the tax. So DispatchTrack is not tracking the tax and is also not tracking what's called Purple Cow. Purple Cow is insurance for the extended warranty. And under generally accepted accounting principles, you would recognize the deferred revenue for Purple Cow when you deliver it.

And so that's not being shown in that document. So while he's correct, the numbers are different, but what it's missing is the proper accounting that they should be different.

Q. And the next example?

A. The next one, we looked into that last night and in the notes, there was a free TV or some kind of TV bonus that was given away as part of this package deal. And so the amount is intentionally different because they still have the obligation to deliver the TV. So that's the difference in that one.

Q. Mr. Fahlman, do you have any changes to the numbers in your report?

A. No.

Q. Mr. Fahlman, did you determine the customer deposit liability with certainty?

A. Yes, with reasonable certainty.

Q. With reasonable certainty. Do you have any changes to the 9.2 million dollar number that you have offered?

A. No.

Q. Mr. Fahlman, do you have any changes to the Comenity prefunded number that you have presented?

A. No.

Q. Did you determine that with reasonable certainty?

A. Yes.

MS. ALI: No further questions. Thank you.

THE COURT: Any cross-examination?

MR. ANDERSON: No, Your Honor.

THE COURT: All right.

Thank you, sir. You may step down.

16:19:15 MR. NOSCHESE: Your Honor, plaintiffs rest and close.

16:19:18 THE COURT: All right. Thank you very much.

16:19:21 MR. ANDERSON: Defendants and counter-claimants rest and close.

16:19:23 THE COURT: All right. Well, this will conclude the trial. We finished a little bit early and I appreciate that. I found this trial to be very interesting and I enjoyed presiding over it. I was impressed with the familiarity of both sides, Counsel, with what was a really difficult subject matter. And not all of us on our team are accountants, but we appreciated the testimony from the experts, which really broke it down for us.

16:20:04 And so I think we have a good idea about what happened here. So we'll look forward to getting the post-trial briefing from the parties.

16:20:14 Just because we went through the trial doesn't mean we can't still settle this. So I'd encourage the parties to sleep on it and think about whether or not they want to get it resolved.

16:20:26 But otherwise, we'll expect a proposal or competing proposals from the parties before the end of the week, just setting forth what you think the post-trial briefing should be. I'd like to get it done sooner, rather than later, while it is still fresh in my mind since we've

16:20:48 got many, many, many more trials before the end of the year.

16:20:53 So it would be helpful to us if we didn't spend 16:20:57 six months briefing it.

16:21:01 Does anybody have any questions?

16:21:05 MR. ANDERSON: No, Your Honor. Thank you.

16:21:07 MR. NOSCHESE: No, Your Honor.

16:21:08 THE COURT: All right. Enjoy your afternoon 16:21:11 everybody. We'll be adjourned.

16:21:16 COURT CLERK: All rise.

16:21:17 (Court adjourned at 4:21 p.m.)

---------------------------------

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.

/s/ Stacy M. Ingram, RPR
Official Court Reporter
U.S. District Court